James Kaste (Wyo. Bar No. 6-3244)
Deputy Attorney General
Travis Jordan (Wyo. Bar No. 7-5721)
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
james.kaste@wyo.gov
travis.jordan@wyo.gov

*Attorneys for Petitioner State of Wyoming*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| STATE OF WYOMING,<br><br>           Petitioner,<br><br>    v.<br><br>THE UNITED STATES DEPARTMENT OF INTERIOR; DEBRA ANNE HAALAND, in her official capacity as Secretary of Interior; THE BUREAU OF LAND MANAGEMENT; NADA CULVER, in her official capacity as acting Director of the Bureau of Land Management; and KIM LIEBHAUSER, in her official capacity as the acting Wyoming State Bureau of Land Management Director,<br><br>           Respondents. | Civil No.: 21-cv-56-J<br><br>**MEMORANDUM IN SUPPORT OF WYOMING'S MOTION FOR PRELIMINARY INJUNCTION** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 2

    A.    Federal Land Policy and Management Act................................. 2

    B.    Mineral Leasing Act .................................................................. 4

    C.    National Environmental Policy Act ........................................... 6

    D.    The Secretary's Action ............................................................... 7

    E.    Federal Oil and Gas Leasing Revenue in Wyoming................................ 10

ARGUMENT ....................................................................................................... 12

    I.    Wyoming has Article III standing.................................................. 12

    II.    The Secretary's suspension of federal oil and gas leasing is a final agency action................................................................................ 13

    III.    Wyoming is entitled to a preliminary injunction ................................. 18

    A.    Standard for granting preliminary injunction ........................... 18

    B.    Wyoming has a substantial likelihood to succeed on the merits ............. 19

        1.    The Secretary's withdrawal of all federal land from oil and gas leasing violates FLPMA ........................................ 20

        2.    The Secretary violated FLPMA by unlawfully amending existing RMPs.................................................................. 22

        3.    The Secretary violated the MLA by failing to conduct quarterly lease sales .................................................... 23

        4.    The Secretary's action was arbitrary and capricious .................. 25

        5.    The Secretary's action violated NEPA ........................................ 27

            a.    The Secretary's action is a major federal action that requires an environmental impact statement.................... 28

b.      The Secretary did not consider the environmental impact of suspending federal oil and gas leasing on non-Federal lands ............................................................ 30

c.      The Secretary did not consider the impacts of suspending federal oil and gas leasing on the human environment ...................................................... 33

d.      The Secretary did not provide notice and an opportunity for comment before suspending federal oil and gas lease sales ....................................... 36

C.      Wyoming will suffer irreparable harm if the Court does not grant a preliminary injunction ............................................................ 37

D.      The balance of equities and public interest favors Wyoming ................... 43

1.      The risk of uninformed decision-making outweighs the inconvenience to the Secretary's agenda for federal land management ................................................................. 43

2.      The public interest is served by ensuring the Secretary complies with federal law ............................................ 45

CONCLUSION ............................................................................................ 49

# TABLE OF AUTHORITIES

**Cases**

*All. for Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011)............................................................................ 47

*Amoco Prod. Co. v. Vill. of Gambell,*
   480 U.S. 531 (1987)................................................................................... 41, 45

*Bennett v. Spear,*
   520 U.S. 154 (1997) .................................................................................. 13, 15

*Biodiversity Conservation All. v. U.S. Forest Serv.,*
   No. 2:11-CV-226, 2012 WL 3264523 (D. Wyo. July 27, 2012) (unpublished) .................... 35

*Blum v. Caldwell,*
   446 U.S. 1311 (1980) ......................................................................................... 43

*Brady Campaign to Prevent Gun Violence v. Salazar,*
   612 F. Supp. 2d (D.D.C. 2009) ......................................................................... 42

*California ex rel. Lockyer v. U.S. Dep't of Agric.,*
   459 F. Supp. 2d 874 (N.D. Cal. 2006) ........................................................... 28, 44

*Catron Cty. Bd. of Comm'rs, N.M. v. U.S. Fish & Wildlife Serv.,*
   75 F.3d 1429 (10th Cir. 1996)................................................................. 17, 37, 43

*CBM Geosolutions v. Gas Sensing Tech. Corp.,*
   215 P.3d 1054 (Wyo. 2009) ............................................................................... 38

*Ciba-Geigy Corp. v. EPA,*
   801 F.2d 430 (D.C. Cir. 1986) ........................................................................... 14

*Citizens for Clean Energy v. U.S. Dep't of Interior,*
   384 F. Supp. 3d 1264 (D. Mont. 2019) ........................................................ 17, 29

*City of Albuquerque v. U.S. Dep't of Interior,*
   379 F.3d 901 (10th Cir. 2004)........................................................................... 16

*Colo. Envtl. Coal. v. Dombeck,*
   185 F.3d 1162 (10th Cir. 1999)......................................................................... 33

*Colo. Farm Bureau Fed'n v. U.S. Forest Serv.,*
   220 F.3d 1171 (10th Cir. 2000)......................................................................... 13

*Colo. Wild v. U.S. Forest Serv.*,
    523 F. Supp. 2d 1213 (D. Colo. 2007) ................................................................... 45

*Comm. for Auto Responsibility v. Solomon*,
    603 F.2d 992 (D.C. Cir. 1979) ........................................................................... 29

*Comm. To Save the Rio Hondo v. Lucero*,
    102 F.3d 445 (10th Cir. 1996) ........................................................................... 13

*Cont'l Air Lines v. Civil Aeronautics Bd.*,
    522 F.2d 107 (D.C. Cir. 1974) ........................................................................... 13

*Coquina Oil Corp. v. Transwestern Pipeline Co.*,
    825 F.2d 1461 (10th Cir. 1987) ......................................................................... 18

*Crowe & Dunlevy, P.C., v. Stidham*,
    640 F.3d 1140 (10th Cir. 2011) ......................................................................... 39

*Ctr. for Biological Diversity v. Bernhardt*,
    982 F.3d 723 (9th Cir. 2020) ............................................................................. 33

*Ctr. for Biological Diversity v. Kempthorne*,
    588 F.3d 701 (9th Cir. 2009) ............................................................................. 29

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
    563 F.3d 466 (D.C. Cir. 2009) ........................................................................... 13

*Ctr. for Native Ecosystems v. Cables*,
    509 F.3d 1310 (10th Cir. 2007) ......................................................................... 14

*Cty. of Los Alamos v. U.S. Dep't of Energy*,
    No. 1:05-CV-1343, 2006 WL 1308305 (D.N.M. Jan. 13, 2006) (unpublished) .................... 45

*Custer Cty. Action Ass'n v. Garvey*,
    256 F.3d 1024 (10th Cir. 2001) ......................................................................... 31

*Davis v. Mineta*,
    302 F.3d 1104 (10th Cir. 2002) ..................................................................... 37, 41

*Davis v. Morton*,
    469 F.2d 593 (10th Cir. 1972) ........................................................................... 29

*Dillmon v. Nat'l Transp. Safety Bd.*,
    588 F.3d 1085 (D.C. Cir. 2009) ......................................................................... 27

*Diné Citizens Against Ruining Our Env't v. Jewell*,
    839 F.3d 1276 (10th Cir. 2016) ................................................................... 37

*DTC Energy Grp. v. Hirschfeld*,
    912 F.3d 1263 (10th Cir. 2018) ................................................................... 18

*Encino Motorcars, LLC v. Navarro*,
    --- U.S. ---, 136 S. Ct. 2117 (2016) ............................................................ 26

*Envtl. Def. Fund v. Tenn. Valley Auth.*,
    468 F.2d 1164 (6th Cir. 1972) ..................................................................... 48

*FCC v. Fox Television Stations*,
    556 U.S. 502 (2009) ............................................................................... 26, 27

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ..................................................................................... 27

*Forest Guardians v. Babbitt*,
    174 F.3d 1178 (10th Cir. 1999) ............................................................. 24, 25

*Forest Guardians v. U.S. Fish & Wildlife Serv.*,
    611 F.3d 692 (10th Cir. 2010) ..................................................................... 36

*Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv.*,
    397 F. Supp. 2d 1241 (D. Mont. 2005) ...................................................... 17

*Fund for Animals v. Espy*,
    814 F. Supp. 142 (D.D.C. 1993) ................................................................. 45

*Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*,
    698 F.3d 1295 (10th Cir. 2012) ................................................................... 18

*Gonzales v. O Centro Espirita Beneficiente Uniao Do Vegetal*,
    546 U.S. 418 (2006) ..................................................................................... 18

*Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*,
    283 F. Supp. 2d 1249 (D.N.M. 2003) ......................................................... 14

*High Country Conservation Advocates v. U.S. Forest Serv.*,
    52 F. Supp. 3d 1174 (D. Colo. 2014) .......................................................... 35

*High Country Conservation Advocates v. U.S. Forest Serv.*,
    951 F.3d 1217 (10th Cir. 2020) ................................................................... 28

*Idaho ex rel. Kempthorne v. U.S. Forest Serv.*,
 142 F. Supp. 2d 1248 (D. Idaho 2001)............................................................................. 28, 30

*Int'l Snowmobile Mfrs. Ass'n v. Norton*,
 304 F. Supp. 2d 1278 (D. Wyo. 2004) ..................................................................................... 47

*Int'l Snowmobile Mfrs. Ass'n v. Norton*,
 340 F. Supp. 2d 1249 (D. Wyo. 2004) ..................................................................................... 36

*Klamath Siskiyou Wildlands Ctr. v. Boody*,
 468 F.3d 549 (9th Cir. 2006) ......................................................................................... 2, 23

*Kleppe v. Sierra Club*,
 427 U.S. 390 (1976) ................................................................................................... 28, 29, 33

*Lane v. Pena*,
 518 U.S. 187 (1996) ................................................................................................................. 39

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) ................................................................................................................. 42

*Marathon Oil Co. v. Lujan*,
 937 F.2d 498 (10th Cir. 1991)........................................................................................... 17, 25

*Massachusetts v. EPA*,
 549 U.S. 497 (2007) ................................................................................................................. 12

*Modesto Irrigation Dist. v. Gutierrez*,
 619 F.3d 1024 (9th Cir. 2010) ................................................................................................. 27

*Mont. Wildlife Fed'n v. Bernhardt*,
 No. 4:18-CV-00069, 2020 WL 2615631 (D. Mont. May 22, 2020)......................................... 23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29, 41 (1983)............................................................................................................. 27

*Mountain States Legal Found. v. Andrus*,
 499 F. Supp. 383 (D. Wyo. 1980) ............................................................................... 20, 21, 22

*Mountain States Legal Found. v. Hodel*,
 668 F. Supp. 1466 (D. Wyo. 1987) ................................................................................... 21, 22

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
 545 U.S. 967 (2005) ................................................................................................................. 26

*Nat'l Mining Ass'n v. Zinke,*
    877 F.3d 845 (9th Cir. 2017) ............................................................................. 3, 4

*Nat'l Parks & Conservation Ass'n v. FAA,*
    998 F.2d 1523 (10th Cir. 1993) ............................................................................ 35

*Nat. Res. Def. Council v. EPA,*
    643 F.3d 311 (D.C. Cir. 2011) .............................................................................. 15

*Nat. Res. Def. Council v. U.S. Forest Serv.,*
    421 F.3d 797 (9th Cir. 2005) ................................................................................ 31

*Nat. Res. Def. Council v. Wheeler,*
    955 F.3d 68 (D.C. Cir. 2020) ................................................................................ 14

*Nat'l Wildlife Fed'n v. Burford,*
    676 F. Supp. 271 (D.D.C. 1985) ........................................................................... 47

*New Mexico ex rel. Richardson v. BLM,*
    565 F.3d 683 (10th Cir. 2009) ................................................................. 3, 6, 29, 36

*New Mexico v. Watkins,*
    969 F.2d 1122 (D.C. Cir. 1992) ............................................................................ 22

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ......................................................................... 3, 5, 16, 17, 22, 23

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,*
    389 F.3d 973 (10th Cir. 2004) ................................................................... 18, 19, 43

*Olenhouse v. Commodity Credit Corp.,*
    42 F.3d 1560 (10th Cir. 1994) .............................................................................. 19

*Pac. Legal Found. v. Watt,*
    529 F. Supp. 982 (D. Mont. 1981) ........................................................................ 21

*Petrella v. Brownback,*
    697 F.3d 1285 (10th Cir. 2012) ............................................................................ 12

*Provo River Coal. v. Pena,*
    925 F. Supp. 1518 (D. Utah 1996) ........................................................................ 46

*Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.,*
    740 F.2d 21 (D.C. Cir. 1984) ................................................................................ 17

*Quest Corp. v. FCC*,
    689 F.3d 1214 (10th Cir. 2012)..................................................................26

*R.I.L.-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ............................................................14

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) .....................................................................................7

*RoDa Drilling Co. v. Siegal*,
    552 F.3d 1203 (10th Cir. 2009)..................................................................18

*Rounds v. U.S. Forest Serv.*,
    301 F. Supp. 2d 1287 (D. Wyo. 2004) .......................................................17

*S. Fork Band of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
    588 F.3d 718 (9th Cir. 2009)......................................................................46

*S. Utah Wilderness All. v. BLM*,
    425 F.3d 735 (10th Cir. 2005)....................................................................20

*Save Strawberry Canyon v. Dep't of Energy*,
    613 F. Supp. 2d 1177 (N.D. Cal. 2009) .....................................................42

*Schrier v. Univ. of Colo.*,
    427 F.3d 1253 (10th Cir. 2005)..................................................................18

*Seattle Audubon Soc'y v. Evans*,
    771 F. Supp. 1081 (W.D. Wash. 1991) .....................................................45

*Seattle Audubon Soc'y v. Evans*,
    952 F.2d 297 (9th Cir.1991) .......................................................................45

*Sierra Club v. Bostick*,
    539 F. App'x 885 (10th Cir. 2013)..............................................................37

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007)....................................................................46

*Sierra Club v. Marsh*,
    872 F.2d 497 (1st Cir. 1989) ......................................................................44

*Sierra Club v. Morton*,
    514 F.2d 856 (D.C. Cir. 1975) ...................................................................28

*Sierra Club v. Peterson,*
   717 F.2d 1409 (D.C. Cir. 1983) ............................................................ 29

*Sierra Club v. U.S. Dep't of Energy,*
   287 F.3d 1256 (10th Cir. 2002) ............................................................ 12

*Sw. Airlines v. FERC,*
   926 F.3d 851 (D.C. Cir. 2019) ........................................................ 25, 26

*Sportsmen's Wildlife Def. Fund v. U.S. Dep't of Interior,*
   949 F. Supp. 1510 (D. Colo. 1996) ...................................................... 34

*United States v. Monsanto,*
   491 U.S. 600 (1989) ............................................................................ 24

*United States v. Nixon,*
   418 U.S. 683 (1974) ............................................................................ 27

*United States ex rel. McLennan v. Wilbur,*
   283 U.S. 414 (1931) .............................................................................. 2

*Univ. of Tex. v. Camenisch,*
   451 U.S. 390 (1981) ............................................................................ 18

*Utah Ass'n of Ctys. v. Bush,*
   316 F. Supp. 2d 1172 (D. Utah 2004) ................................................. 16

*Utah Shared Access All. v. Carpenter,*
   463 F.3d 1125 (10th Cir. 2006) .............................................................. 5

*Utah Shared Access All. v. U.S. Forest Serv.,*
   288 F.3d 1205 (10th Cir. 2002) .............................................................. 7

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n,*
   259 F.2d 921 (D.C. Cir. 1958) ............................................................ 45

*Venetian Casino Resort LLC v. EEOC,*
   530 F.3d 925 (D.C. Cir. 2008) ............................................................ 14

*W. Energy All. v. Jewell,*
   No. 1:16-cv-912, 2017 WL 3600740 (D.N.M. Jan. 13, 2017) (unpublished) ........................ 24

*W. Energy All. v. Zinke,*
   877 F.3d 1157 (10th Cir. 2017) ...................................................... 5, 23

*W. Watersheds Project v. Bennett*,
  392 F. Supp. 2d 1217 (D. Idaho 2005) .................................................................. 23

*W. Watersheds Project v. Bernhardt*,
  391 F. Supp. 3d 1002 (D. Ore. 2019) ..................................................................... 46

*W. Watersheds Project v. BLM*,
  629 F. Supp. 2d 951 (D. Ariz. 2009) ...................................................................... 16

*W. Watersheds Project v. Zinke*,
  336 F. Supp. 3d 1204 (D. Idaho 2018) ................................................................... 46

*W. Watersheds Project v. Zinke*,
  441 F. Supp. 3d 1042 (D. Idaho 2020) ................................................................... 15

*WildEarth Guardians v. Bernhardt*,
  No. 1:19-cv-00505-RB-SCY, 2020 WL 6799068 (D.N.M. Nov. 19, 2020) ......................... 29

*WildEarth Guardians v. Conner*,
  920 F.3d 1245 (10th Cir. 2019) ............................................................................... 6

*WildEarth Guardians v. U.S. Fish & Wildlife Serv.*,
  784 F.3d 677 (10th Cir. 2015) ............................................................................... 15

*WildEarth Guardians v. Zinke*,
  368 F. Supp. 3d 41 (D.D.C. 2019) ................................................................... 29, 46

*Wilderness Soc'y v. U.S. Forest Serv.*,
  850 F. Supp. 2d 1144 (D. Idaho 2012) ................................................................... 16

*Wilderness Workshop v. BLM*,
  No. 1:08-CV-462, 2008 WL 1946818 (D. Colo. Apr. 30, 2008) (unpublished) .................... 48

*Wyo. Outdoor Council v. U.S. Army Corps. of Eng'rs*,
  351 F. Supp. 2d 1232 (D. Wyo. 2005) .................................................................... 31

*Wyoming v. U.S. Dep't of Agric.*,
  277 F. Supp. 2d 1197 (D. Wyo. 2003) .................................................................... 45

*Wyoming v. U.S. Dep't of Agric.*,
  414 F.3d 1207 (10th Cir. 2005) ............................................................................. 45

*Wyoming v. U.S. Dep't of Agric.*,
  661 F.3d 1209 (10th Cir. 2011) ............................................................................... 6

**Statutes**

5 U.S.C. § 551 ................................................................................................................ 16

5 U.S.C. § 702 ................................................................................................................ 39

5 U.S.C. § 705 ................................................................................................................ 18

5 U.S.C. § 706 ........................................................................................................... 16, 23

30 U.S.C. § 21a .............................................................................................................. 48

30 U.S.C. §§ 181-287 .................................................................................................... 2, 4

30 U.S.C. § 191 ........................................................................................... 10, 11, 12, 38, 48

30 U.S.C. § 226 ..................................................................................... 4, 5, 15, 16, 19, 23, 24

30 U.S.C. § 1701 ............................................................................................................ 48

42 U.S.C. § 4331 ............................................................................................................ 44

42 U.S.C. § 4332 ................................................................................................. 3, 6, 7, 28, 31

43 U.S.C. § 1701 ............................................................................................................ 20

43 U.S.C. § 1702 ......................................................................................................... 4, 21

43 U.S.C. § 1712 .......................................................................................................... 3, 5

43 U.S.C. § 1714 ........................................................................................... 2, 3, 4, 20, 21, 22

43 U.S.C. § 1732 ......................................................................................................... 3, 22

43 U.S.C. § 1739 ............................................................................................................ 44

54 U.S.C. 200301 through 200310 .................................................................................. 34

54 U.S.C. § 200302 ........................................................................................................ 34

54 U.S.C. § 200304 ........................................................................................................ 34

Federal Land Policy and Management Act of 1976, Pub. L. 94-579, 90 Stat. 2743 (1976) .......... 3

Federal Onshore Oil and Gas Leasing Reform Act, Pub. L. No. 100-203, 101 Stat. 1330
    (1987) ................................................................................................................... 2, 24

Wyo. Stat. Ann. § 9-4-601 ....................................................................................... 11, 38

Wyo. Stat. Ann. § 30-5-102 ................................................................................. 39

Wyo. Stat. Ann. § 39-13-102 ............................................................................... 11

Wyo. Stat. Ann. § 39-14-203 ............................................................................... 11

Wyo. Stat. Ann. § 39-14-204 ............................................................................... 11

 **Rules**

Fed. R. Civ. P. 65 ............................................................................................... 18

**Regulations**

40 C.F.R. § 1500.1 ............................................................................................. 36

40 C.F.R. Part 1502 ............................................................................................... 6

40 C.F.R. § 1502.1 ................................................................................................. 7

40 C.F.R. § 1502.9 ................................................................................................. 7

40 C.F.R. § 1502.14 ............................................................................................... 7

40 C.F.R. § 1503.1 ................................................................................................. 7

40 C.F.R. § 1503.4 ................................................................................................. 7

40 C.F.R. § 1508.1 ........................................................................................... 6, 28

43 C.F.R. § 46.30 ................................................................................................. 31

43 C.F.R. § 46.225 ............................................................................................... 36

43 C.F.R. § 46.230 ............................................................................................... 36

43 C.F.R. § 46.305 ............................................................................................... 36

43 C.F.R. § 46.435 ........................................................................................... 7, 36

43 C.F.R. § 1508.1 ............................................................................................... 33

43 C.F.R. Part 1600 ............................................................................................... 5

43 C.F.R. § 1601.0-6 ........................................................................................ 5, 30

43 C.F.R. §§ 1610.1-1610.8 .................................................................................. 3

43 C.F.R. § 1610.1 ..................................................................................... 3

43 C.F.R. § 1610.2 ..................................................................................... 5

43 C.F.R. § 1610.5-3 ........................................................................... 3, 5, 22

43 C.F.R. § 3100.0-3 .................................................................................. 4

43 C.F.R. Subpart 3120 .............................................................................. 5

43 C.F.R. § 3120.1-1 .................................................................................. 5

43 C.F.R. § 3120.1-2 ................................................................... 4, 15, 17, 24

43 C.F.R. § 3162.3-1 .................................................................................. 5

Gulf of Mexico, Outer Continental Shelf, Oil and Gas Lease Sale 257, 86 Fed. Reg.
   10132 (Feb. 18, 2021) ........................................................................... 9

Withdrawal of the Public Review Period for Cook Inlet Lease Sale, 86 Fed. Reg. 10994
   (Feb. 23, 2021) ...................................................................................... 9

**Other Authorities**

11A Charles Alan Wright, Arthur R. Miller, *Federal Practice & Procedure* § 2944 (3d
   ed.), Westlaw (database updated Apr. 2021) .......................................... 38

Ben Cahill, *Biden Makes Sweeping Changes to Oil and Gas Policy* (Center for Strategic
   & International Studies (Jan. 28, 2021)) ............................................... 31

BLM Manual 3120 (2013) .................................................................. 4, 5, 24

Executive Order 14008, Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg.
   7619 (Feb. 1, 2021) ....................................................... 1, 7, 15, 20, 43

George Cameron Coggins, *The Developing Law of Land Use Planning on the Federal
   Lands*, 61 U. Colo. L. Rev. 307 (1990) ................................................. 3

H.R. Rep. No. 100-378, pt. 1 (Oct. 15, 1987) ........................................... 24

Jennifer A. Dlouhy & Ari Natter, *Biden Poised to Freeze Oil and Coal Leasing on
   Federal Land* (Bloomberg Green (Jan. 21, 2021)) ............................. 31, 32

Legislation to reform the Federal Onshore Oil and Gas Leasing Program: Hearing on H.R. 933
   and H.R. 2851 Before the H. Comm. on Interior and Insular Affairs, S. Comm. on Mining
   and Nat. Res., 100th Cong. (July 28, 1987) [Serial No. 100-11] ............... 24

Marc Humphries, *U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas*, R42432, (Cong. Research Serv. 2018)..................................................... 25

Memorandum from Laura Daniel-Davis, Principal Deputy Assistant Secretary – Land and Minerals Management, to Bureau Directors (BLM, OSMRE, BSEE, BOEM) (Mar. 19, 2021)........................................................................................................ 8, 15

Mohammad S. Masnadi et al., *Global carbon intensity of crude oil production*, 361 Science 6405 (Aug. 31, 2018)........................................................................ 32

National Energy Technology Laboratory, *An Evaluation of the Extraction, Transport and Refining of Imported Crude Oils and the Impact on Life Cycle Greenhouse Gas Emissions*, DOE/NETL-2009/1362 (Mar. 27, 2009)................................................ 32

Press Release, *Secretary Haaland Delivers Remarks at Interior's Public Forum on the Federal Oil and Gas Program* (March 25, 2021) ....................................... 10

Press Release, *Statement from Deb Haaland on Becoming the 54th Interior Secretary* (Mar. 16, 2021)............................................................................................. 8

Richard Lazarus, *The National Environmental Policy Act in the U.S. Supreme Court: A Reappraisal and Peak Behind the Curtains*, 100 Geo. L.J. 1507 (2012)................................ 27

*The Great American Outdoors Act, P.L. 116-152*, IF 11636 (Cong. Research Serv. 2020)......... 34

Timothy J. Considine, *The Fiscal and Economic Impact of Federal Onshore Oil and Gas Lease Moratorium and Drilling Ban Practices* (Dec. 14, 2020) ............................... 39

U.S. Bureau of Land Management, *BLM Wyoming Planning and NEPA*.................................... 23

U.S. Bureau of Land Management, *Finding of No Significant Impact, 2021 First Competitive Lease Sale,* DOI-BLM-WY-0000-2021-0002-EA (Nov. 2020) .......................... 25

U.S. Energy Information Administration, *Short-Term Energy Outlook* 1 (Feb. 2021) ............... 30

U.S. Dep't of Interior, Secretarial Order 3395 *Temporary Suspension of Delegated Authority* (Jan. 20, 2021)................................................................................ 8, 14, 15

U.S. Gov't Accountability Office, GAO-21-138, *Onshore Competitive and Noncompetitive Lease Revenues* (Nov. 2020)...................................................... 48

Wyo. Const. art. 15 .................................................................................. 11

## INTRODUCTION

President Biden issued Executive Order 14008 on January 27, 2021, requiring the Secretary of Interior, consistent with applicable law, to "pause" new oil and gas leasing on public lands and offshore waters pending a review of all federal oil and gas leasing practices. *See* Executive Order 14008, Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7619 (Feb. 1, 2021). The Secretary, through the United States Department of Interior and the Bureau of Land Management (collectively the Secretary), acted on the Executive Order, resulting in the cancelation of all planned quarterly lease sales. This litigation does not challenge the Secretary's authority to review the federal oil and gas leasing program. Instead, Wyoming challenges the Secretary's suspension of federal oil and gas leasing **before** complying with applicable federal law. Put simply, the Secretary took a "shoot first, ask questions later" approach to managing federal land by failing to involve the public, provide an explanation, or consider any environmental impacts **before** suspending the federal oil and gas leasing program.

The Secretary's action violated federal law in four ways. First, the Secretary violated the Federal Land Policy and Management Act (FLPMA) by unlawfully withdrawing millions of acres from the public domain and ignoring the terms of existing land use plans. Second, the Secretary violated her statutory responsibility to hold quarterly lease sales in contravention of the Mineral Leasing Act (MLA) and the Department of Interior's own regulations. Third, the Secretary failed to provide an explanation for a change in policy that upended the entire federal oil and gas leasing program, a clear violation of the Administrative Procedure Act (APA). Finally, the Secretary violated the National Environmental Policy Act (NEPA) by failing to consider the environmental consequences of a nationwide suspension of oil and gas leasing and by failing to provide notice or invite public comment on this action.

A preliminary injunction is necessary to ensure that the Secretary meets her statutory obligation to hold quarterly oil and gas lease sales during the pendency of this litigation. The State of Wyoming is entitled to a preliminary injunction because the Secretary's action will result in irreparable economic, environmental, and procedural harm to the State. Enjoining the Secretary is in the public interest because any benefits claimed by the Secretary are outweighed by the need to ensure the Secretary adheres to federal law, engages in informed decision-making, and considers the environmental consequences **before** suspending all federal oil and gas lease sales.

## BACKGROUND

The MLA has governed federal leasing of oil and gas resources on public lands for over 100 years. *See* 30 U.S.C. §§ 181-287. Initially, the Secretary retained broad discretion to lease oil and gas resources on public lands. *See United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 419 (1931). In 1976, however, Congress enacted limits to the Secretary's discretion to withdraw lands from mineral leasing with the passage of FLPMA. *See, e.g.,* 43 U.S.C. § 1714. In 1987, Congress subsequently amended the MLA to require the Secretary to hold competitive lease sales "at least quarterly" where eligible lands are available for leasing. Federal Onshore Oil and Gas Leasing Reform Act, Pub. L. No. 100-203, § 5102, 101 Stat. 1330, 1330-256 (1987).

Since 1987, quarterly federal oil and gas lease sales were held under this statutory framework. This practice changed shortly after President Biden issued Executive Order 14008. Through a series of actions, the Secretary indefinitely canceled scheduled lease sales for the first and second quarter of 2021.

### A.    Federal Land Policy and Management Act

FLPMA governs the Secretary's management of public lands. At its core, FLPMA is a planning statute. *See Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 555 (9th Cir. 2006).

To accomplish this objective, the Secretary must "develop, maintain, and, when appropriate, revise land use plans which provide … for the use of public lands." 43 U.S.C. § 1712(a). The Secretary's land use planning objectives are adopted in resource management plans (RMPs), which are prepared and maintained by Bureau of Land Management (BLM) state offices following public input. *See* 43 U.S.C. § 1712(a); 43 C.F.R. § 1610.1(b).

The "main thrust" of FLPMA is to ensure that management actions conform to RMPs. George Cameron Coggins, *The Developing Law of Land Use Planning on the Federal Lands*, 61 U. Colo. L. Rev. 307, 324-25 (1990). FLPMA prohibits the Secretary from taking actions inconsistent with the provisions of RMPs. *See Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 69 (2004) (hereinafter *SUWA*); 43 U.S.C. § 1732(a) ("The Secretary shall manage the public lands … in accordance with the land use plans developed by him[.]"); 43 C.F.R. § 1610.5-3 ("All future resource management authorizations and actions … shall conform to the approved plan."). The Secretary is allowed to change an RMP, but only through a formal land use amendment process that includes public participation. *See* 43 U.S.C. § 1714; *see also* 43 C.F.R. §§ 1610.1-1610.8. RMP amendments are "major federal actions" with potential environmental impacts that must also be assessed under NEPA. 42 U.S.C. § 4332(2)(C); *see also New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 689 (10th Cir. 2009).

When FLPMA was enacted, Congress eliminated the Executive Branch's implied authority to withdraw federal lands from mineral extraction. *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 856 (9th Cir. 2017) (citing Pub. L. 94-579, § 704, 90 Stat. 2743, 2792 (1976)). FLPMA conditions withdrawal on the Secretary's adherence to strict procedures. *See id.* at 856-57. Congress has defined a "withdrawal" as:

> [W]ithholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities

3

under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program; or transferring jurisdiction over an area of Federal land, other than "property" governed by the Federal Property and Administrative Services Act, as amended from one department, bureau or agency to another department, bureau or agency.

43 U.S.C. § 1702(j). Before withdrawing lands, FLPMA requires the Secretary to publish notice in the Federal Register, afford an opportunity for public hearing and comment, and obtain consent from any other department or agency involved in the administration of lands proposed for **all** withdrawals. 43 U.S.C. § 1714(b), (h), (i) (emphasis added); *see also Nat'l Mining Ass'n*, 877 F.3d at 856. The Secretary also must prepare an inventory of natural resources in any notice of withdrawal accompanied by a clear explanation of the proposed use of the land involved which led to the withdrawal. *See, e.g.,* 43 U.S.C. § 1714(c)(2).

### B.    Mineral Leasing Act

The MLA governs federal oil and gas leasing on federal lands. 30 U.S.C. §§ 181-287. The MLA requires that "[l]ease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. § 226(b)(1)(A). Similarly, federal regulation provides that "[e]ach proper BLM S[t]ate office shall hold sales at least quarterly if lands are available for competitive leasing." 43 C.F.R. § 3120.1-2(a).

A broad swath of the public domain is eligible and available for oil and gas leasing. Any lands not excluded from leasing by a statutory or regulatory prohibition are eligible for leasing. (BLM Manual 3120 at .1(.11) (2013)).[1] For example, National Park lands, Indian reservations, incorporated cities and towns, petroleum reserves, and lands recommended or designated as wilderness are not eligible for leasing. 43 C.F.R. § 3100.0-3(a)(2). From the federal lands eligible

---

[1] https://www.blm.gov/sites/blm.gov/files/uploads/mediacenter_blmpolicymanual3120.pdf

for leasing, the applicable RMP identifies the lands that are available for oil and gas leasing. *W. Energy All. v. Zinke*, 877 F.3d 1157, 1161 (10th Cir. 2017); (BLM Manual 3120 at .1(.11) (2013)).

The BLM manages federal oil and gas resources through a three-phase decision-making process. First, it develops RMPs. 43 U.S.C. § 1712; 43 C.F.R. Part 1600. Generally, an RMP "describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps." *SUWA*, 542 U.S. at 59. When developing RMPs, the BLM "prepare[s] an environmental impact statement" in compliance with NEPA. *Id.* at 72; 43 C.F.R. § 1601.0-6. The public must have a chance "to meaningfully participate in and comment on the preparation [and] amendment[]" of RMPs. 43 C.F.R. § 1610.2(a); *see also Utah Shared Access All. v. Carpenter*, 463 F.3d 1125, 1129 (10th Cir. 2006). All subsequent activity on the land, including oil and gas development, must conform to RMPs. *See* 43 C.F.R. § 1610.5-3(a).

During the second phase of federal oil and gas leasing, BLM state offices identify which specific parcels to offer for lease in a competitive lease sale. *See* 43 C.F.R. Subpart 3120. Lands available for leasing "shall be offered for competitive bidding" and include, but are not limited to, "[l]ands included in any expression of interest." 43 C.F.R. § 3120.1-1(e). Once the BLM posts notice of a lease sale, the BLM provides a 30-day protest period. (*See* BLM Manual 3120 at .5(.53)). If protests are not resolved before leasing, BLM can still accept bids for protested parcels at auction. (*Id.*). At this point, the BLM state office holds a competitive lease sale.

In the final stage, the BLM decides whether to permit specific oil and gas projects on leased lands. *See* 30 U.S.C. § 226(g). The BLM regulates surface activities on leased lands and sets reclamation and other conservation requirements before drilling occurs. *See* 43 C.F.R. § 3162.3-1 (providing for drilling applications and plans).

### C.      National Environmental Policy Act

NEPA requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives. *See New Mexico ex rel. Richardson,* 565 F.3d at 703 (citation omitted). "NEPA has two aims, [] it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action" and "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1236-37 (10th Cir. 2011) (citations omitted).

Before embarking upon any "major federal action," an agency must conduct an environmental assessment to determine whether the action "significantly affects the quality of the human environment." *New Mexico ex rel. Richardson*, 565 F.3d at 703 (quoting 42 U.S.C. § 4332(2)(C)). The "human environment" comprehensively means "the natural and physical environment and the relationship of present and future generations of Americans with that environment." 40 C.F.R. § 1508.1(m). Impacts to the human environment include ecological, aesthetic, historic, cultural, economic, social, or health effects. 40 C.F.R. § 1508.1(g)(1). Impacts also include actions which may result in both beneficial and detrimental effects, even if on balance the agency believes that the effect is beneficial. *Id.; see also WildEarth Guardians v. Conner*, 920 F.3d 1245, 1261 (10th Cir. 2019).

If the action does not significantly affect the human environment, the agency may issue a "finding of no significant impact" (FONSI). 40 C.F.R. § 1508.1(*l*). But if the action results in a significant impact, the agency must prepare a thorough environmental impact statement (EIS) assessing the predicted impacts of the proposed action on all aspects of the environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. Part 1502. In an EIS, federal agencies must take a "hard look" at

environmental impacts. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989**)**. Agencies must also consider alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1502.14.

NEPA prohibits uninformed agency action. *Utah Shared Access All. v. U.S. Forest Serv.,* 288 F.3d 1205, 1207-08 (10th Cir. 2002). For example, agencies must publish a draft EIS for public comment and respond to those comments in the final EIS. 40 C.F.R. §§ 1502.9, 1503.1, 1503.4. The purpose of soliciting public comment is to "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. When preparing an EIS, the BLM must also request comment from state agencies, local governments, and interested persons or organizations. 43 C.F.R. § 46.435(b). These procedural requirements ensure that the agency, in reaching its decision, will make relevant information available to the public who may have a role in both the decision-making process and the implementation of that decision. *See Robertson*, 490 U.S. at 349.

### D.    The Secretary's Action

Executive Order 14008 directs the Secretary, consistent with applicable law, to "pause" new oil and gas leasing on public lands:

> To the extent consistent with applicable law, the Secretary of the Interior shall pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and in offshore waters, including potential climate and other impacts associated with oil and gas activities on public lands or in offshore waters.

86 Fed. Reg. at 7624-25 (Feb. 1, 2021).

Before the issuance of Executive Order 14008, the acting Secretary issued Secretarial Order 3395 and temporarily removed authority for individual state BLM offices and other bureaus to authorize any onshore or offshore fossil fuel activity including leasing. (U.S. Dep't of Interior, Secretarial Order 3395, *Temporary Suspension of Delegated Authority* at § 3 (Jan. 20, 2021)).[2] Secretarial Order 3395 reserved all decision-making authority over federal oil and gas lease sales for a small group of senior acting Department of Interior officials, including the acting Secretary. (*Id.* at § 4). Secretary Haaland was confirmed by the United States Senate and sworn into office on March 16, 2021. (Press Release, *Statement from Deb Haaland on Becoming the 54th Interior Secretary* (Mar. 16, 2021)).[3] On March 19, 2021, Department officials clarified that, going forward, all oil and gas lease sale notices required review by the Office of the Assistant Secretary for Land and Minerals Management. (Memorandum from Laura Daniel-Davis, Principal Deputy Assistant Secretary – Land and Minerals Management, to Bureau Directors (BLM, OSMRE, BSEE, BOEM) at 1-2 (Mar. 19, 2021)).[4]

Following the issuance of Executive Order 14008, the Secretary canceled scheduled quarterly federal oil and gas lease sales.[5] The Secretary's action halted the following BLM and Bureau of Ocean Energy Management (BOEM) lease sales scheduled for 2021:

1. On January 27, 2021, the same day President Biden issued Executive Order 14008, the Nevada BLM State Office issued an errata postponing the oil and gas lease sale scheduled for March 9, 2021.[6]

---

[2] https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3395-signed.pdf
[3] https://www.doi.gov/news/statement-deb-haaland-becoming-54th-interior-secretary
[4] https://www.eenews.net/assets/2021/03/23/document_gw_02.pdf
[5] Acting Secretary Scott de la Vega initiated the implementation of Executive Order 14008 prior to the confirmation of Secretary Haaland (collectively the Secretary).
[6] https://www.blm.gov/sites/blm.gov/files/docs/2021-01/NV_OG_20210309_Sale_Errata_1.pdf

2.      On February 12, 2021, the Wyoming BLM State Office updated the posting for the March 2021 lease sale to note that the Wyoming lease sale was "postponed to confirm the adequacy of the underlying environmental analysis."[7] No further reasoning was provided for the postponement.

3.      On February 12, 2021, the Montana/Dakotas BLM State Office updated the posting for the March 23, 2021 lease sale to indicate that the scheduled sale was paused and/or postponed.[8]

4.      On February 12, 2021, the Utah and Colorado BLM State Offices announced that oil and gas lease sales scheduled for March 2021 were canceled and/or postponed.[9]

5.      On February 18, 2021, BOEM rescinded the record of decision for the March 17, 2021 Gulf of Mexico Outer Continental Shelf oil and gas lease Sale 257 "to comply with Executive Order 14008." (Gulf of Mexico, Outer Continental Shelf, Oil and Gas Lease Sale 257, 86 Fed. Reg. 10132, 10132 (Feb. 18, 2021)).

6.      On February 23, 2021, BOEM rescinded the public review period for the Cook Inlet, Alaska oil and gas lease Sale 258 consistent with Executive Order 14008. (Withdrawal of the Public Review Period for Cook Inlet Lease Sale 258, 86 Fed. Reg. 10994, 10994 (Feb. 23, 2021)).

---

[7] https://eplanning.blm.gov/eplanning-ui/project/2003625/570
[8] https://eplanning.blm.gov/eplanning-ui/project/2002224/510
[9] https://eplanning.blm.gov/eplanning-ui/project/2003697/510;
https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/leasing/regional-lease-sales/colorado

7.      The BLM issued a public statement on April 21, 2021 stating, "the Bureau of Land Management is exercising its discretion to not hold lease sales in the second quarter of Calendar Year 2021."[10]

The federal land subject to the Secretary's suspension was eligible and available to oil and gas leasing because the lease sales were consistent with existing RMPs and the necessary regulatory requirements for a lease sale were met. For example, the public notice for the March 2021 Wyoming lease sale was issued with the appropriate environmental analysis on November 13, 2020.[11]  Although the Secretary has not issued any formal decision or order on the suspension of federal lease sales, Secretary Haaland acknowledged in prepared remarks on March 25, 2021 that the "pause" was in effect and "gives us space to look at the federal fossil fuel programs." (Press Release, *Secretary Haaland Delivers Remarks at Interior's Public Forum on the Federal Oil and Gas Program* (March 25, 2021)).[12]

### E.      Federal Oil and Gas Leasing Revenue in Wyoming

The MLA distributes 50% of all sums received from federal oil and gas lease sales to the state where the leasing occurs. 30 U.S.C. § 191(a). These payments are distributed to states after 2% is withheld by the federal government to cover the administrative costs of the federal leasing program. *Id.* at § 191(b). As a result, Wyoming receives approximately 49% of all revenue collected from federal oil and gas leasing within the state including revenue from competitive leasing, non-competitive leasing, and bonus bids.

---

[10] https://www.blm.gov/press-release/statement-second-quarter-oil-and-gas-lease-sales
[11] https://eplanning.blm.gov/eplanning-ui/project/2003636/510
[12] https://www.doi.gov/news/secretary-haaland-delivers-remarks-interiors-public-forum-federal-oil-and-gas-program

Wyoming Statute § 9-4-601 governs the distribution of federal oil and gas leasing revenue. The first $200 million in revenue that Wyoming receives each year from federal oil and gas development is distributed by a formula: education (44.80%), highway fund (30.375%), cities and counties (9.375%), the University of Wyoming (6.75%), capital construction (3.75%), school construction (2.70%), and county roads (2.25%). Wyo. Stat. Ann. § 9-4-601(a). Revenue that Wyoming receives over $200 million is distributed to the state's budget reserve account (66.67%) and the school foundation program (33.33%). *Id.* at § 9-4-601(d).

Wyoming ranks first in the nation for natural gas production on federal lands and second for oil production. (Obermueller Aff. at ¶ 5). Wyoming also receives considerable revenue from federal oil and gas leasing to support government services. From November 2016 through March 2019, Wyoming estimates that it received $193 million in bids from federal oil and gas lease sales conducted by the BLM. (Smith Aff. at ¶ 6). In 2020, Wyoming received approximately $5.7 million in revenue directly from federal quarterly lease sales held by the BLM. (Smith Aff. at ¶ 8).

Revenue from federal oil and gas leasing accounts for a significant portion of Wyoming's budget. (*See* Smith Aff. at ¶¶ 5-6, 11). Once oil and gas resources are developed on federal land, Wyoming also receives royalty revenue from federal oil and gas production from leased lands. *See* 30 U.S.C. § 191(a). In fiscal year 2020, Wyoming's combined share of federal mineral sales, bonuses, royalties, and rentals totaled $488 million. (Smith Aff. at ¶ 11). Wyoming, independently, imposes severance taxes on oil and gas production, including federal land. *See* Wyo. Stat. Ann. §§ 39-14-203(a), -204(a). Wyoming counties also collect ad valorem tax revenue from oil and gas produced from federal land. Wyo. Const. art. 15, § 3; Wyo. Stat. Ann. § 39-13-102(m). In some Wyoming counties where oil and gas development is the most active, this revenue makes up over 50% of the county's annual budget. (Willox Aff. at ¶ 22). The suspension of federal oil and gas

leasing not only eliminates a direct source of revenue to Wyoming, but results in additional losses of state revenue because oil and gas resources go undeveloped.

## ARGUMENT

### I.    Wyoming has Article III standing.

Wyoming has standing to challenge the Secretary's action suspending all federal oil and gas leasing. To establish standing, litigants must demonstrate a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury. *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007). For the reasons set forth below, the Secretary's suspension of federal oil and gas lease sales deprived Wyoming of millions of dollars in revenue afforded to Wyoming by federal law. *See* Section III.C.; *see also* 30 U.S.C. § 191. Wyoming's injury will compound each subsequent quarter the Secretary's suspension of federal leasing remains in place. (Smith Aff. at ¶ 16). The Secretary's action also resulted in actual environmental and procedural harm to Wyoming and its interest in managing federal lands in the state. *See Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002).

But for the Secretary's action suspending federal oil and gas lease sales, Wyoming would have received revenue from the March 2021 Wyoming lease sale. (Smith Aff. at ¶¶ 15-16); *see also Petrella v. Brownback*, 697 F.3d 1285, 1293 (10th Cir. 2012) (applying the "but for" standard for causation). Wyoming suffers from the lost opportunity cost of not having federal leasing revenue in Fiscal Year 2021 to support its schools, highways, and local governments. (Smith Aff. at ¶ 16). Wyoming is also expected to lose 8,950 jobs after a single year of the Secretary's suspension of federal oil and gas lease sales. (Willox Aff. at ¶ 27). These job losses result in additional injury to Wyoming communities because previously employed residents will no longer

have a paycheck to spend at local restaurants and grocery stores or on their mortgage or rent payments. (*Id.*).

This Court can redress Wyoming's injuries with injunctive relief or a ruling on the merits setting aside the Secretary's action. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 483-84 (D.C. Cir. 2009) (setting aside an irrationally based mineral leasing program redresses plaintiff's harm); *see also Comm. To Save the Rio Hondo v. Lucero*, 102 F.3d 445, 452 (10th Cir. 1996) (procedural injuries under NEPA are redressable because a favorable decision would require agency to engage in additional NEPA analysis).

## II.    The Secretary's suspension of federal oil and gas leasing is a final agency action.

The Supreme Court established a two-part test to determine whether agency action is final. Agency action is final when it "mark[s] the consummation of the agency's decisionmaking process," and when the action is one "by which rights or obligations have been determined, or from which legal consequences will flow[.]" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted); *see also Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173-74 (10th Cir. 2000) (reaffirming the standard). "The label an agency attaches to its action is not determinative." *Cont'l Air Lines v. Civil Aeronautics Bd.*, 522 F.2d 107, 124 (D.C. Cir. 1974). The Secretary's suspension of federal oil and gas leasing meets both prongs of the *Bennett* test for final agency action.

The Secretary's suspension of scheduled federal oil and gas lease sales marks the consummation of the Secretary's decision-making process because the decision resulted in "direct and immediate" impacts. *See Colo. Farm Bureau Fed'n*, 220 F.3d at 1173. Not a single lease sale has occurred since the Secretary implemented Executive Order 14008. The Secretary also reserved the final word in all lease sale decisions by stripping BLM state offices of their discretion to notice

and hold quarterly lease sales. (U.S. Dep't of Interior, Secretarial Order 3395 at § 3). No matter how the Secretary characterizes the action, the Secretary's decision to "pause" lease sales during a review of the federal oil and gas program marks the culmination of the agency's decisionmaking process because the decision to suspend leasing is not subject to further consideration by the agency. *See Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020) ("[The court's] precedents make clear that an interim agency resolution counts as final agency action despite the potential for a different permanent decision, as long as the interim decision is not itself subject to further consideration by the agency."). The Secretary's action is the result of that final word and led to the immediate suspension of scheduled federal oil and gas lease sales. *See Ctr. for Native Ecosystems v. Cables*, 509 F.3d 1310, 1330 (10th Cir. 2007) (finding final agency action for Forest Service annual operating instructions which serve as the last word for "day-to-day operations" in grazing management for that season).

It also does not matter that the Secretary failed to issue any formal order suspending federal oil and gas lease sales. Courts have acknowledged that "agency action … need not be in writing to be final and judicially reviewable" under the APA. *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015); *see also Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003) (holding that "[b]oth law and logic" dictate that an unwritten agency policy is reviewable). An unwritten policy can still satisfy the APA's pragmatic final agency action requirement. *Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008). Final agency action can also come from a "series of agency pronouncements rather than a single edict." *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 n.7 (D.C. Cir. 1986). Here, the Secretary's action implementing Executive Order 14008 fundamentally changed the operation of the federal oil and gas leasing program and is reviewable as final agency action.

Significant legal consequences flowed from the Secretary's action because suspending all federal oil and gas lease sales "alter[ed] the legal regime to which the [agency action] is subject." *Bennett*, 520 U.S. at 169 (1997). Before the Secretary's action, federal regulations required quarterly lease sales and lease sales were held regularly on a quarterly basis. 43 C.F.R. § 3120.1-2(a). The Secretary's action eviscerated the quarterly lease sale requirement in federal regulation and in effect changed the law. However, nothing in statute, prior regulation, or case law authorizes the Secretary to enforce a wholesale suspension of federal lease sales. *See Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 321 (D.C. Cir. 2011) (finding EPA guidance document authorizing regional directors to approve implementation plans triggered notice and rulemaking procedures under the APA). To the contrary, the Secretary has a statutory obligation under the MLA to hold lease sales at least quarterly, and "more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. § 226(b)(1)(A). Because the Secretary also prevented BLM state offices from issuing notices and holding lease sales, the Secretary's action has appreciable legal consequences. (Secretarial Order 3395; Memorandum from Laura Daniel Davis to Bureau Directors); *Bennett*, 520 U.S. at 178. This court is within its authority to review executive actions that impose substantial changes on how oil and gas leasing is conducted on federal lands. *See W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1061-62 (D. Idaho 2020).

Agency actions that exceed the authority granted to the executive branch by Congress are also reviewable as a final agency action. *See WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 683 (10th Cir. 2015). The Secretary did not implement the suspension of federal oil and gas leasing consistent with applicable federal law. Executive Order 14008 directs the Secretary to suspend federal oil and gas leasing "[t]o the extent consistent with federal law." 86 Fed. Reg. at 7624. Executive orders cannot impose legal requirements on the executive branch that are

15

inconsistent with the express will of Congress. *Utah Ass'n of Ctys. v. Bush*, 316 F. Supp. 2d 1172, 1184 (D. Utah 2004). The Secretary's action implementing the Executive Order is subject to judicial review because Congress enacted specific statutory requirements for the Secretary to manage federal oil and gas leasing. *See City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 914-15 (10th Cir. 2004) (noting that statutes, regulations, and certain executive orders may be a basis for an APA claim); *see also Wilderness Soc'y v. U.S. Forest Serv.*, 850 F. Supp. 2d 1144, 1170 (D. Idaho 2012) (finding agency action taken pursuant to an executive order reviewable when a statutory foundation, such as NEPA or a land planning statute, provide a specific statutory foundation for the court to objectively judge the agency's action). FLPMA and NEPA, in particular, place discernable limits on executive power to manage federal lands. *See W. Watersheds Project v. BLM*, 629 F. Supp. 2d 951, 964-65 (D. Ariz. 2009). Therefore, the Secretary's action implementing Executive Order 14008 is reviewable under the APA because Congress imposed discernable limits on the Secretary's ability to manage federal oil and gas leasing. *See id.* at 966.

Alternatively, the Secretary's action is reviewable as a failure to execute a statutory obligation under the MLA. An agency's failure to carry out a mandatory duty also constitutes final agency action. 5 U.S.C. §§ 551(13), 706(1). "[A] claim under [Section] 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* **to take**." *SUWA*, 542 U.S. at 63.  The Supreme Court understands "failure to act" as failure to take one of the agency actions defined in 5 U.S.C. § 551(13). *Id.* at 62 (noting that agency action includes decisions made or outcomes implemented by an agency such as an agency rule, order, license, sanction, or relief).

The plain language of the MLA and its associated regulations requires the Secretary to hold quarterly lease sales for each state where eligible lands are available for leasing. 30 U.S.C. § 226;

43 C.F.R. § 3120.1-2(a). The Secretary's failure to perform this mandatory statutory duty allows this Court to review her decision as a final agency action. *See Rounds v. U.S. Forest Serv.*, 301 F. Supp. 2d 1287, 1293-94 (D. Wyo. 2004). "When agency recalcitrance is in the face of clear statutory duty or is of such a magnitude that it amounts to an abdication of statutory responsibility, the court has the power to order the agency to act to carry out its substantive statutory mandates." *Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.,* 740 F.2d 21, 32 (D.C. Cir. 1984); *see also Marathon Oil Co. v. Lujan,* 937 F.2d 498, 500 (10th Cir. 1991) (holding that "[a]dministrative agencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform").

The Secretary's decision not to initiate the NEPA process **before** suspending lease sales is also a discrete agency action reviewable by this Court under Section 706(1). *See, e.g., SUWA*, 542 U.S. at 64. For example, a "decision not to prepare an EIS or consult NEPA can itself be final agency action." *Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv.*, 397 F. Supp. 2d 1241, 1252 (D. Mont. 2005); *see also Catron Cty. Bd. of Comm'rs, N.M. v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996). Here, the Secretary's failure to initiate NEPA before implementing the nationwide suspension of federal oil and gas leasing constitutes a final agency action. *See Citizens for Clean Energy v. U.S. Dep't of Interior*, 384 F. Supp. 3d 1264, 1281 (D. Mont. 2019) (finding that secretarial action rescinding a coal moratorium without initiating NEPA constituted a "discrete agency action that it is required to take" and was therefore subject to judicial review).

III.    **Wyoming is entitled to a preliminary injunction**

   A.    **Standard for granting preliminary injunction**

The Administrative Procedure Act, 5 U.S.C. § 705, and Fed. R. Civ. P. 65(a) empower this Court to enjoin an administrative action.[13] The purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). To grant a preliminary injunction, the Court must find that:

> (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.

*DTC Energy Grp. v. Hirschfeld,* 912 F.3d 1263, 1270 (10th Cir. 2018) (citations omitted). To make this showing, the movant must demonstrate that the right to relief is clear and unequivocal. *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 698 F.3d 1295, 1301 (10th Cir. 2012).

Mandatory injunctions which "require[] the non-moving party to take affirmative action" are disfavored. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004) (per curiam), *aff'd sub nom, Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal,* 546 U.S. 418 (2006)). Courts require a movant seeking a mandatory injunction to make a heightened showing of the four factors. *O Centro*, 389 F.3d at 976. However, when the moving party

---

[13] Petitioners request that no injunctive bond or surety be required under Fed. R. Civ. P. 65(c). As discussed below, the harm to the Secretary from a preliminary injunction is *de minimis* because the Secretary violated the procedural requirements of FLPMA and NEPA. This court has discretion to determine whether a bond is necessary. *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (instructing district courts to use discretion if "there is an absence of proof showing a likelihood of harm").

demonstrates that the "exigencies of the case require extraordinary interim relief," the district court may grant the motion upon satisfaction of the heightened burden. *Id.* at 976; *also Id.* at 978 (Murphy, C.J., concurring in part and dissenting in part).

**B.    Wyoming has a substantial likelihood to succeed on the merits.**

Wyoming meets the standard for a mandatory injunction because the Secretary's suspension of all federal oil and gas lease sales plainly violates federal law, including the Secretary's obligation to hold lease sales "at least quarterly." 30 U.S.C. § 226. When considering the legality of an agency action, "the essential function of judicial review is a determination of: (1) whether the agency acted within the scope of its authority; (2) whether the agency complied with prescribed procedures; and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (citations omitted). With regard to the first element, "[d]etermination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency's action can reasonably be said to be within that range." *Id.* For the second element, "[d]etermination of whether the agency complied with prescribed procedures requires a plenary review of the record and consideration of applicable law." *Id.* With regard to the third element, a court must ascertain "whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Id.* Agency action is arbitrary if not supported by "substantial evidence" in the administrative record. *Id.* at 1575.

Wyoming has a substantial likelihood to succeed on the merits of this case because the Secretary failed to adhere to federal law **before** canceling oil and gas leasing on federal land. First, the Secretary exceeded her authority under FLPMA by unlawfully withdrawing oil and gas leasing

from the public domain and taking management actions inconsistent with existing RMPs. Second, the Secretary contravened the plain language of the MLA by failing to hold quarterly lease sales. Third, the Secretary acted arbitrarily and capriciously by failing to explain her change of policy **before** upending the entire federal oil and gas lease program. Finally, the Secretary violated NEPA by suspending all federal oil and gas leasing without considering the environmental impacts of this action and without engaging in informed decision-making.

> **1.    The Secretary's withdrawal of all federal land from oil and gas leasing violates FLPMA.**

President Biden issued Executive Order 14008 for the purported purpose of assessing the potential climate impacts resulting from federal oil and gas leasing. 86 Fed. Reg. at 7624-25. The Secretary's action implementing Executive Order 14008 violates FLPMA because it unlawfully withdraws federal land from sale and entry in order to maintain a particular public value or purpose. *See Mountain States Legal Found. v. Andrus*, 499 F. Supp. 383, 391 (D. Wyo. 1980); 43 U.S.C. § 1714(c)(1).

Congress enacted FLPMA to "delineate the extent to which the Executive may withdraw lands without legislative action." 43 U.S.C. § 1701(a)(4). Although FLPMA authorizes the Secretary to conduct some withdrawals, that authority is limited. 43 U.S.C. § 1714(a) ("[T]he Secretary is authorized to make, modify, extend, or revoke withdrawals but only in accordance with the provisions and limitations of this section."). For example, the Secretary must publish notice of a withdrawal in the Federal Register and provide an opportunity for public hearing. *See* 43 U.S.C. § 1714(b), (h).

The Secretary's action is clearly a withdrawal under FLPMA. A withdrawal makes land unavailable for certain kinds of private appropriation under the public land laws. *S. Utah Wilderness All. v. BLM*, 425 F.3d 735, 784 (10th Cir. 2005). FLPMA defines withdrawal as:

> **[W]ithholding an area of Federal land from** settlement, **sale, location, or entry, under some or all of the general land laws,** for the purpose of limiting activities under those laws **in order to maintain other public values** in the area or reserving the area for a particular public purpose or program….

43 U.S.C. § 1702(j) (emphasis added). Congress has also associated the term withdrawal to cover the exclusion of lands from operation of the Mineral Leasing Act. *See* 43 U.S.C. § 1714(*l*); *see also Pac. Legal Found. v. Watt*, 529 F. Supp. 982, 996 (D. Mont. 1981). On two occasions, this Court, has held that suspending mineral leasing constitutes a withdrawal under FLPMA. *See Andrus*, 499 F. Supp. at 391; *see also Mountain States Legal Found. v. Hodel*, 668 F. Supp. 1466, 1474 (D. Wyo. 1987) (citing *Pac. Legal Found.*, 529 F. Supp. at 995-97). Here, the Secretary removed millions of acres of federal land from sale or entry under the MLA. Suspending oil and gas leasing in the name of climate preservation withdraws land from the operation of the MLA "to maintain other public values." *See Andrus,* 499 F. Supp. at 392 ("To withhold vast tracts of land from oil and gas leasing for the purpose of wilderness preservation is, to withdraw and withhold the lands from the purposes and operation of the Mineral Leasing Act."). Thus, the Secretary's action suspending federal oil and gas lease sales constitutes a "withdrawal" under FLPMA.

As an initial matter, the decision to suspend federal lease sales before the United States Senate confirmed Secretary Haaland was unlawful.[14] FLPMA specifically provides that the Secretary may only delegate withdrawal authority to individuals within the Office of the Secretary who were appointed by the President and confirmed by the advice and consent of the Senate. 43 U.S.C. § 1714(a). Federal oil and gas lease sales were suspended before the Senate confirmation of any senior Department officials and during the acting Secretary's "temporary suspension of

---

[14] The decision to suspend federal oil and gas leasing apparently occurred during the tenure of acting Secretary of Interior Scott de la Vega serving in that capacity between January 20, 2021 and March 16, 2021. Acting Secretary de la Vega was neither nominated by the President nor confirmed by the Senate.

21

delegated authority" under Secretarial Order 3395. *See* Background at Section D. The action to immediately suspend oil and gas leasing following the signing of Executive Order 14008 violates Section 1714(a) of FLPMA because millions of acres of federal land were withdrawn from mineral leasing by acting Department officials not confirmed by the U.S. Senate.

FLPMA also requires the Secretary to follow certain procedural requirements before withdrawing lands. Before a withdrawal, the Secretary must conduct an inventory of the resources subject to withdrawal, notice the action in the Federal Register, and hold a public hearing. 43 U.S.C. § 1714(b)(1), (c)(2), (h). Here, the Secretary conducted no such inventory, issued no notice in the Federal Register, and held no public hearing prior to suspending federal oil and gas lease sales. The Secretary's failure to comply with Section 1714 is an abuse of discretion and not in accordance with law. *Hodel*, 668 F. Supp. at 1475; *Andrus,* 499 F. Supp. at 395 ("[I]t was the intent of Congress with the passage of FLPMA to limit the ability of the Secretary of the Interior to remove large tracts of public land from the operation of the public land laws by generalized use of his discretion authorized under such laws."). Because Congress retained for itself control over the use and disposition of federal land, this Court is within its authority to enjoin the Secretary from proceeding with its suspension of federal lease sales. *See New Mexico v. Watkins*, 969 F.2d 1122, 1138 (D.C. Cir. 1992) (upholding district court's permanent injunction of Secretary for exceeding withdrawal authority under FLPMA).

> **2.      The Secretary violated FLPMA by unlawfully amending existing RMPs.**

The Secretary's action suspending federal oil and gas leasing also violates FLPMA's land planning requirements. Under FLPMA, federal land management decisions must conform to the approved RMP. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a). This statutory directive prevents BLM from "taking actions inconsistent with the provisions of a land use plan." *SUWA*, 542 U.S.

at 69. The Department's existing RMPs indicate which lands are open or closed to oil and gas leasing. *See W. Energy All.,* 877 F.3d at 1161. Unless and until the plan is amended, unlawful land use plan amendments can be set aside as contrary to law under 5 U.S.C. § 706(2). *SUWA*, 542 U.S. at 69.

The Secretary's action is inconsistent with dozens of governing RMPs across the United States that designate millions of federal acres "open" to oil and gas development. At least ten RMPs govern management decisions in Wyoming over approximately twenty-nine million acres of federal mineral estate. (U.S. Bureau of Land Management, *BLM Wyoming Planning and NEPA*).[15] When an agency action changes "the scope of resource uses" or the "terms, conditions and decisions" of the RMP, BLM must first amend the RMP. *Klamath Siskiyou Wildlands Ctr.*, 468 F.3d at 556. Here, the Secretary did not formally amend existing RMPs which authorize federal oil and gas leasing. The Secretary unilaterally removed millions of acres of federal land from leasing previously designated by the BLM as open for mineral development after years of public input and agency deliberation.

This Court should set aside the Secretary's action suspending federal oil and gas lease sales because it is inconsistent with governing RMPs and, therefore, violates FLPMA. *See Mont. Wildlife Fed'n v. Bernhardt*, No. 4:18-CV-00069, 2020 WL 2615631, at *8-11 (D. Mont. May 22, 2020); *see also W. Watersheds Project v. Bennett*, 392 F. Supp. 2d 1217, 1227-28 (D. Idaho 2005).

### 3.    The Secretary violated the MLA by failing to conduct quarterly lease sales.

The Secretary has a mandatory obligation under the MLA to hold quarterly lease sales of eligible lands. 30 U.S.C. § 226(b). "The Supreme Court and [Tenth Circuit] have made clear that

---

[15] https://www.blm.gov/programs/planning-and-nepa/plans-in-development/wyoming

when a statute uses the word 'shall,' Congress has imposed a mandatory duty upon the subject of the command." *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir. 1999) (citing *United States v. Monsanto*, 491 U.S. 600, 607 (1989)). The MLA requires that "[l]ease sales **shall** be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. § 226(b) (emphasis added). Federal regulation and BLM guidance subsequently codify the duty to hold quarterly lease sales. 43 C.F.R. § 3120.1-2(a); (BLM Manual 3120 at .1(.11)). The decision whether to hold lease sales at least quarterly is not discretionary. *See W. Energy All. v. Jewell*, No. 1:16-cv-912, 2017 WL 3600740, at *7 (D.N.M. Jan. 13, 2017) (unpublished) ("BLM is under no such discretion and 'shall' hold lease sales for each state where eligible parcels are available **at least quarterly**.") (emphasis added).

Congress amended the MLA in 1987 to require quarterly lease sales in each State where eligible lands are available for leasing. Pub. L. 100-203, § 5102, 101 Stat. at 1330-256. During consideration of the 1987 amendment, Congress received testimony from the Governor of Alaska who supported giving the Secretary the discretion to hold fewer lease sales "to respond to changing circumstances." (Legislation to reform the Federal Onshore Oil and Gas Leasing Program: Hearing on H.R. 933 and H.R. 2851 Before the H. Comm. on Interior and Insular Affairs, S. Comm. on Mining and Nat. Res.,  100th Cong. at 350 [Serial No. 100-11] (July 28, 1987) (Letter from Governor Steve Cowper, to Representative Nick Joe Rahall, Chairman House S. Comm. On Mining and Nat. Res.)). Congress rejected the Alaskan proposal by adopting the language in current law which only gives the Secretary discretion to hold lease sales **more frequently** if necessary. (*See* H.R. Rep. No. 100-378, pt. 1, at 8, 11 & 19 (Oct. 15, 1987) (emphasis added)).

The lands identified in the March 2021 Wyoming lease sale are **eligible** for leasing because they are not excluded by a statutory or regulatory prohibition and are **available** because they are identified as open to oil and gas development in the underlying RMPs. (U.S. Bureau of Land Management, *Finding of No Significant Impact, 2021 First Competitive Lease Sale,* DOI-BLM-WY-0000-2021-0002-EA at 3 (Nov. 2020)).[16]  This scenario is not unique to Wyoming or the lands identified for leasing in the March 2021 lease sale. Department of Interior inventories show that approximately 113 million acres of onshore federal lands are "open and accessible" for oil and gas development while 166 million acres remain off-limits to development. (Marc Humphries, *U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas,* R42432 at 8 (Cong. Research Serv. 2018)).[17] The plain language of the MLA requires the Secretary to hold a quarterly lease sale when lands are eligible and available for leasing. The Secretary had no discretion to avoid discharging the duty that Congress imposed on her under the MLA. *See Marathon Oil*, 937 F.2d at 500. Because the Secretary failed to hold quarterly lease sales, this Court may issue injunctive relief to ensure the Secretary meets a mandatory obligation under federal law. *See Forest Guardians*, 174 F.3d at 1187.

### 4.    The Secretary's action was arbitrary and capricious.

The Secretary provided no reasoning, explanation, or justification for suspending all federal oil and gas leasing on public land. Reasoned decision-making requires an agency, when departing from precedents or practices, to "offer a reason to distinguish them or explain its apparent rejection of their approach." *Sw. Airlines v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019) (internal quotation marks and citation omitted). "[H]owever the agency justifies its new position, what it

---

[16] https://eplanning.blm.gov/public_projects/2003636/200393912/20029515/250035716/March%202021%20Wyoming%20Oil%20and%20Gas%20Lease%20Sale_FONSI_draft.pdf
[17] https://crsreports.congress.gov/product/pdf/R/R42432

may not do is 'gloss[ ] over or swerve[ ] from prior precedents without discussion.'" *Id.* The Secretary not only deviated from prior practice but left the roadway altogether by upending the federal oil and gas leasing program without a meaningful explanation for its action.

"Unexplained inconsistency" can be "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, — U.S. —, 136 S. Ct. 2117, 2125 (2016). An agency provides a reasoned explanation for a policy change where it (1) displays "awareness that it *is* changing position," (2) shows the new policy is "permissible under the statute," (3) shows there are "good reasons for [the new policy]," and (4) shows "the agency *believes* [the new policy] to be better." *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). When an agency's new policy "rests upon factual findings that contradict those which underlay its prior policy[,] or when its prior policy has engendered serious reliance interests that must be taken into account," the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.* "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515-16; *see also Encino Motorcars,* 136 S. Ct. at 2125-26.

The Secretary provided no explanation for reversing existing agency practice and suspending all federal oil and gas lease sales. At the very least, the Secretary was required to explain how the new policy of suspending quarterly oil and gas lease sales "is permissible under the statute." *Quest Corp. v. FCC*, 689 F.3d 1214, 1225 (10th Cir. 2012) (citing *Fox*, 556 U.S. at

515). The Secretary was not excused from this obligation to explain changes in policy simply because the President signed an Executive Order. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000) ("[N]o matter how 'important, conspicuous, and controversial' the issue, … an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress.").

Because the Secretary provided no explanation for her action, this Court owes no deference to the Secretary's interpretation of the MLA. Courts will not assume an agency has engaged in reasoned decision-making when the agency implicitly departs from its prior precedent and provides no explanation. *See Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1034 (9th Cir. 2010); *and Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1091 (D.C. Cir. 2009). What makes the Secretary's action particularly insidious is that the Secretary departed from prior policy *sub silentio* with complete disregard for existing Department regulations which provide for quarterly lease sales. *Fox*, 556 U.S. at 515 (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)). The Secretary's action is similarly arbitrary and capricious because the Secretary departed from agency precedent of holding quarterly lease sales without an explanation. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983).

### 5.      The Secretary's action violated NEPA.

In its simplest terms, NEPA requires federal agencies to "look before they leap." Richard Lazarus, *The National Environmental Policy Act in the U.S. Supreme Court: A Reappraisal and Peak Behind the Curtains*, 100 Geo. L.J. 1507, 1510 (2012). The Secretary's action here does just the opposite. In the name of further environmental review, the Secretary suspended oil and gas leasing nationwide without first considering the environmental impacts of that action as required by NEPA. Even if the Secretary is correct in assuming that suspending federal oil and gas leasing

will only result in beneficial impacts to the environment, she was not excused from complying with the substantive requirements of NEPA before taking action. *See Idaho ex rel. Kempthorne v. U.S. Forest Serv.*, 142 F. Supp. 2d 1248, 1259 (D. Idaho 2001).

### a. The Secretary's action is a major federal action that requires an environmental impact statement.

The Secretary violated NEPA by failing to prepare an EIS prior to suspending federal oil and gas leasing because suspending all federal oil and gas leasing is a major federal action. Under NEPA, the federal government must prepare an EIS on "major federal actions significantly affecting the quality of the human environment." *High Country Conservation Advocates v. U.S. Forest Serv.*, 951 F.3d 1217, 1223 (10th Cir. 2020) (citing 42 U.S.C. § 4332(2)(C)). A major federal action can include the adoption of a policy to implement an executive directive. 40 C.F.R. § 1508.1(q)(3)(iii). A major federal action can also include the adoption of an official policy which substantially alters agency programs or the adoption of formal plans which prescribe alternate uses of federal resources upon which future agency actions will be based. *See* 40 C.F.R. § 1508.1(q)(3)(i-ii). The Secretary's suspension of federal leasing triggers NEPA on both grounds.

For example, a nationwide policy suspending an entire class of activities on federal land constitutes a major federal action and requires the preparation of an EIS. *See, e.g., California ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874, 894, 903-04 (N.D. Cal. 2006); *see also Sierra Club v. Morton*, 514 F.2d 856, 878 (D.C. Cir. 1975) ("It is [the court's] view that when the federal government, through exercise of its power to approve leases, mining plans, rights-of-way, and water option contracts, attempts to 'control development' of a definite region, it is engaged in a regional program constituting major federal action within the meaning of NEPA, whether it labels its attempts a 'plan,' a 'program,' or nothing at all."), *rev'd on other grounds sub nom.*

*Kleppe v. Sierra Club,* 427 U.S. 390 (1976). No matter how the Secretary characterizes its "pause" on leasing, it is a major federal action.

Decisions about federal oil and gas lease sales routinely require some environmental analysis under NEPA.[18] The Secretary's action imposing a nationwide moratorium, however, goes beyond routine and justifies the preparation of a detailed EIS. The Secretary disturbed the status quo of all oil and gas leasing on federal land. *See Citizens for Clean Energy*, 384 F. Supp. 3d at 1278 (explaining that secretarial order on federal coal leasing "changed the status quo" under NEPA); *see also Comm. for Auto Responsibility v. Solomon*, 603 F.2d 992, 1002-03 (D.C. Cir. 1979) ("The duty to prepare an EIS normally is triggered when there is a proposal to change the status quo.").

Additionally, the Secretary's action to suspend all federal oil and gas leasing "is a coherent plan of national scope, and its adoption surely has significant environmental consequences." *Kleppe*, 427 U.S. at 400. The Secretary was obligated to complete NEPA before suspending federal oil and gas leasing programs nationwide because the "pause" is a major federal action. *See Davis v. Morton*, 469 F.2d 593, 597-98 (10th Cir. 1972) (enjoining a leasing decision on tribal lands until an EIS was completed); *see also Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983) ("If *any* 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared *before* the action is taken."). The Secretary's suspension of all federal oil

---

[18] *See, e.g., New Mexico ex rel. Richardson*, 565 F.3d at 718 (10th Cir. 2009) (concluding that an EIS was necessary at the leasing stage "[b]ecause BLM could not prevent the impacts resulting from surface use after a lease issued"); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 54 (D.D.C. 2019) ("At the leasing stage an EIS may be required, but is not mandated by regulation."); *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009) (EIS is required when the effects of a lease sale are "highly uncertain."); *WildEarth Guardians v. Bernhardt*, No. 1:19-cv-00505-RB-SCY, 2020 WL 6799068, at *15 (D.N.M. Nov. 19, 2020) (EA was adequate for 68,232 acre federal oil and gas lease sale).

and gas leasing was also a *de facto* RMP amendment, triggering NEPA requirements. 43 C.F.R. § 1601.0-6 ("Approval of a resource management plan is considered a major Federal action significantly affecting the quality of the human environment.").

The Secretary cannot presume that suspending an entire class of activity on federal lands will result in no environmental impact. Other courts recognize that NEPA equally applies to actions which serve to "leave nature alone" including nationwide actions to change or limit management on federal lands. *Idaho ex rel. Kempthorne*, 142 F. Supp. 2d at 1259 (finding the Forest Service was required to prepare an EIS prior to adopting rule preserving roadless areas in national forests, although the rule did not alter the natural physical environment). Either way, the Secretary was obligated to consider the environmental consequences of suspending federal oil and gas leasing and failed to do so before enforcing the President's Executive Order.

### b. The Secretary did not consider the environmental impact of suspending federal oil and gas leasing on non-Federal lands.

The Secretary's action does nothing to suppress the global demand for oil and gas resources. The United States Energy Information Administration forecasts that as the United States and the global economy moves beyond the COVID-19 pandemic, the demand for oil and gas will continue to grow. (U.S. Energy Information Administration, *Short-Term Energy Outlook* 1 (Feb. 2021)("EIA forecasts that global consumption of petroleum and liquid fuels will average 97.7 million b/d for all of 2021, which is up by 5.4 million b/d from 2020. EIA forecasts that consumption of petroleum and liquid fuel will increase by 3.5 million b/d in 2022 to average 101.2 million b/d."))[19] The Secretary's action suspends federal oil and gas leasing but does not consider the environmental impacts of shifting oil and gas production to non-federal lands in the United States and to foreign oil and gas producers.

---

[19] https://www.eia.gov/outlooks/steo/pdf/steo_full.pdf

NEPA requires federal agencies to provide a statement on "any adverse environmental effects which cannot be avoided[.]" 42 U.S.C. § 4332(2)(C)(ii). Department regulations also require the Secretary to consider reasonably foreseeable future actions, including federal and non-federal activities, which are likely occur when reaching a decision under NEPA. *See* 43 C.F.R. § 46.30; *see also Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1035 (10th Cir. 2001).

Although the federal government does not have authority over private mineral development, agencies are obligated to consider impacts to private land resulting from federal actions. *Wyo. Outdoor Council v. U.S. Army Corps. of Eng'rs*, 351 F. Supp. 2d 1232, 1245 (D. Wyo. 2005) ("Impacts to private lands should be considered in determining whether impacts are significant under NEPA."). Evaluating the impact of a federal action on non-federal land is particularly necessary when the federal action results in a disproportionate impact to adjoining non-federal lands. *See Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 814-16 (9th Cir. 2005).

Suspending federal oil and gas lease sales will drive oil and gas development to private and state lands. (Ben Cahill, *Biden Makes Sweeping Changes to Oil and Gas Policy* (Center for Strategic & International Studies (Jan. 28, 2021)) ("In general, a leasing ban on public lands would drive more investors to private and state land.")).[20] In Wyoming, the oil and gas industry expects to shift investments for developing oil and gas resources elsewhere to meet demands for domestic oil and gas consumption. (Obermueller Aff. at ¶ 20).

Suspending federal oil and gas leasing also moves production, and any associated environmental impacts, overseas to other oil producing nations. (Jennifer A. Dlouhy & Ari Natter, *Biden Poised to Freeze Oil and Coal Leasing on Federal Land* (Bloomberg Green (Jan. 21, 2021))

---

[20] https://www.csis.org/analysis/biden-makes-sweeping-changes-oil-and-gas-policy

("A leasing ban is just going to ship that production to Saudi Arabia, to Russia, where there are far less stringent environmental controls." (citing Dan Naatz, Independent Petroleum Association of America))).[21] This includes shifting production to OPEC nations, such as Algeria, Nigeria, and Iraq with higher rates of carbon intensity for producing a single barrel of oil than the United States. (*See* Mohammad S. Masnadi et al., *Global carbon intensity of crude oil production*, 361 Science 6405, 5-6, 8 (Aug. 31, 2018)).[22]

The environmental impact of shifting oil and gas production overseas is potentially significant. Greenhouse gas emissions of "outsourcing" production are amplified by the fact that foreign sources of crude oil have varying levels of environmental controls, must be transported to the United States, and may have physical characteristics that increase environmental impacts. For example, imported crude oils are on average heavier (often with higher sulfur content) and are sourced from countries with fewer regulations on venting and flaring during the production process. (National Energy Technology Laboratory, *An Evaluation of the Extraction, Transport and Refining of Imported Crude Oils and the Impact on Life Cycle Greenhouse Gas Emissions*, DOE/NETL-2009/1362 at ES-1 (Mar. 27, 2009)).[23]

The impact of transporting crude oil from foreign nations also increases greenhouse gas impacts. (*Id.* at 7-8). The Secretary had an obligation to consider the environmental consequences under NEPA of shifting oil production overseas and should have either provided a quantitative estimate of downstream greenhouse gas emissions resulting from the "pause" or explained why it

---

[21] https://www.bloomberg.com/news/articles/2021-01-21/biden-poised-to-freeze-oil-and-coal-leasing-on-federal-land
[22] https://www.osti.gov/servlets/purl/1485127
[23] https://ethanolrfa.org/wp-content/uploads/2015/09/An-Evaluation-of-the-Extraction-Transport-and-Refining-of-Imported-Crude-Oils-and-the-Impact-on-Life-Cycle-Greenhouse-Gas-Emissions-.pdf

was not necessary to consider these impacts. *See Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 736-40 (9th Cir. 2020). Courts have similarly held that the failure to consider these type of greenhouse gas impacts is arbitrary and capricious. *Id.* at 737. In this instance, the Secretary did not consider any of the environmental impacts of shifting oil and gas production off federal land and overseas before suspending federal oil and gas lease sales in violation of NEPA.

c.    **The Secretary did not consider the impacts of suspending federal oil and gas leasing on the human environment.**

The Secretary's action violated NEPA by suspending the federal oil and gas leasing program without first considering the socioeconomic impacts to communities. The Secretary also did not consider the impacts to nationwide conservation programs that rely on funding directly from federal offshore oil and gas lease sales. The Secretary's failure to take a "hard look" at these impacts to the human environment violated NEPA. *See Kleppe*, 427 U.S. at 410 n.21.

The Secretary suspended federal oil and gas leasing without first considering the socioeconomic impacts. Under NEPA, impacts to the human environment include economic (such as employment), social, or health effects. 43 C.F.R. § 1508.1(g)(1). An EIS must analyze not only the direct impacts of a proposed action, but indirect impacts including economic, social, and health impacts. *See Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999).

Wyoming relies on federal oil and gas leasing as a source of revenue for supporting human services programs. In 2020, Wyoming received $5.7 million in receipts directly from federal oil and gas lease sales. (Smith Aff. at ¶ 8).  The State of Wyoming uses revenue from federal oil and gas lease sales to directly fund schools, highways, and local government services. (Smith Aff. at ¶ 9; Willox Aff. at ¶ 17). The suspension of federal lease sales results in lost revenue to the State of Wyoming for supporting these services. (Smith Aff. at ¶ 16). For example, the canceled March 2021 Wyoming federal lease sale alone was expected to provide Wyoming with $4.3 million in

funding for K-12 education. (Obermueller Aff. at ¶¶ 17-18). Even a temporary suspension of federal leasing impacts employment in Wyoming. It is estimated that a single year without federal lease sales will result in 8,950 jobs lost in Wyoming. (Willox Aff. at ¶ 27). Unemployment causes cascading economic and social impacts in a community as income once spent on restaurants, grocery stores, and on mortgage or rent disappears. (*See id.* at ¶¶ 27-28). The Secretary violated NEPA by not considering these socioeconomic impacts.

The Secretary also did not consider impacts to conservation programs that are funded directly by federal offshore oil and gas leasing revenue. Congress enacted the Land and Water Conservation Fund (LWCF) Act, currently codified at 54 U.S.C. 200301 through 200310, to benefit persons using outdoor recreation resources. *Sportsmen's Wildlife Def. Fund v. U.S. Dep't of Interior*, 949 F. Supp. 1510, 1519 (D. Colo. 1996). The LWCF Act achieves this goal by providing outdoor recreation grants to both states and federal agencies. *See* 54 U.S.C. § 200304(b)(1)-(2). Approximately $900 million in annual receipts from offshore oil and gas leasing under the Outer Continental Shelf Lands Act directly support LWCF Act programs. (*The Great American Outdoors Act, P.L. 116-152,* IF 11636 (Cong. Research Serv. 2020) (Prior to the passage of The Great American Outdoors Act in August 2020, funds for LWCF were subject to appropriation by Congress. The Great American Outdoors Act provided mandatory funding for LWCF activities from offshore oil and gas leasing revenue))[24]; 54 U.S.C. § 200302(c)(2).

Wyoming received over $4.8 million in obligated funds from the LWCF Act between 2015 and 2020. (Glenn Aff. at ¶ 6). Wyoming relied on LWCF Act funds for maintenance at state parks, the construction of playgrounds, and supporting other outdoor recreational opportunities. (*Id.*). The Secretary's action threatens the $1.8 million Wyoming expected to receive from LWCF in 2021.

---

[24] https://www.everycrsreport.com/reports/IF11636.html

(Glenn Aff. at ¶ 7). These 2021 LWCF Act funds are intended to support the construction of new trails on the Platte River Parkway in Casper, the development of open space and cross-country ski trails in Sheridan, and upgrading pedestrian trails in Teton County to make Miller Park ADA accessible. (*Id.*). The Secretary's "pause" on offshore federal leasing means fewer LWCF Act dollars are available to Wyoming to fund these projects. (*Id.* at ¶ 5). Because parks and outdoor recreation play an important role in community health, cuts to LWCF Act funding are likely to result in adverse mental and physical health impacts to Wyoming citizens. (*Id.* at ¶ 10).

The Secretary's suspension of offshore federal oil and gas leasing has an equally harmful impact on federal lands in Wyoming. In 2020, Congress directed federal agencies to use $1.9 billion in federally-allocated LWCF Act monies to address deferred maintenance needs at national parks, national forests, and other federal recreation sites. (Glenn Aff. at ¶ 12). The National Park Service alone has identified millions of dollars in deferred maintenance needs in Wyoming at Yellowstone National Park, Grand Teton National Park, Devils Tower National Monument, Fossil Butte National Monument, and Fort Laramie National Historical Site (*Id.*). The Secretary's action jeopardizes the funding source to meet deferred maintenance needs on federal lands which adversely impacts the enjoyment of those visiting federal lands in Wyoming. (*See Id.*).

Federal action impacting outdoor recreation falls within the scope of NEPA analysis. *See, e.g., Biodiversity Conservation All. v. U.S. Forest Serv.*, No. 2:11-CV-226, 2012 WL 3264523, at *6 (D. Wyo. July 27, 2012) (unpublished); *see also High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1199 (D. Colo. 2014). The Secretary's failure to consider the impacts to outdoor recreation before enforcing a "pause" on federal oil and gas leasing violates NEPA. *See Nat'l Parks & Conservation Ass'n v. FAA*, 998 F.2d 1523, 1533 (10th Cir. 1993) (finding agency failure to consider effects on recreational interests violates the APA).

**d.** **The Secretary did not provide notice and an opportunity for comment before suspending federal oil and gas lease sales.**

"The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process." 40 C.F.R. § 1500.1(a). Department regulations provide for varying levels of notice and comment at each stage of the NEPA process. *See, e.g.,* 43 C.F.R. § 46.305(c) (bureaus must publish notices for a finding of no significant impact); 43 C.F.R. § 46.435(a) (bureaus must seek public comment when initiating an EIS); 43 C.F.R. § 46.230 (bureaus must to the fullest extent possible collaborate with cooperating agencies). Throughout the NEPA process, "the public must be informed and its comments considered." *New Mexico ex rel. Richardson*, 565 F.3d at 704. The Secretary failed to provide any notice or opportunity to comment on her action suspending federal oil and gas leasing before she took action.

Wyoming and its local governments actively participate in decisions involving federal oil and gas leasing. (Scoggin Aff. at ¶ 6; Willox Aff. at ¶¶ 10-12). Wyoming's participation in the NEPA process includes its role as a cooperating agency. *See* 43 C.F.R. § 46.225(a). The purpose of having cooperating agencies is to emphasize agency cooperation in the NEPA process. *Int'l Snowmobile Mfrs. Ass'n v. Norton*, 340 F. Supp. 2d 1249, 1262 (D. Wyo. 2004). When the federal government fails to meet its obligations with respect to cooperating agencies under NEPA, the court may set aside the agency action. *See Id.* at 1262, 1266.

The Secretary committed the Department to a plan of action before engaging in an objective, good faith inquiry into the environmental consequences of suspending all federal lease sales. *See Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010). When an agency predetermines the NEPA analysis by committing itself to an outcome, the agency likely failed to take a hard look at the environmental consequences of its actions due to its bias in

favor of that outcome, and therefore, acted arbitrarily and capriciously. *Sierra Club v. Bostick*, 539 F. App'x 885, 893 (10th Cir. 2013) (citing *Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002)), *abrogated on other grounds by Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016). Here, the Secretary enforced Executive Order 14008 blindly, without any consideration of the environmental consequences or any input from the public. A preliminary injunction is warranted when the Secretary does not comply with NEPA. *See, e.g., Catron Cty. Bd. of Comm'rs*, 75 F.3d at 1439-40.

For the aforementioned reasons, Wyoming has a substantial likelihood to succeed on the merits because the Secretary violated FLPMA, the MLA, the APA, and NEPA. Wyoming satisfies this factor for a preliminary injunction because when the Secretary canceled all federal oil and gas lease sales, the Secretary exercised discretion that the Secretary does not have under federal law.

**C.    Wyoming will suffer irreparable harm if the Court does not grant a preliminary injunction.**

The Secretary's decision to suspend federal oil and gas leasing irreparably harms Wyoming on four fronts. First, Wyoming suffers economic harm from each quarterly lease sale that is not held on a timely basis. This harm is irreparable because Wyoming will not collect revenue from federal lease sales to pay for schools, highways, and government services in 2021. Second, the Secretary's action leaves minerals stranded in the ground, both on unleased federal lands and on adjoining state and private lands. Wyoming is irreparably harmed because the State cannot collect revenue from minerals it cannot recover.   Third, Wyoming faces irreparable environmental consequences including increased emissions from less efficient environmental controls such as flaring and adverse impacts to the LWCF Act program. Fourth, Wyoming suffered procedural injury when the Secretary failed to engage the public and stakeholders before suspending leasing.

The Court should enjoin the Secretary's action during the pendency of this litigation to avoid these real and substantial economic, environmental, and procedural injuries.

"Irreparable harm is, by definition, harm for which there can be no adequate remedy at law." *CBM Geosolutions v. Gas Sensing Tech. Corp.*, 215 P.3d 1054, 1058 (Wyo. 2009). Harm to a party is generally considered to have no adequate remedy at law if an award of damages would not rectify the harm. 11A Charles Alan Wright, Arthur R. Miller, *Federal Practice & Procedure* § 2944 (3d ed.), Westlaw (database updated Apr. 2021). Wyoming receives 49 percent of the total bids paid for parcels leased by the Department of Interior. 30 U.S.C. § 191. The Wyoming Treasurer's Office distributes this bid revenue quarterly to schools, local governments, State infrastructure funds, and State reserve accounts. Wyo. Stat. Ann. § 9-4-601; (Smith Aff. at ¶ 9). In the same manner, the State also receives and distributes a 49 percent share of the rentals accruing during the life of a lease and the royalties resulting from production of oil and gas. 30 U.S.C. § 191; (Smith Aff. at ¶ 5). In Fiscal Year 2020, the State received a total of $488,602,812 from federal mineral sales, bonuses, rentals, and royalties. (Smith Aff. at ¶ 11). The State Treasurer's Office distributed over $190 million of these funds to Wyoming schools and more than $18 million to local governments. (*Id.*).

Wyoming lost revenue from the Secretary's decision not to hold the March 2021 Wyoming lease sale. (Smith Aff. at ¶ 16). Wyoming also faces the lost opportunity cost of not having this revenue in 2021 to invest in schools, highways, and local government. (*Id.*). Wyoming's injuries will continue to compound as the Secretary's indefinite suspension of lease sales will result in additional lost revenue each quarter. (*Id.*).

The Secretary's action, whether permanent or temporary, will also cause serious socioeconomic harm to Wyoming communities. (Willox Aff. at ¶¶ 25-26, 28). Dr. Considine at

the University of Wyoming estimates Wyoming will lose 8,950 jobs after a single year of the federal leasing moratorium. (Timothy J. Considine, *The Fiscal and Economic Impact of Federal Onshore Oil and Gas Lease Moratorium and Drilling Ban Practices* at 17 (Dec. 14, 2020))[25]; (Willox Aff. at ¶ 27). Unemployment leads to the relocation of families and fewer dollars spent in the local economy at stores and restaurants. (*Id.*). Wyoming counties alone receive $123 million in direct revenue from oil and gas activities. (*Id.* at ¶ 21). The loss of revenue from canceling federal oil and gas leasing strains county budgets and will result in cuts to social services, education, and law enforcement programs. (*Id.* at ¶ 17).

Wyoming cannot seek monetary damages in this case. 5 U.S.C. § 702; *see also Lane v. Pena*, 518 U.S. 187, 196 (1996) (stating that in the Administrative Procedure Act, Congress waived its sovereign immunity for liability without waiving its immunity for monetary damages). As a result, the economic damages that Wyoming will incur without a preliminary injunction are irreparable. *Crowe & Dunlevy, P.C., v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) (explaining that while economic harm is usually insufficient to constitute irreparable harm, "the [i]mposition of money damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury"). The Court should enjoin the Secretary during the pendency of this litigation to avoid these real and substantial harms.

The Secretary's suspension of federal leasing also irreparably harms Wyoming by hindering responsible oil and gas development and stranding resources in the ground, thereby causing waste. (Kropatsch Aff. at ¶¶ 14-16; Obermueller Aff. ¶ 19). Wyoming Statute § 30-5-102 prohibits the waste of oil and gas resources, including from federal lands. (Kropatsch Aff. at ¶ 5).

---

[25] https://www.wyoenergy.org/wp-content/uploads/2020/12/Final-Report-Federal-Leasing-Drilling-Ban-Policies-121420.pdf

The Wyoming Oil and Gas Conservation Commission (WOGCC) regulates drilling and the spacing of wells to prevent waste. (*Id.*). The WOGCC establishes Drilling and Spacing Units (DSUs) to efficiently develop oil and gas on intermingled small tracts of federal, state, and private (fee) minerals commonly found in Wyoming. (Kropatsch Aff. at ¶ 6; Scoggin Aff. at ¶ 9). When small tracts of unleased federal minerals within a DSU cannot be independently developed to conform to spacing orders, the BLM enters into Communitization Agreements (CAs) to allow responsible development within the DSU. (Kropatsch Aff. at ¶¶ 6, 8) The CA is a commitment to develop isolated federal minerals within a DSU and the BLM's policy is to offer unleased federal minerals in a CA for competitive leasing as soon as possible. (*Id.* at ¶¶ 7, 9).

Multiple CAs in Wyoming include unleased federal minerals within a DSU where development on adjoining fee, state, or leased federal minerals is expected to occur in the near future. (Kropatsch Aff. at ¶ 9). Modern drilling technology allows operators to drill horizontally into a formation to maximize oil and gas recovery. (*Id.* at ¶ 13). The Secretary's suspension of quarterly lease sales prevents operators from securing rights to unleased federal lands within existing DSUs where the BLM committed to leasing in a CA. (*Id.*). Operators will be required to make modifications to avoid any unleased federal minerals, which will, in certain cases, result in uneconomic wells that will not be drilled. (*Id.*). The Secretary's action results in irreparable harm to Wyoming because oil and gas resources will become stranded in DSUs with unleased federal minerals. (*Id.* at ¶ 14).

The State of Wyoming will not collect its share of federal mineral royalties from unrecovered oil and gas on unleased federal land. (Kropatsch Aff. at ¶ 14). Wyoming's irreparable harm from stranded oil and gas resources also includes the loss of severance and ad valorem taxes that will not be collected from stranded minerals. (*Id.* at ¶ 15). Wyoming also manages its own

mineral interests on state lands with a nexus to federal minerals. (Scoggin Aff. at ¶¶ 5, 7). Wyoming's rights as a mineral owner on state lands are also irreparably harmed because if isolated tracts of federal minerals are not leased, state minerals cannot be developed within existing DSUs which results in less revenue generated for state trust land beneficiaries (K-12 education). (Kropatsch Aff. at ¶¶ 16-17; Scoggin Aff. at ¶ 12).

Wyoming will suffer irreparable environmental harm from the Secretary's action. "Environmental injury, by its nature, can seldom be adequately remedied by money damages[.]" *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Because the installation of pipelines and other oil and gas emission capture technologies require a minimum amount of production to be economically and technically practicable, the Secretary's "pause" will result in unleased federal lands in DSUs which will likely result in producers using less effective environmental controls to capture emissions, such as flaring. (Kropatsch Aff. at ¶ 19).

Wyoming will also suffer harm to the human environment, including lost recreational opportunities because suspending federal oil and gas leasing eliminates the primary funding source for the LWCF Act. (Glenn Aff. at ¶ 5). Wyoming received $4.8 million in direct LWCF grants between 2015 and 2020 for outdoor recreation projects. (*Id.* at ¶ 6). Wyoming expected to receive $1.8 million in LWCF funds for 2021 that were intended to support thirteen projects including trail improvements along the Platte River Parkway in Casper, development of open space and cross-country skiing trails in Sheridan, and accessible trails in Teton County, Wyoming. (*Id.* at ¶¶ 7-8). Because the Secretary did not prepare any NEPA analysis before suspending federal oil and gas leasing, harms to the natural environment and human environment from the Secretary's action remain unquantified. However, this "harm to the environment may be presumed when an agency fails to comply with the required NEPA procedure." *Davis*, 302 F.3d at 1115.

Wyoming will also suffer irreparable harm to its procedural interests if the Secretary is allowed to move forward with its suspension of the federal oil and gas leasing program without proper NEPA analysis. "There is no doubt that the failure to undertake an EIS when required to do so constitutes procedural injury to those affected by the environmental impacts of a project." *Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1187 (N.D. Cal. 2009) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 & n.7 (1992)). The Secretary's suspension of all federal oil and gas leasing triggered NEPA and required the Secretary to engage the public and interested parties in the decision-making process. Wyoming state agencies and counties regularly participate in federal land management decisions under NEPA. (Scoggin Aff. at ¶ 6; Willox Aff. at ¶ 7). This engagement comes at Wyoming's own expense of time and resources because the state and its counties have an interest in how Wyoming's federal lands are managed. (Willox Aff. at ¶ 7). State and local government engagement includes the unique "cooperating agency" role that Wyoming and its counties serve in to assist the federal government in meeting its informed decision-making duties under NEPA. (Willox Aff. at ¶ 10). Wyoming was denied the opportunity to participate in the decision-making process when the Secretary suspended federal oil and gas leasing without any environmental analysis under NEPA. When a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, other courts have not hesitated to find a likelihood of irreparable injury. *See Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009).

For the aforementioned reasons, Wyoming will suffer irreparable injuries in the absence of an injunction. This Court should enjoin the Secretary's action during the pendency of this litigation and require the Secretary to hold quarterly oil and gas lease sales in Wyoming.

**D.      The balance of equities and public interest favors Wyoming.**

When determining the balance of equities, this Court must compare the public interests involved "to determine on which side the risk of irreparable harm weighs most heavily." *Blum v. Caldwell*, 446 U.S. 1311, 1315 (1980). To prevail on this factor, the movant must show that the threatened injury outweighs any potential injury to the non-moving party. *See O Centro Espirita Beneficiente Uniao Do Vegetal*, 389 F.3d at 983.

**1.      The risk of uninformed decision-making outweighs the inconvenience to the Secretary's agenda for federal land management.**

At best, a preliminary injunction creates an inconvenience to the Secretary's agenda. An injunction will require the Secretary to hold congressionally mandated quarterly lease sales in Wyoming but will not prevent the Secretary from continuing her comprehensive review of the federal oil and gas leasing program. Any harm to the Secretary is both *de minimis* and self-inflicted. Executive Order 14008 directed the Secretary to proceed "[t]o the extent consistent with applicable law." 86 Fed. Reg. at 7624. The Secretary's injury was caused by the Secretary's decision to sidestep procedural requirements of FLPMA and NEPA before instituting the "pause" on federal leasing. The harm of an injunction to the Secretary amounts to nothing more than a delay of implementing a portion of Executive Order 14008.

The balance of equities favors a preliminary injunction because the Secretary implemented the suspension on leasing before complying with federal law. "The 'risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation' by the acting federal agency." *Catron Cty. Bd. of Comm'rs*, 75 F.3d at 1433 (citation omitted). Although the Secretary claims that suspending federal oil and gas leasing is in the interest of mitigating potential climate impacts, those environmental risks are unsubstantiated because the Secretary failed to comply with NEPA. This Court is left with balancing the purported

environmental benefits of suspending federal oil and gas leasing with the actual economic, environmental, and procedural harms presented by Wyoming.

Even if the competing environmental harms are a wash, the balance of equities remain in Wyoming's favor because the "harm at stake when the government fails to comply with the NEPA procedures 'is a harm to the *environment,* but the harm consists of the *added risk* to the environment that takes place when governmental decision-makers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment.'" *California ex rel. Lockyer*, 459 F. Supp. 2d at 913 (citing *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989)). Both FLPMA and NEPA require the Secretary to provide states, local governments, and the public with the opportunity to comment and participate in the management of public lands. *See, e.g.,* 43 U.S.C. § 1739(e); *and* 42 U.S.C. § 4331(a). The Secretary violated her statutory responsibility to engage in informed decision-making by suspending federal oil and gas leasing **before** complying with NEPA and FLPMA. Here, the irreparable harm that flows from the Secretary's uninformed decision-making outweighs the Secretary's alleged environmental injuries of a preliminary injunction.

The Secretary's action results in significant irreparable harm to Wyoming communities which rely on revenue from federal oil and gas lease sales. (*See* Smith Aff. at ¶ 16). Services normally provided by these revenues that will go unfunded include Wyoming's schools, roads, public health services, and law enforcement. (*Id.*). The balance of equities again weighs in favor of Wyoming because an injunction ensures that these public services remain funded for the duration of the Secretary's review of the federal oil and gas leasing program or until this litigation is resolved.

The balance of equities often favors a preliminary injunction to protect the environment, but here, the Secretary failed to substantiate its alleged environmental harms. Wyoming's economic, environmental, and procedural harms outweigh the Secretary's speculative environmental injuries. For these reasons, the balance of equities heavily favors a preliminary injunction against the Secretary. *See Amoco Prod. Co.,* 480 U.S. at 545 (1987).

###    2.    The public interest is served by ensuring the Secretary complies with federal law.

The term "public interest" encompasses any matter of public policy potentially affected by the issuance of an injunction. *See, e.g., Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958). An injunction serves the public interest here because the Secretary's egregious violation of federal law aligns multiple public interests against the Secretary.

First, requiring the Secretary to comply with federal law is in the public interest. *See, e.g., Wyoming v. U.S. Dep't of Agric.*, 277 F. Supp. 2d 1197, 1238 (D. Wyo. 2003), *vacated as moot* 414 F.3d 1207 (10th Cir. 2005); *see also Fund for Animals v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993) ("[T]here is a strong public interest in meticulous compliance with the law by public officials."). In fact, the Secretary's refusal to comply with environmental laws "invokes a public interest of the highest order: the interest in having government officials act in accordance with law." *Cty. of Los Alamos v. U.S. Dep't of Energy*, No. 1:05-CV-1343, 2006 WL 1308305, at *8 (D.N.M. Jan. 13, 2006) (unpublished) (citing *Seattle Audubon Soc'y v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991), *aff'd in part and rev'd on other grounds,* 952 F.2d 297 (9th Cir.1991)).

Next, "the public has an undeniable interest in the [Secretary's] compliance with NEPA's environmental review requirements and in the informed decision-making process that NEPA is designed to promote." *Colo. Wild v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1223 (D. Colo. 2007). Similarly, when the federal government violates federal law the public interest weighs in favor of

the plaintiff. *See W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1026 (D. Ore. 2019). "[T]he public interest favor[s] the issuance of [a preliminary] injunction because allowing a potentially environmentally damaging program to proceed without an adequate record of decision runs contrary to the mandate of NEPA." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007). A preliminary injunction serves the public interest as a remedy to the Secretary's curtailment of meaningful public participation in the decision to enforce a suspension of federal oil and gas leasing without complying with NEPA. *W. Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204, 1212 (D. Idaho 2018) (granting preliminary injunction in part).

The public interest is also served by ensuring the Secretary adequately considers the environmental impacts of suspending federal oil and gas leasing *before* taking action. *S. Fork Band of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009) ("Congress's determination in enacting NEPA was that the public interest requires careful consideration of environmental impacts before major federal projects may go forward. Suspending a project until that consideration has occurred thus comports with the public interest."). The purpose of NEPA is to require agencies to compile and consider all relevant information which might have significant environmental effects before taking action. *Provo River Coal. v. Pena*, 925 F. Supp. 1518, 1526 (D. Utah 1996). A preliminary injunction preserves the public interest of informing the public of the potential environmental consequences of federal action. *See Bosworth*, 510 F.3d at 1033. Furthermore, enjoining the Secretary from suspending federal oil and gas leasing during the pendency of this litigation does not harm the public interest in protecting the United States from alleged climate impacts because the agency will ultimately consider the impact of oil and gas leasing on greenhouse gas emissions during the NEPA process. *See, e.g., WildEarth Guardians*, 368 F. Supp. 3d at 64.

In addition to the public interest ensuring the Secretary adheres to federal law, a preliminary injunction protects the State of Wyoming and its local communities who rely on revenue from federal oil and gas lease sales to fund essential public services. *See Int'l Snowmobile Mfrs. Ass'n v. Norton*, 304 F. Supp. 2d 1278, 1289 (D. Wyo. 2004) ("Public interest is served by protecting the business owners and concessionaires who relied on the NPS's proposed regulations."). The Secretary's action did not consider the environmental impacts **before** implementing the President's Executive Order and failed to evaluate the socioeconomic consequences of suspending the federal oil and gas leasing program, and should be enjoined while the Secretary completes the necessary analysis required by NEPA. *See All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) ("The effect on the health of the local economy is a proper consideration in the public interest analysis.").

This Court also cannot discount the public interest in preserving the extensive amount of federal resources, public involvement, and deliberation that went into preparing existing federal land use plans which designate lands open to oil and gas development. The Secretary suspended all federal oil and gas leasing in direct conflict with existing RMPs which govern the use of federal lands. In recent years, Wyoming and its counties worked with the federal government to finalize RMP amendments and the Wyoming Greater Sage-Grouse RMP amendments. (Willox Aff. at ¶ 9). These RMP amendments came at great expense to the federal government and the cooperating state and local governments. (*See id.*). Courts recognize that the public interest is served by ensuring the Secretary adheres to the orderly process for managing federal lands under FLPMA. *See Nat'l Wildlife Fed'n v. Burford*, 676 F. Supp. 271, 279 (D.D.C. 1985). An injunction serves the public interest by ensuring the Secretary makes land use decisions consistent with FLPMA and

the governing RMPs that the federal government prepared in conjunction with states, local governments, and the public after years of deliberation.

Issuing a preliminary injunction also serves the public interest by adhering to Congress's stated policy of fostering mineral development on public land. *See Wilderness Workshop v. BLM*, No. 1:08-CV-462, 2008 WL 1946818, at *8 (D. Colo. Apr. 30, 2008) (unpublished) (citing 30 U.S.C. § 21a and the Energy Policy Act of 2005). In this case, a preliminary injunction is the vehicle by which a declared congressional policy can be effectuated. *Envtl. Def. Fund v. Tenn. Valley Auth.*, 468 F.2d 1164, 1184 (6th Cir. 1972). Holding quarterly lease sales also promotes the public interest in the prompt collection of all oil and gas revenues owed to the United States. *See* 30 U.S.C. § 1701(b)(3). Enjoining the Secretary results in the collection of billions of dollars from federal lease sales that are deposited in the United States Treasury. *See* 30 U.S.C. § 191. Competitive onshore oil and gas lease sales alone between fiscal years 2003 and 2019 resulted in $14.3 billion in revenue for the federal government. (U.S. Gov't Accountability Office, GAO-21-138, *Onshore Competitive and Noncompetitive Lease Revenues* at 11 (Nov. 2020)).[26] Uniquely, a preliminary injunction generates a substantial monetary benefit to the federal government and promotes the public interest in collecting revenue owed to the U.S. Treasury.

The public interest is served by ensuring the Secretary complies with federal law, including NEPA. Enjoining the Secretary also serves the public interest in maintaining consistency with existing RMPs and meeting the congressional directive that the Secretary hold quarterly federal oil and gas lease sales.

---

[26] https://www.gao.gov/products/gao-21-138W

**CONCLUSION**

The Secretary's "shoot first, ask questions" later approach to managing federal lands runs contrary to federal law and warrants an injunction during the pendency of this litigation. She contravened the procedural requirements of FLPMA by unlawfully withdrawing millions of acres of federal land from mineral development. The Secretary violated the plain language of the MLA by failing to hold quarterly lease sales and acted unlawfully under the APA by failing to provide an explanation for her change of policy. The Secretary also violated NEPA by failing to evaluate the environmental impacts of a major federal action and engaging in informed decision-making. A preliminary injunction is necessary to remedy the harms caused by the Secretary's suspension of all federal oil and gas leasing. The Secretary's purported unsubstantiated greenhouse gas benefits do not outweigh the public interest in ensuring compliance with federal law which, in turn, generates substantial revenue for the federal government. For the foregoing reasons, Wyoming requests that the Court enter an order enjoining the Secretary's suspension of federal quarterly oil and gas lease sales in Wyoming during the pendency of this litigation. Wyoming also requests that the Court order the Secretary to hold the March 2021 Wyoming lease sale and June 2021 Wyoming lease sale as soon as reasonably possible.

//

//

//

//

//

//

//

//

//

Submitted this 3rd day of May, 2021.

FOR THE STATE OF WYOMING

/s/ *Travis Jordan*
James Kaste (Wyo. Bar No. 6-3244)
Deputy Attorney General
Travis Jordan (Wyo. Bar No. 7-5721)
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
james.kaste@wyo.gov
travis.jordan@wyo.gov

*Attorneys for Petitioner State of Wyoming*

## CERTIFICATE OF SERVICE

I certify that on this 3rd day of May 2021, I electronically filed the foregoing with the Clerk of the U.S. District Court for the District of Wyoming and served all parties using the CM/ECF system.

/s/ *Travis Jordan*

50