Mark S. Barron
L. Poe Leggette (Wyoming Bar No. 7-4652)
Alexander K. Obrecht (Wyoming Bar No. 7-5542)
BAKER & HOSTETLER LLP
1801 California Street, Suite 4400
Denver, Colorado 80202
Telephone: 303.861.0600
Facsimile: 303.861.7805
mbarron@bakerlaw.com
pleggette@bakerlaw.com
aobrecht@bakerlaw.com

*Attorneys for Petitioners Western Energy Alliance
& Petroleum Association of Wyoming*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| WESTERN ENERGY ALLIANCE and PETROLEUM ASSOCIATION OF WYOMING, | ) ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | No. 0:21-cv-00013-SWS |
| JOSEPH R. BIDEN, Jr., in his official capacity as President of the United States, DEB HAALAND, in her official capacity as Secretary of the Interior, and UNITED STATES BUREAU OF LAND MANAGEMENT, | ) ) ) ) ) ) ) ) | |
| Respondents. | ) ) | |

## PETITIONERS' OPENING MEMORANDUM ON THE MERITS

# TABLE OF CONTENTS

I.    RELEVANT BACKGROUND. ..........................................................- 2 -

A. FEDERAL OIL AND GAS LEASING PROCESS. .........................- 4 -

B. CANCELLATION OF THE 2021 LEASE SALES. .......................- 7 -

    1. The First Quarter Lease Sales. ....................................................- 8 -

    2. The Second Quarter Lease Sales. ...............................................- 16 -

C. PROCEDURAL POSTURE. ...........................................................- 18 -

II.    STANDARD OF REVIEW. .............................................................- 20 -

III.   THE LEASE SALES MUST BE REINSTATED. ...........................- 22 -

A. CANCELLATION VIOLATES EXPRESS STATUTORY
    REQUIREMENTS. ..........................................................................- 23 -

    1. Nominated Lands are "Available." .............................................- 25 -

    2. The Secretary Lacks Discretion to Postpone Lease Sales. .........- 28 -

    3. Respondents' NEPA Failures do not Excuse Respondents' Failures
    Under the Mineral Leasing Act. ..................................................- 31 -

B. CANCELLATION OF THE LEASE SALES IS ARBITRARY AND
    CAPRICIOUS. ...............................................................................- 36 -

C. THE CANCELLATIONS ARE PROCEDURALLY DEFECTIVE.... -
    43 -

IV.   CONCLUSION. ...............................................................................- 47 -

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974)...................................................................................21

*Burlington Truck Lines v. United States*,
  371 U.S. 156 (1962)...................................................................................36

*Columbia Riverkeeper v. U.S. Army Corps of Eng'rs*,
  No. 3:19-cv-6071-RJB, 2020 WL 6874871 (W.D. Wash. Nov. 23,
  2020) .......................................................................................................11

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019)...............................................................................36

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
  140 S. Ct. 1891 (2020)...............................................................................22

*Grace Petroleum Corp. v. Fed. Energy Regulatory Comm'n*,
  815 F.2d 589 (10th Cir. 1987) ...................................................................42

*Hall v. U.S. Dep't of Labor*,
  476 F.3d 847 (10th Cir. 2007) ...................................................................21

*Harvey v. Udall*,
  384 F.2d 883 (10th Cir. 1967) .....................................................................6

*Idaho ex rel. Kempthorne v. U.S. Forest Serv.*,
  142 F. Supp. 2d 1248 (D. Idaho 2001) ......................................................47

*Louisiana v. Biden*,
  2021 WL 2446010 (W.D. La. June 15, 2021) ................................18, 19, 29, 38

*Metro. Edison Co. v. People Against Nuclear Energy*,
  460 U.S. 766 (1983)...................................................................................47

i

*Michigan v. Envtl. Prot. Agency,*
   576 U.S. 743 (2015) ..................................................................22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ..................................................................21, 36, 43

*Nat. Res. Def. Council v. McCarthy,*
   993 F.3d 1243 (10th Cir. 2021) ...........................................44

*Olenhouse v. Commodity Credit Corp.,*
   42 F.3d 1560 (10th Cir. 1994) ............................................21

*Pennaco Energy, Inc. v. U.S. Dep't of Interior,*
   377 F.3d 1147 (10th Cir. 2004) ...........................................21

*Rocky Mountain Wild v. Bernhardt,*
   506 F. Supp. 3d 1169 (D. Utah 2020)....................................13, 14, 15

*Sierra Club v. Fed. Energy Reg. Comm'n,*
   867 F.3d 1357 (D.C. Cir. 2017)...........................................45

*Via Christi v. Leavitt,*
   509 F.3d 1259 (10th Cir. 2007) ...........................................21

*W. Energy All. v. Jewell,*
   No. 1:16-CV-00912-WJ-KBM, 2017 WL 3600740 (D.N.M. 2017)................29

*W. Energy All. v. Salazar,*
   709 F.3d 1040 (10th Cir. 2013) ...........................................22

*W. Energy All. v. Zinke,*
   877 F.3d 1157 (10th Cir. 2017) ................................5, 8, 22, 23, 25, 30

*WildEarth Guardians v. Bernhardt,*
   501 F. Supp. 3d 1192 (D.N.M. 2020)....................................34

*WildEarth Guardians v. Bernhardt,*
   2020 WL 6701317 (D.D.C. Nov. 13, 2020) ...........................11, 16, 34

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.,*
   870 F.3d 1222 (10th Cir. 2017) ...........................................44

ii

**Statutes**

5 U.S.C. § 706 ...................................................................................20, 21, 29

16 U.S.C. § 1133(d)(3) ...................................................................................3

30 U.S.C. § 21a .............................................................................................22

30 U.S.C. § 181 ..............................................................................................3

30 U.S.C. § 191 ..............................................................................................4

30 U.S.C. § 201 .......................................................................................29, 30

30 U.S.C. § 226 ........................................... 1, 3, 6, 7, 23, 25, 28, 29, 30, 38

42 U.S.C. § 4332 ..........................................................................................47

42 U.S.C. § 15921 ........................................................................................23

43 U.S.C. § 1701 ............................................................................................4

43 U.S.C. § 1712 ............................................................................................5

54 U.S.C. § 200402 ......................................................................................46

Act of Feb. 25, 1920, ch. 85, § 32, 41 Stat. 437 ........................................6

Pub. L. 94-377 § 2, 90 Stat. 1083 (Aug. 4, 1976)............................... 29-30

Pub. L. 100-203 § 5102(a), 101 Stat. 1330 (Dec. 22, 1987)............... 25-26

Pub. L. 116-152, 134 Stat. 682 (Aug. 4, 2020).........................................46

**Regulations**

40 C.F.R. § 1508.1 ......................................................................................43

43 C.F.R. pt. 3120 .........................................................................................6

43 C.F.R. § 1610.1 ........................................................................................5

43 C.F.R. § 1610.2 ........................................................................................5

43 C.F.R. § 3120.1-1 ...................................................................6, 25, 26, 28

43 C.F.R. § 3120.1-3 ................................................................27, 28

43 C.F.R. § 3120.4-2 ......................................................................19

43 C.F.R. § 3162.3-1 ........................................................................7

43 C.F.R. § 3162.5-1 ........................................................................7

53 Fed. Reg. 22,814 (June 17, 1988) ..........................................26, 27

## Other Authorities

Bureau of Land Mgmt., *Statement on Second Quarter Oil & Gas Lease Sales* (Apr. 21, 2021) ................................................................18

Defs.' Mem. in Opp'n to Pls.' Mot. for Order to Show Cause & Compel Compliance with Prelim. Inj. at 5, *Louisiana v. Biden*, No. 2:21-cv-00778-TAD-KK (W.D. La. Aug. 24, 2021), ECF No. 155 ......19, 20, 29

Dep't of Interior, Natural Res. Revenue Data ............................................3

Full. Comm. Hr'g to Examine the President's FY 2022 Budget Request for the Dep't of the Interior: Hr'g Before the Sen. Comm. on Energy & Nat. Res. (Jly 27, 2021) ................................................................19

U.S. Energy Info. Admin., *Review of Emerging Resources: U.S. Shale Gas and Shale Oil Plays* (July 2011) ................................................................45

U.S. Energy Info. Admin., *Initial prod. rates in tight oil formations continue to rise* (Feb. 11, 2016) ................................................................45

The White House, *Statement by Nat'l Sec. Advisor Jake Sullivan on the Need for Reliable & Stable Global Energy Markets* (Aug. 11, 2021) ................................................................ 37-38

Petitioners Western Energy Alliance and the Petroleum Association of Wyoming (collectively, "Petitioners") submit respectfully this opening memorandum in support of Petitioners' administrative appeal. The Mineral Leasing Act mandates the frequency with which federal minerals must be made available for lease. "Lease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. § 226(b). The Bureau of Land Management ("BLM"), acting ostensibly at the direction of the President and the Secretary of the Interior, has cancelled all oil and gas lease sales that were or should have been scheduled for 2021 in violation of the Secretary's statutory obligations and without adequate explanation. Respondents also appear to assert incorrectly that the Secretary has discretion to cancel additional lease sales in the future.

Federal Respondents' cancellation of the lease sales is legally defective for at least three independent reasons – any one of which would be sufficient alone to require those cancellations to be reversed. Because eligible and available parcels existed at the time each cancellation was announced – and continue to exist now – federal Respondents' cancellation of lease sales is contrary to law. Because the administrative record in this case lacks any reasonable explanation supported by substantial evidence for why the lease sales have been cancelled, federal Respondents' cancellations are arbitrary and capricious. And because federal

Respondents have failed to conduct the environmental review that was a prerequisite for cancelling oil and gas lease sales, the cancellations are procedurally invalid. Petitioners seek an order requiring that: (i) BLM immediately reinstate the canceled oil and gas lease sales; (ii) all cancelled lease sales be held as expeditiously as logistical arrangements allow; and (iii) BLM adopt immediately revised lease sale schedules that comply with the terms of the Mineral Leasing Act and other applicable law.

## I.   **RELEVANT BACKGROUND.**

The United States owns approximately 700 million subsurface acres of mineral estate. *See* Admin. R. ("A.R.") at 254.[1]  The Mineral Leasing Act establishes the framework under which the Secretary of the Interior leases and manages the development of these minerals. The Secretary exercises her statutory responsibilities through BLM. *See id.* (acknowledging "BLM is responsible for oil and gas leasing on about 700 million acres of BLM, national forest, and other Federal lands").

Not all 700 million acres are subject to leasing. *See id.* at 17 (recognizing "[c]ertain lands are not available for oil and gas leasing by statutory, regulatory, and

---

[1] The administrative record consists of consecutively paginated documents bates numbered BLM_I000001 through BLM_I002683. Because all bates numbers for material in the administrative record share the same prefix, "BLM_I," Petitioners' citations omit "BLM_I" and any preceding zeros.

policy prohibition"). Among others, national parks and monuments, lands in incorporated cities, towns, and villages, and most lands within the National Wilderness Preservation System are expressly excluded from the leasing program. *See* 30 U.S.C. § 181; 16 U.S.C. § 1133(d)(3). And while not expressly excluded, the Secretary may not lease any parcel within the National Forest System reserved from the public domain over the Secretary of Agriculture's objection. *See* 30 U.S.C. § 226(h).

Approximately 26 million mineral acres – less than 4% of the federal mineral estate – is leased for oil and gas development. *See* A.R. at 2414. Of that amount, approximately 12 million mineral acres – less than 2% of the federal mineral estate – are subject to oil and gas production. *See id.* Yet in FY 2020, the onshore federal oil and gas program generated approximately $3 billion in the form of royalties, rents, bonuses, and other fees on federal and Indian leases (notwithstanding the economic effects of the COVID-19 pandemic).[2] *See* Dep't of Interior, Nat. Res. Revenue Data.[3] Approximately half of federal oil and gas royalty, rental fee, and

---

[2] In FY 2019, the last fiscal year unaffected by the pandemic, federal oil and gas revenues were almost thirty percent higher. *See* Dep't of Interior, Nat. Res. Revenue Data, https://revenuedata.doi.gov/explore (last visited Aug. 30, 2021).

[3] Available at: https://revenuedata.doi.gov/explore (last visited Aug. 30, 2021). To the extent federal Respondents considered revenue data in any analyses relevant to this case, the administrative record confirms that this is the data source federal Respondents considered. *See* A.R. at 668; *id.* at 877; *id.* at 1308; *id.* at 2618.

bonus bid revenue is paid to the state in which the development occurred.  *See* 30 U.S.C. § 191; *see also, e.g.,* A.R. at 71 (explaining that "Colorado receives 49 percent of the total revenue associated with federal mineral leases"); *id.* at 631 ("Forty-nine percent of Federal revenue associated with oil and gas from public domain lands are distributed to the state."); *id.* at 863 ("[T]he State of Utah retains 49 percent of the proceeds."). Revenues associated with oil and gas production fund, among other functions, law enforcement, infrastructure, first responder services, primary and secondary education, clinics, hospitals, and other civil services. *See* A.R. at 631; *see also id.* at 1175 ("Revenue from oil and gas development accounts for one-third of New Mexico's operating budget and much of the production in New Mexico occurs on Federal land administered by the BLM.").

## A.   FEDERAL OIL AND GAS LEASING PROCESS.

The Federal Land Policy and Management Act, 43 U.S.C. §§ 1701-87 ("FLPMA"), governs the land use planning process that precedes federal oil and gas leasing. Among other considerations, BLM must plan to: (i) protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values, *see* 43 U.S.C. § 1701(a)(8); *and* (ii) account for the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands, *see* 43 U.S.C. § 1701(a)(12). Through an exhaustive National Environmental Policy Act ("NEPA") process involving extensive opportunities for

- 4 -

public review and comment, resource management plans are prepared for all federal lands and resources. *See* 43 U.S.C. § 1712(a). Each field office prepares an environmental impact statement ("EIS") that analyzes management alternatives for the lands and resources within the field office's boundaries. *See* 43 C.F.R. § 1610.1(b). "[A]pplicable regulations [] require that the public must have a chance 'to become meaningfully involved in and comment on the preparation and amendment of' [resource management plans]." *W. Energy All. v. Zinke*, 877 F.3d 1157, 1161 (10th Cir. 2017) (quoting 43 C.F.R. § 1610.2(a)).

The resource management plans establish which areas within each field office's boundaries are open to oil and gas leasing and which areas are closed. *See* A.R. at 259 ("The decision as to which public lands and minerals are open for leasing . . . is made during the land use planning process."); *id.* at 1028 ("Decisions as to which public lands and minerals are open for leasing . . . are made during the land use planning process using available information."). For open areas, the resource management plan analyzes impacts of reasonably foreseeable development and enumerates any stipulations needed to provide extra protection for sensitive resources in the plan area. *See id.* at 259 (explaining that the determination of what "leasing stipulations may be necessary is made during the land use process"). All subsequent activity on designated lands, including oil and gas development, must conform to the resource management plans. *See Zinke*, 877 F.2d at 1161-62; *see also*

- 5 -

A.R. at 17 ("The BLM objective is to place reliance on land-use planning and associated NEPA analyses . . . to support oil and gas leasing decisions.").

The Mineral Leasing Act and its implementing regulations govern the next phase of federal oil and gas development – the leasing process at issue in this suit. Unlike FLPMA, the Secretary's obligations under the Mineral Leasing Act do not involve weighing competing interests – Congress stated expressly that the Mineral Leasing Act's purpose is "[t]o promote the mining of coal, phosphate, oil, oil shale, and sodium on the public domain." Act of Feb. 25, 1920, ch. 85, § 32, 41 Stat. 437; *see also Harvey v. Udall*, 384 F.2d 883, 885 (10th Cir. 1967) (recognizing that the Mineral Leasing Act's "purpose…was to promote the orderly development of the oil and gas deposits in the publicly owned lands of the United States through private enterprise") (internal quotation omitted).

Parcels in areas identified as open for oil and gas leasing in a resource management plan may be nominated for leasing through the submission of an expression of interest. *See* 43 C.F.R. pt. 3120. BLM regulations designate "land[s] included in an expression of interest" as "Lands available for competitive leasing" and mandate that such parcels "shall be offered for competitive leasing." 43 C.F.R. § 3120.1-1(e). The Mineral Leasing Act requires that "[l]ease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. §

- 6 -

226(b). Consistent with this requirement, BLM undertakes NEPA analysis to evaluate impacts associated with leasing the nominated parcels, addresses and resolves any protests members of the public might file in association with nominated parcels, and conducts the lease sale.[4] *See* A.R. at 1156 (acknowledging that once parcels are nominated through an expression of interest, "a BLM interdisciplinary team reviews each parcel to ensure resource management plan conformance and analyzes potential environmental impacts").

## B.     CANCELLATION OF THE 2021 LEASE SALES.

On January 27, 2021, President Biden issued Executive Order 14008, directing that:

> [t]o the extent consistent with applicable law, the Secretary of the Interior shall pause new oil and natural gas leases on public lands or in offshore waters pending the completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and offshore waters, including potential climate and other impacts associated with oil and gas activities on public lands or in offshore waters.

---

[4] Once leases are issued, there is yet another round of NEPA analysis before any operational activity can occur. Before drilling, the lease "operator shall submit…for approval an Application for Permit to Drill [("APD")] for each well." 43 C.F.R. § 3162.3-1(c). NEPA requirements must be satisfied before BLM can issue a permit, 30 U.S.C. § 226(p)(2)(A), with the NEPA review "used in determining whether or not an [EIS] is required and in determining any appropriate…conditions of approval of the submitted plan." 43 C.F.R. § 3162.5-1(a).

A.R. at 1138. BLM leadership interpreted Executive Order 14008 as requiring the agency to "pause[] new oil and gas leasing." *Id.* at 1313.

### 1.    The First Quarter Lease Sales.

Between January 27 and February 12, varying notations were added to the websites of BLM's State Offices indicating that all onshore oil and gas lease sales scheduled for the first quarter of 2021 had been cancelled. In virtually all cases, BLM's national leadership – not local State Office officials – personally oversaw and authorized these cancellations. *See* A.R. at 1314 (acknowledging that BLM delayed posting notices for *all* lease sales planned for March 2021 and halted any public comment periods for *all* planned lease sales); *see also* discussion *infra* Part I.B.1.a-d. BLM's national leadership officials directed State Offices to post notices of cancellation on the various State Office websites. *See* A.R. at 2414. And BLM's national leadership dictated messaging and media advocacy concerning the cancellations. *See id.*

### a.    Nevada.

On the same day Executive Order 14008 was issued, BLM's Nevada State Office issued a notice advising that an oil and gas lease sale previously set for March 9, 2021 had been "postponed." A.R. at 1132. Nevada's notice acknowledged that the March 9, 2021 sale was to involve seventeen parcels that had been nominated through expressions of interest. *See id.* Nevada's notice did not identify any reason

why the lease sale was being postponed or offer any date at which the cancelled sale

would be rescheduled.[5] *See id.*

### b.  Colorado & Montana/Dakotas.

On February 4, 2021, Michael D. Nedd, BLM's Deputy Director,[6] requested

that Laura Daniel-Davis, Senior Advisor to the Secretary of the Interior,[7] authorize

BLM's Colorado State Office to conduct an oil and gas lease sale on March 30,

2021.[8] *See* A.R. at 1150. Nedd indicated that the sale would involve eighty-six

parcels that had been timely nominated through expressions of interest.[9] *See id.* at

1150-51 ("Each parcel identified in this sale was nominated by an expression of

interest on or before the cutoff date."). Nedd advised that the "sale parcels were

analyzed in [Environmental Assessments] prepared by BLM for both BLM and

---

[5] Though the cancellation notice was issued on January 27, 2021, e-mail correspondence in the administrative record reveals that the decision to cancel the lease was made no later than January 25, 2021. *See* A.R. at 1131. Like the January 27, 2021 cancellation notice, the e-mail correspondence does not identify any reason why the Nevada sale was being cancelled. *See id.*

[6] On February 4, 2021, Nedd was exercising the delegated authority of the BLM Director. *See* A.R. at 1150.

[7] On February 4, 2021, Daniel-Davis was exercising the delegated authority of the Assistant Secretary of Land and Minerals Management. *See* A.R. at 1150.

[8] Nedd's memorandum to Daniel-Davis noted that the sale was scheduled for March 25, 2021 but requested that the date of the sale be changed to March 30, 2021. *See* A.R. at 1151.

[9] Nedd explained that ninety-six parcels had been nominated in total, but that BLM was seeking to defer ten parcels. *See* A.R. at 1150.

Forest Service parcels" and that "[s]coping and public comment periods were held for these NEPA documents." *Id.* at 1151. Nedd stated that a "Finding of No Significant Impacts and Decision Record documents would be signed before the sale." *Id.*

On the same day, Nedd requested that Daniel-Davis authorize BLM's Montana/Dakotas State Office to conduct an oil and gas lease sale on March 23, 2021. *See id.* at 1153. Nedd indicated that the sale would involve seventeen parcels that "have been identified as available for leasing and were nominated through submitted [expressions of interest]." *See id.* at 1154. The proposed sale included nominated parcels located in both Montana and North Dakota. *See id.* at 1153; *id.* at 1185. Nedd enclosed with his request the draft Environmental Assessment ("EA"), Decision Record, and Finding of No Significant Impact ("FONSI") that BLM had prepared in association with the sale. *See id.* at 1154. Nedd added that "no litigation or appeals have been filed on this sale or the NEPA document for this sale." *Id.* at 1155.

On February 12, 2021, Travis Annatoyn, Acting Deputy Solicitor for the Department of the Interior, recommended that Daniel-Davis postpone both Colorado's and Montana/Dakota's March 2021 lease sales. *See id.* at 1169. Annatoyn observed that "numerous courts have recently remanded or vacated agency actions for want of proper analysis of greenhouse emissions" and concluded

- 10 -

that "there is a significant likelihood that [the greenhouse gas] analysis of the Colorado and Montana/Dakotas leases does not satisfy NEPA and is therefore vulnerable to litigation." *Id.* at 1170 (citing *Columbia Riverkeeper v. U.S. Army Corps of Eng'rs*, No. 3:19-cv-6071-RJB, 2020 WL 6874871 (W.D. Wash. Nov. 23, 2020), and *WildEarth Guardians v. Bernhardt*, No. 1:16-cv-1724-RC, 2020 WL 6701317 (D.D.C. Nov. 13, 2020)). Annatoyn neither identified any inadequacies in the greenhouse gas analyses prepared for the Colorado or Montana/Dakotas sales nor compared the EAs prepared for the Colorado and Montana/Dakotas sales with the environmental documents that were the subject of the cases he cited. On February 12, 2021, Daniel-Davis concurred with Annatoyn's recommendation to cancel the sales without additional comment. *See* A.R. at 1170.

On February 12, 2021, the website for the Colorado State Office added a notation indicating that "[t]he oil and gas lease sale scheduled for March 25, 2021 has been postponed." *Id.* at 1173. On the same day, the website for the Montana/Dakotas State Office added a notation that "lease sales in Colorado, Montana, Utah, and Wyoming are postponed." *Id.* at 1167. Neither website

- 11 -

identified any reason why the lease sale was being postponed or offered any date at which the cancelled lease sale would be rescheduled.[10]

### c.   Utah and Wyoming.

Also on February 4, 2021, Nedd requested that Daniel-Davis authorize BLM's Utah State Office to conduct an oil and gas lease sale in March 2021. *See* A.R. at 1148. Nedd indicated that the sale would involve one parcel and that the "oil and gas industry has expressed interest in this lease sale."[11] *See id.* at 1148-49. Nedd explained that a draft EA prepared for the March 2021 sale had been made available for public comment in December 2020, BLM had received eight comments responsive to the EA, and BLM was prepared to post an updated EA that included responses to these comments on the same day the notice of competitive lease sale would be posted for the March 2021 sale.[12] *See id.* at 1149.

On the same day, Nedd also requested that Daniel-Davis authorize BLM's Wyoming State Office to conduct an oil and gas lease sale in March 2021. *See id.* at

---

[10] The notice on the Montana/Dakotas website also failed to note that lease sales in additional states, including North Dakota (which is under the jurisdiction of the Montana/Dakotas State Office), had been cancelled. *See* A.R. at 1167.

[11] Nedd explained that nine parcels had been nominated in total, but that BLM was seeking to defer eight parcels "based on Greater Sage-grouse habitat overlap." A.R. at 1148.

[12] Nedd's memorandum acknowledged that the deadline to post a notice of competitive lease sale for the March 2021 lease sale was February 12, 2021 – only eight days later. *See* A.R. at 1148-49.

1156. Nedd indicated that the sale would involve 383 parcels that had been nominated through expressions of interest.[13] *See id.* at 1157. Nedd advised that an EA had been prepared for the March 2021 lease sale and would be posted for public comment along with the regulatory notice of the lease sale. *See id.* at 1156. Nedd emphasized that "[p]ublic comments and protests will be addressed before any lease is issued." *Id.* Nedd also stated that "[c]oncerns raised in ongoing litigation" – including concerns pertaining to BLM's analyses of climate change and greenhouse gas emissions, implementation of leasing policy documents, and prioritization of Greater Sage-grouse habitats – "will be satisfactorily addressed in the [EA] and Protest Decision before any lease is issued." *Id.* at 1157.

By memorandum dated February 11, 2021, Gregory Sheehan, BLM's Utah State Director, recommended to Nedd that Utah's March 2021 lease sale be postponed. *See id.* at 1163. Citing a December 10, 2020 order in *Rocky Mountain Wild v. Bernhardt*, 506 F. Supp. 3d 1169 (D. Utah 2020), Sheehan implied that uncertainty existed whether BLM's EA for the March 2021 sale adequately evaluated reasonable alternatives to the leasing decision the EA proposed. Sheehan asserted that "BLM requires additional time to review the Court's ruling and

---

[13] Nedd explained that 426 parcels had been nominated in total, but that the Wyoming State Office had been granted approval to defer 43 parcels. *See* A.R. at 1157.

rationale in order to determine to what extent, if any, that decision affects the Leasing EA prepared in connection with the March 2021 Lease Sale." A.R. at 1164. Sheehan's memorandum did not conclude that the EA prepared for the March 2021 sale was inadequate. Nor did Sheehan explain why the Utah State Office had failed to incorporate the holding in *Rocky Mountain Wild* in the nine weeks since the decision was entered or why the State Office waited until the day before the deadline to notice first quarter lease sales before raising the concern to BLM's leadership. On February 12, 2021, Nedd concurred with Sheehan's recommendation without additional comment. *See id.*

Also on February 12, 2021, in the same memorandum in which Annatoyn recommended that Daniel-Davis cancel the Colorado and Montana/Dakotas March 2021 lease sales, Annatoyn recommended that the first quarter lease sales in Utah and Wyoming be cancelled because, according to Annatoyn, "BLM has not prepared Environmental Assessments for the proposed lease sales in these states." *Id.* at 1170. Daniel-Davis concurred with Annatoyn's recommendation on the same day. *See id.* It is unclear why Daniel-Davis concurred with Annatoyn's assertion that no EA had been prepared for the March 2021 sales in Utah or Wyoming when, only eight days previous, Nedd had described both EAs and the related environmental reviews conducted in association with the same sales in Nedd's memoranda requesting

- 14 -

Daniel-Davis approve the March 2021 sales in Utah and Wyoming. *See id.* at 1149 (Utah); *id.* at 1156-57 (Wyo.).

On February 12, 2021, the website for the Utah State Office added a notation indicating that "[t]he oil and gas lease sale scheduled for March 30, 2021 has been postponed." *Id.* at 1171. The Utah State Office's notation did not identify any reason why the lease sale was being postponed or offer any date at which the lease sale would be rescheduled. On the same day, the website for the Wyoming State Office added a notation indicating that "lease sales in Colorado, Montana, Utah, and Wyoming are postponed to confirm the adequacy of underlying environmental analysis." *Id.* at 1172. Wyoming's notation did not identify any specific concerns with the "adequacy of underlying environmental analysis" or provide any explanation why those concerns could not be addressed through the applicable NEPA process.

### d.   Eastern States.

By memorandum dated February 12, 2021, Mitchell Leverette, BLM's Eastern States Director, recommended to Nedd that an Eastern States lease sale scheduled to be conducted on March 18, 2021 be postponed until June 17, 2021. *See* A.R. at 1166. The March 18, 2021 sale involved one parcel in Alabama and thirteen parcels in Mississippi that had been nominated through expressions of interest. *See id.* at 1165. Leverette advised that an EA had been prepared for the Alabama parcel

- 15 -

and that BLM had completed a public comment period on the EA in December 2020. *See id.* Leverette also stated a Determination of NEPA Adequacy ("DNA") had been completed for the Mississippi parcels. *See id.*

Citing the November 13, 2020 order in *WildEarth Guardians*, 2020 WL 6701317, Leverette asserted that "the DNA for [the] 13 parcels in [Mississippi] needs additional air quality analysis, including greenhouse gas (GHG) analysis." A.R. at 1166. Leverette neither identified any inadequacies in the greenhouse gas analysis nor compared the air quality analyses in the DNA to the analyses contained in the environmental documents that were the subject of *WildEarth Guardians*. On February 12, 2021, Nedd concurred with Leverette's recommendation without additional comment. *See id.* The administrative record does not contain any evidence that the decision to postpone the first quarter Eastern States sale was ever communicated to the public.

### 2.      The Second Quarter Lease Sales.

In an undated memorandum sent sometime before February 23, 2021, Nedd requested that Daniel-Davis authorize BLM's New Mexico State Office to conduct an oil and gas lease sale during the week of April 12, 2021.[14] *See* A.R. at 1174. Nedd

---

[14] Petitioners presume that the memorandum was sent before February 23, 2021 because, on that date, Daniel-Davis sent an e-mail to Nedd indicating that Daniel-Davis had been advised that the April 2021 lease sale for New Mexico had been

indicated that the sale would involve "six Federal oil and gas lease parcels totaling 535.72 acres." *Id.* at 1175. Nedd described the NEPA documents associated with the April 2021 sales as: (i) an EA that BLM New Mexico's Pecos District prepared; (ii) a FONSI; and (iii) a DNA that BLM New Mexico's Oklahoma Field Office prepared based on an EA evaluating leasing in the same area. *See id.* at 1174. On February 24, 2021, Steven Wells, BLM New Mexico's State Director, confirmed for Nedd that the NEPA analyses prepared in association with the April 2021 sale was complete. *See id.* at 2423 ("The NEPA is ready."); *id.* at 2424 (confirming that "NEPA is completed" for parcels in New Mexico and Oklahoma).

Sometime between February 12, 2021 and February 23, 2021, the BLM New Mexico State Office cancelled the April 2021 sale. The New Mexico State Office cancelled the sale "when they saw all the March sales were postponed." *Id.* at 2420. The decision was not based on any evaluation of the merits of the April 2021 sale but rather on a "'perception' that all future sales would be postponed." *See id.* The administrative record does not contain any evidence that the decision to postpone the April 2021 lease sale in New Mexico was ever communicated to the public.[15]

---

postponed. *See* A.R. at 2422. Daniel-Davis' e-mail inquired "why and when they made that decision?" *Id.*

[15] BLM never considered holding a second quarter lease sale in any State Office other than New Mexico. *See* A.R. at 1179 (clarifying that "the only sale that was anticipated is in NM"). On April 21, 2021 – after Petitioners' filed the operative

- 17 -

### C.   PROCEDURAL POSTURE.

On June 15, 2021, the United States District Court for the Western District of Louisiana granted a nationwide injunction that prohibits federal Respondents from maintaining any "pause" of oil and gas lease sales. *See Louisiana v. Biden*, No. 2:21-cv-778, 2021 WL 2446010, at \*22 (W.D. La. June 15, 2021) (enjoining federal Respondents from "implementing the Pause of new oil and natural gas leases on public lands . . . as to all eligible lands, both onshore, and offshore"). The *Louisiana* court specifically referenced the cancellation of the same individual oil and gas lease sales Petitioners have identified in this case, *see supra* Part I.B.1-2, as examples of cancellations that violated controlling law. *See Louisiana*, 2021 WL 2446010, at \*16 (documenting onshore lease sales scheduled for March and April 2021 that were improperly cancelled). Despite this injunction, federal Respondents have not taken

---

complaint in this action – BLM issued a press release advising that BLM "is exercising its discretion to not hold lease sales in the 2nd quarter of Calendar Year 2021." Bureau of Land Mgmt., Statement on Second Quarter Oil & Gas Lease Sales (Apr. 21, 2021), available at: https://www.blm.gov/press-release/statement-second-quarter-oil-and-gas-lease-sales (last visited Aug. 30, 2021). As support for its decision to cancel second quarter lease sales, BLM's press release references the pending review of oil and gas development practices called for under Executive Order 14008. *See id.* The press release does not address the fact that parcels in areas open to oil and gas have been nominated through expressions of interest in all states in which lease sales have been canceled or identify any provision of Executive Order 14008 or other authority that allows oil and gas lease sales to be cancelled while President Biden's review is being conducted.

any steps to reinstate any cancelled oil and gas lease sale. To the contrary, on July 27, 2021, the Secretary testified that, notwithstanding the order in *Louisiana*, the pause on federal leasing was still in effect. *See* Full Comm. Hr'g to Examine the President's FY 2022 Budget Request for the Dep't of the Interior: Hr'g Before the Sen. Comm. on Energy & Nat. Res. (July 27, 2021) (Oral testimony of Hon. Debra Haaland at 1:18:59-1:19:08) ("You can say that as soon as, you know, one lease sale happens that the pause is over."); *id.* at 1:19:19-1:19:31 ("Well, technically, I suppose you could say the pause is still in place."). At the time of this filing, no cancelled lease sale has been reinstated and federal Respondents have missed the regulatory deadline to issue notice for any lease sale to be conducted in the third quarter of 2021. *See* 43 C.F.R. § 3120.4-2 (requiring public notice of lands to be auctioned at least forty-five days in advance of an oil and gas lease sale).

On August 24, 2021, federal Respondents advised the court in *Louisiana* that they had no intention of reinstating or conducting the 2021 lease sales that have already been cancelled. Federal Respondents represented instead that BLM State Offices had been directed "to finalize parcel lists for upcoming sales, in order to publicly post those parcel lists for NEPA scoping by August 31, 2021." Defs.' Mem. in Opp'n to Pls.' Mot. for Order to Show Cause & Compel Compliance with Prelim. Inj. at 5, *Louisiana v. Biden*, No. 2:21-cv-00778-TAD-KK (W.D. La. Aug. 24, 2021), ECF No. 155 ("Gov't La. Br."). "Following scoping, BLM anticipates

- 19 -

publishing draft NEPA documents for public comment in October 2021, followed by a notice of sale published in December 2021." *Id.*

Federal Respondents' representations to the court in *Louisiana* fail to acknowledge that parcel lists for the first and second quarter 2021 sales already exist, and do not disclose that the NEPA work associated with those sales is already complete. Federal Respondents did not cite any authority in their August 24, 2021 filing in *Louisiana* excusing federal Respondents from the obligation to conduct oil and gas lease sales in the third or fourth quarters of 2021. Vague and noncommittal representations of what federal Respondents hope or intend do not constitute compliance with express statutory obligations or the injunction the *Louisiana* court issued. Federal Respondents have still not scheduled a single onshore oil and gas lease sale in any jurisdiction.

## II.   <u>STANDARD OF REVIEW</u>.

On March 17, 2021, Petitioners filed their operative petition for review of final agency action under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"). Under the APA, the reviewing court must: (i) "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and (ii) "hold unlawful and set aside agency action" determined to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory

- 20 -

jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law," 5 U.S.C. § 706(2)(A)-(D); *see also Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (construing 5 U.S.C. § 706(2)(A)-(D) as providing "the generally applicable standards").

The court must set aside agency action "unless it is supported by substantial evidence in the administrative record." *Via Christi v. Leavitt*, 509 F.3d 1259, 1271 (10th Cir. 2007) (quoting *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004) (internal quotation omitted)). *See also* 5 U.S.C. § 706(2)(E). In determining whether substantial evidence supports the agency's decision, "the court must also consider that evidence which fairly detracts from the [agency's] decision." *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 854 (10th Cir. 2007).

Agency action must be "based on a consideration of the relevant factors." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "It is a 'foundational principle of administrative law' that judicial review of agency action is limited 'to the grounds

that the agency invoked when it took the action.'" *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (quoting *Michigan v. Envtl. Prot. Agency*, 576 U.S. 743, 758 (2015)).

## III.    <u>THE LEASE SALES MUST BE REINSTATED.</u>

Petitioners recognize that the Mineral Leasing Act "vest[s] the Secretary with considerable discretion to determine which lands will be leased." *W. Energy All. v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013). But the existence of discretion does not mean that the Secretary and BLM may ignore statutory requirements circumscribing that discretion or that the leasing process is subject to nothing more than the Secretary's whim. The United States Court of Appeals for the Tenth Circuit has recognized that "[b]oth the [Mineral Leasing Act] and the associated regulations provide for quarterly lease sales." *Zinke*, 877 F.3d at 1158.

Congress has also determined that it is "in the national interest to foster and encourage private enterprise in," among other endeavors, "the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs." Mining & Minerals Policy Act of 1970, 30 U.S.C. § 21a. Congress has directed that access to federal lands for energy development must be efficient. Among other obligations, BLM is required "[t]o ensure timely action on oil and gas leases" and to effect policy that: (i) "ensure[s] expeditious compliance" with NEPA and any other

- 22 -

applicable environmental and cultural resources laws. Energy Policy Act of 2005, 42 U.S.C. § 15921(a)(1)(A). BLM's cancellation of lease sales violates not only express terms of the Mineral Leasing Act, but also the Congressional will reflected in these additional directives. Because BLM's cancellation of lease sales disregards controlling law, the cancellations must be vacated and the cancelled lease sales immediately reinstated.

### A.   CANCELLATION   VIOLATES   EXPRESS   STATUTORY REQUIREMENTS.

In exercising her discretion to lease, the Secretary is subject to a discrete, ministerial obligation that the Mineral Leasing Act says the Secretary "shall" abide: "Lease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. § 226(b). At the time BLM cancelled the first and second quarter lease sales – between January 27, 2021 and February 23, 2021 – eligible lands were available in each of the states for which BLM cancelled sales. Because those same lands continue to be eligible and available now, federal Respondents' indefinite suspension of the lease sales process constitutes an ongoing violation of federal Respondents' statutory obligations.

"'Eligible' lands comprise all lands 'subject to leasing, i.e, lands not excluded from leasing by a statutory or regulatory prohibition.'" *Zinke*, 877 F.3d at 1162

- 23 -

(quoting BLM Manual 3120 § 3120.11 (Feb. 18, 2013)); A.R. 8 (applying the term "eligible" to "the lands not closed by law"); *id.* at 17 (defining "lands eligible for leasing" as "lands considered not to be excluded from leasing by a statutory or regulatory prohibition"). The documentation that was prepared in association with each of the cancelled sales identified the parcels that were to be offered in that sale. *See*, *e.g.*, *id.* at 1148 (enclosing the EA that identified the nine parcels that had been nominated for the first quarter sale in Utah and a deferral memo seeking to defer eight of the parcels); *id.* at 1151 (advising that "[t]he sale parcels [for the first quarter Colorado sale] were analyzed in EAs prepared by BLM" and requesting permission to defer ten of the identified parcels); *id.* at 1154 (noting that Appendix A to the EA prepared for the first quarter Montana/Dakotas sale "provides a list of all the parcels by parcel number, and identifies the size, legal descriptions, and associated stipulations"). The parcels that were to be offered are all located in areas that are not statutorily excluded from leasing and that are open to oil and gas leasing under the applicable resource management plans. *See*, *e.g.*, *id.* at 244 (concluding that leasing the parcels identified for the March 2021 sale in Colorado "conforms with the decisions contained in the applicable RMPs for the planning area"); *id.* at 575 ("The lease parcels to be potentially offered for sale are within an area determined to be open to oil and gas leasing in the RMPs."); *id.* at 1927 ("The sale and issuance of

- 24 -

the leases conforms to the approved RMPs. . . and Records of Decisions [] for the applicable planning areas, as amended or updated.").

Each of the cancelled lease sales involved eligible parcels that were nominated for leasing through an expression of interest. *See, e.g., id.* at 1150-51; *id.* at 1154; *id.* at 1157; *id.* at 1165. BLM's "regulations provide that '[l]ands included in any expression of interest' are 'available for leasing' and 'shall be offered for competitive bidding.'" *Zinke*, 877 F.3d at 1162 (quoting 43 C.F.R. § 3120.1-1(e)). In other words, when eligible parcels are nominated, they become legally "available" and "[t]he [BLM] State Office then conducts a competitive lease sale auction." *Zinke*, 877 F.3d at 1162 (citing 30 U.S.C. § 226(b)(1)(A)).

## 1.   <u>Nominated Lands are "Available."</u>

Petitioners anticipate Respondents will ask this Court to disregard 43 C.F.R. § 3120.1-1(e) and suggest that applying the regulation's plain language would somehow transfer the power to decide which lands may be leased from the Secretary to interested bidders. That argument is both factually incorrect and contrary to the Department of the Interior's historic understanding of what the term "available" means legally.

The quarterly sale requirement for "eligible" and "available" lands was added in 1987 when Congress amended the Mineral Leasing Act by enacting the Federal Onshore Oil and Gas Leasing Reform Act ("Reform Act"). *See* Pub. L. No. 100-203

- 25 -

§ 5102(a), 101 Stat. 1330 (Dec. 22, 1987). In June 1988, BLM enacted regulations – including 43 C.F.R. § 3120.1-1(e) – to implement the Reform Act's provisions. *See* 53 Fed. Reg. 22,814 (June 17, 1988). While Respondents will likely suggest that Petitioners' interpretation of 43 C.F.R. § 3120.1-1(e) improperly expands the definition of "available" to *add* those lands in which oil and gas operators might have an interest, the regulatory preamble for the 1988 regulations clarifies that Petitioners' interpretation is correct and, in fact, *narrows* what would otherwise be an even broader understanding of "available" lands to *only* those land in which oil and gas operators have interest.

BLM explained in 1988 that the "term 'available' means any lands subject to leasing under the Mineral Leasing Act." 53 Fed. Reg. at 22,828. BLM understood this also led to a problem; given the regulatory prerequisites applicable to offering a parcel in a competitive lease sale, it would be an administrative impossibility to offer all such lands on any confined timeline. *See id.* (rejecting commenter's suggestion that all "available" parcels be offered through competitive leasing within eighteen months of a parcel's availability). On the other hand, BLM noted that "far more lands are and always have been available than have been leased." *Id.* ("[M]any if not most land will not be 'offered' by the Bureau but are nonetheless available for . . . expressions of interest."). The 1988 regulations resolve BLM's administrative conundrum not by compelling BLM to lease anything-and-everything, but rather by

focusing BLM's leasing efforts exclusively on the portion of "available" lands in which oil and gas operators have demonstrated an interest. *See id.* ("The final rulemaking expands categories of available lands in this section to include lands for which an offer or expression of interest has been received by the proper BLM office.")

Contrary to the inference Respondents would have the Court draw, this understanding does nothing to limit the Secretary's leasing discretion or force the Secretary to lease any individual parcel. As a preliminary manner, oil and gas operators may only submit expressions of interest for those parcels determined to be open for oil and gas leasing under the applicable resource management plan. The Department of the Interior has long understood that "'[a]vailable' lands could be considered those lands for which BLM has exercised the Secretary's discretion through land use planning." A.R. at 8.

Equally important, current regulations authorize BLM to "suspend the offering of a specific parcel while considering a protest or appeal against its inclusion in a Notice of Competitive Lease Sale." 43 C.F.R. § 3120.1-3. The administrative record reflects that BLM is not only aware of this mechanism for withholding parcels but invokes it routinely. *See*, *e.g.*, A.R. at 1148 (requesting authorization to defer eight parcels nominated for March 2021 sale in Utah); *id.* at 1150 (seeking authorization to defer ten parcels nominated for March 2021 sale in Colorado); *id.*

- 27 -

at 1157 (referencing deferral of forty-three parcels nominated for March 2021 sale in Wyoming). The essential point is, if federal Respondents can articulate an explanation for withholding individual parcels that is not arbitrary and capricious, a regulatory mechanism exists that would allow federal respondents to withhold parcels that are otherwise "available" under 43 C.F.R. § 3120.1-1(e).[16]

### 2.    The Secretary Lacks Discretion to Postpone Lease Sales.

Rather than implicate any aspect of federal Respondents' discretion, Petitioners seek a straightforward ruling that federal Respondents' decision not to conduct the first and second quarter lease sales for reasons other than a lack of eligible parcels is illegal coupled with an order compelling federal Respondents to reinstate those sales.[17] Federal courts that have considered the identical issue before

---

[16] Despite BLM's familiarity with 43 C.F.R. § 3120.1-3, there is no evidence in the administrative record that BLM relied on the provision as its basis for cancelling any lease sale. This omission is not surprising. Given that BLM declined to post a Notice of a Competitive Lease Sale for any 2021 lease sale and halted any public comment periods for all planned lease sales on or before January 28, 2021, *see* A.R. at 1314, there would have been no protests or appeals to resolve.

[17] The statutory deadline contained in 30 U.S.C. § 226(b)(1)(A) also undermines any contention that cancellation of individual lease sales are merely interim postponements of lease sales and not final agency action. What Petitioners challenge here is not the decision to simply delay the individual sales described above, *see supra* Part I.B.1-2, but the decision not to conduct those sales *in the first and second quarter* of 2021. Both the first and second quarters of 2021 have come and gone. The third quarter will conclude before briefing on the merits in this case is complete and federal Respondents have already missed the regulatory deadline to notice any competitive lease sale in the third quarter of 2021. Federal Respondents have

this Court have confirmed that this request constitutes a permissible action to "enforce a discrete, non-discretionary duty contained in a single statutory provision [30 U.S.C. § 226(b)(1)(A)]." *W. Energy All. v. Jewell*, No. 1:16-CV-00912-WJ-KBM, 2017 WL 3600740, at *13 (D.N.M. Jan. 13, 2017); *see also Louisiana*, 2021 WL 2446010, at *20 (concluding that 5 U.S.C. § 706(1) authorizes the court to compel BLM to conduct lease sales of eligible and available lands). It is the cancellations of entire lease sales based on administrative whim, convenience, or preference – despite the existence of "eligible" parcels that are "available for leasing" – that makes federal Respondents' action impermissible.

The characterization of the Reform Act's quarterly lease sales requirement as a mandatory, non-discretionary obligation is consistent with the plain language of 30 U.S.C. § 226(b) and the Department of the Interior's understanding of the statute at the time it was enacted. Only eleven years before enacting the Reform Act, Congress amended 30 U.S.C. § 201(a), the provision of the Mineral Leasing Act that governs the timing of federal coal leasing. *See* Pub. L. 94-377 § 2, 90 Stat. 1083

---

recently represented to the court in *Louisiana* that they have no intention of reinstating the sales that have already been cancelled and do not plan to conduct an onshore oil and gas lease sale in the fourth quarter of 2021. *See* Gov't's La. Br. at 5. The decision not to conduct the cancelled sales before the applicable statutory deadlines is therefore not interlocutory, but final and, in the case of sales that should have been conducted in the first three quarters of 2021, irreversible.

(Aug. 4, 1976). Unlike the Reform Act, the coal amendments did not apply a deadline or define a periodicity for coal leasing. The Secretary is instead authorized to divide coal parcels into "leasing tracts of such size as [s]he finds appropriate and in the public interest" and then once done, the Secretary "shall, in [her] discretion, upon the request of any qualified applicant or his own motion, from time to time, offer such lands for leasing and shall award leases thereon by competitive bidding." 30 U.S.C. § 201(a). The coal amendments demonstrate that, when Congress wishes to leave lease timing to the Secretary's discretion, Congress has the language to do so. The omission of any reference to the Secretary's "discretion" in 30 U.S.C. § 226(b) and the substitution of the deferential "time to time" with the mandatory "at least quarterly" demonstrates that, in enacting the Reform Act, Congress intentionally circumscribed the Secretary's discretion concerning when oil and gas lease sales should occur.

This understanding of Congressional intent is consistent with the Office of the Solicitor's observation in December 1989 that "that Congress did not intend to give the Secretary any discretion in this regard." A.R. at 8. The Solicitor asserted – and Petitioners acknowledge here – that nothing in the Reform Act requires the Secretary to offer *all* parcels or any individual parcel on a quarterly basis. *See id.* ("As long as interested bidders are not stymied by a limited number of parcels, BLM may exercise its discretion to limit its administrative work where, for example, there is no

demonstrable interest in leasing."). But the Solicitor concluded: "A sale, however, must still be held each quarter." *Id.* The Solicitor's position in 1989 is precisely the one Petitioners advance here – though BLM controls the process of making lands available for leasing through the resource management planning and nomination processes, "where eligible lands are available," the obligation to offer those lands for lease is mandatory.

### 3. Respondents' NEPA Failures do not Excuse Respondents' Failures Under the Mineral Leasing Act.

Petitioners expect Respondents to argue that – notwithstanding the plain language of BLM's regulations and the Tenth Circuit's observation that eligible parcels become "available" when nominated through an expression of interest – BLM was still authorized to cancel the 2021 lease sales because the NEPA review that is required to be conducted in association with those sales has not been finalized. *See* A.R. at 17 (asserting, in a non-binding agency handbook, that "[e]ligible lands are available for leasing when all statutory requirements and reviews, including compliance with [NEPA], have been met"). That argument suggests that federal Respondents are passive actors in the NEPA process. But the NEPA process is not something that happens to agencies, it is a process that agencies control. This Court should not let Respondents manufacture a lack of eligible and available parcels through federal Respondents' failure to satisfy NEPA's requirements.

The administrative record demonstrates that NEPA review for each of the cancelled lease sales is either already complete or was on schedule to be completed before the respective lease sale. *See, e.g.*, *id.* at 1149 (explaining that an EA prepared for the first quarter Utah sale – which had been updated after scoping and public comment period – was ready to be signed); *id.* at 1151 (confirming that "sale parcels [for the first quarter Colorado sale] were analyzed in EAs prepared by BLM for both BLM and Forest Service parcels" and noting that "[s]coping and public comment periods were held for these NEPA documents"); *id.* at 1154 (enclosing the EA and FONSI that were prepared for the first quarter Montana/Dakotas sale and indicating that these documents had been subject to both a scoping and public comment period); *id.* at 1156 (advising that the draft EA prepared for the first quarter Wyoming sale would be posted along with the sale notice); *id.* at 1165 (stating that an EA and a DNA had been prepared for the first quarter Eastern States lease sale); *id.* at 2423 (confirming that "[t]he NEPA is ready" for the April 2021 New Mexico sale). To the extent Respondents might argue that, even though this work had been completed, BLM desired additional time to properly account for various judicial decisions issued in 2020, that argument is both pretextual, inconsistent with the evidence in the administrative record, and totally inapposite when evaluated against the agency's statutory deadlines.

- 32 -

In a series of coincidentally timed memoranda issued on the eve of BLM's deadline to post notice of first quarter lease sales, various Interior officials recommended that individual lease sales be cancelled so that BLM would have additional time to evaluate the NEPA analysis prepared for those sales against judicial decisions issued in 2020: (i) on February 11, 2021, Sheehan recommended that the first quarter Utah sale be postponed, *see id.* at 1164; (ii) on February 12, 2021, Annatoyn recommended that the first quarter sales in Colorado, Montana/Dakotas, Utah, and Wyoming be postponed, *see id.* at 1170; and (iii) on February 12, 2021, Leverette recommended that the first quarter Eastern States sale be postponed, *see id.* at 1166. The judicial decisions referenced in Sheehan's, Annatoyn's, and Leverett's recommendation memoranda were issued at least two full months before the memoranda were transmitted. Yet *none* of these recommendations include any finding that NEPA documents prepared for any individual lease sale were inadequate under the judicial decisions cited. *None* of these recommendations include any explanation why the concern had not been raised until the deadline for posting notice of a first quarter lease sale. And most revealing, *none* explain why the concern over how to account for these judicial decisions was not already an issue when Nedd requested that Daniel-Davis approve the Colorado, Montana/Dakotas, Utah, and Wyoming first quarter lease sales on February 4, 2021

- 33 -

(just one week earlier). *See id.* at 1148 (Utah); *id.* at 1150 (Colo.); *id.* at 1153 (Mont./Dakotas); *id.* at 1146 (Wyo.).

The administrative record, in fact, refutes the contention that any additional time was needed to incorporate recent judicial decisions into NEPA documents for the first quarter sale. In his February 4, 2021 request that Daniel-Davis approve the first quarter lease sale in Wyoming, Nedd acknowledged "[c]oncerns raised in ongoing litigation," citing three lawsuits then pending, including the *WildEarth Guardians* suit in the United States District Court for the District of Columbia referenced in Annatoyn's February 12, 2021 memo. *See* A.R. at 1157. Rather than rely on these suits as a basis for cancelling the lease, Nedd assured Daniel-Davis that Wyoming's lease sale could be conducted because the "concerns raised . . . will be satisfactorily addressed in the [EA] and Protest Decision before any lease is issued." *Id.*

More than just timing evidences the pretextual nature of the recommendations to postpone lease sales. While Sheehan, Annatoyn, and Leverette cherry pick judicial decisions from late 2020 that ruled against federal agencies in NEPA cases, the same memoranda omit any analysis of decisions issued contemporaneously that *upheld* BLM's NEPA work in the same leasing context. *See*, *e.g.*, *WildEarth Guardians v. Bernhardt*, 501 F. Supp. 3d 1192 (D.N.M. 2020) (rejecting NEPA challenge to three lease sales conducted in New Mexico in a decision issued on November 19, 2020).

- 34 -

In other words, the implication that, in mid-February 2021, BLM did not have a legal template for how to successfully prepare NEPA analyses associated with oil and gas lease sales is simply inaccurate.

Perhaps most important, any effort to use NEPA as an administrative get-out-of-jail-free card constitutes an improper compartmentalization of federal Respondents' statutory obligations. The Mineral Leasing Act requires quarterly lease sales whenever eligible lands are available. Meeting that deadline requires BLM to undertake all the steps necessary to satisfy the prerequisites for oil and gas lease sales. One of those steps is completion of NEPA analyses. BLM can no more omit the NEPA step than any other step that must be taken to satisfy the quarterly leasing deadline. *See*, *e.g.*, A.R. at 1148 (recognizing that the BLM needed to post a notice of competitive lease sale for the first quarter by February 12, 2021 "to meet the regulatory 45-day timeline"). Since at least 1989, the Department of the Interior's own counsel has understood "that the obligation to hold quarterly sales carries with it the responsibility to plan the activities necessary to have eligible lands available for sale." *Id.* at 9. Those activities include NEPA.

Respondents would have this Court rule that BLM may simply decline to complete NEPA when doing so is inconvenient, complicated, or inconsistent with an administration's policy objectives. But while BLM may have some discretion over how a NEPA analysis is prepared and the conclusions reached, there is no

authority to support the conclusion that federal Respondents have any discretion over whether a NEPA analysis must be undertaken. While it is theoretically possible that after conducting NEPA, BLM may be able to articulate a non-arbitrary explanation for why a particular parcel cannot or should not be included in a specific lease sale, there is no support for the proposition that BLM may avoid compliance with the Mineral Leasing Act's quarterly mandate by simply declining to complete work that is statutorily required to satisfy that mandate.

### B.   CANCELLATION OF THE LEASE SALES IS ARBITRARY AND CAPRICIOUS.

Even if the Secretary possessed unfettered discretion over the timing of oil and gas lease sales under substantive law – which she does not – BLM's cancellation of the lease sales would still be invalid as a matter of administrative law. When an agency exercises discretion, it is axiomatic that the "agency must cogently explain why it has exercised its discretion in a given manner." *State Farm*, 463 U.S. at 48. The agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). A court will not uphold agency reasoning when it constitutes little more than pretext to support an outcome selected before the agency begins consideration of the issue. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551,

- 36 -

2575-76 (2019) (rejecting agency's reasoning as pretextual when evidence revealed a "disconnect between the decision made and the explanation given."). BLM's explanation of why lease sales were cancelled fails to meet this standard.

Should Respondents rely on Executive Order 14008 to support the cancellation of the lease sales, that reliance will be misplaced. Executive Order 14008 does not itself cancel any lease sales; the Order merely directs the Secretary to cancel leasing "[t]o the extent consistent with applicable law." A.R. at 1138. Executive Order 14008 does not cite to any data on which its instruction to cancel lease sales relies. Nor does Executive Order 14008 contain any factual findings that could be rationally connected to the policy choice cancelling lease sales embodies. While Executive Order 14008 is styled as a response to "a profound climate crisis," *id.* at 1133, nothing in the Order explains how cancellation of federal oil and gas leases – without corresponding restrictions on non-federal production of oil and gas or the public's consumption of the same – will advance the President's goals of "global reductions in greenhouse gas emissions and net-zero global emissions by mid-century or before."[18] *Id.*

---

[18] Not only does Executive Order 14008 omit any measures to decrease non-federal production of oil and gas or limit consumption, the Biden Administration has actively encouraged foreign producers to *increase* oil and gas production to meet unsatisfied demand. *See* The White House, *Statement by Nat'l Sec. Advisor Jake Sullivan on the Need for Reliable & Stable Global Energy Markets* (Aug. 11, 2021)

Executive Order 14008 directs that leasing be paused "pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices," but does not describe the format this "comprehensive review" should take, identify the legal authority for undertaking such a review, or establish a timeline within which the review must be completed. Executive Order 14008 does not cite any legal authority granting the Secretary the right to cancel lease sales while such a review is conducted or otherwise disregard the requirements of 30 U.S.C. § 226(b) and, indeed, no such authority exists. *See Louisiana*, 2021 WL 2446010, at *14 ("Although there is certainly nothing wrong with performing a comprehensive review, there is a problem in ignoring acts of Congress while the review is being completed.").

Executive Order 14008 does not include any discussion explaining why the current federal oil and gas leasing process – which involves technical review of "potential climate and other impacts" in the planning, leasing, and operational stages of oil and gas development, *see* discussion *supra* Part I.A – was insufficient to satisfy

---

(calling for OPEC+ nations to increase crude oil production), available at: https://www.whitehouse.gov/briefing-room/statements-releases/2021/08/11/statement-by-national-security-advisor-jake-sullivan-on-the-need-for-reliable-and-stable-global-energy-markets/ (last visited Aug. 30, 2021).

the Secretary's "broad stewardship responsibilities over the public lands and offshore waters." A.R. at 1138-39.

Beyond Executive Order 14008, the administrative record is entirely bereft of any evidence that support the cancellation of certain sales. Nothing in the administrative record identifies any reason why the first quarter sale in Nevada was cancelled. To the contrary, other than the inclusion of the cancellation notice that was published to the Nevada State Office's website, *see id.* at 1132, there is no substantive reference to the Nevada sale in any document included in the administrative record.

An explanation for the cancellation of the second quarter sale in New Mexico is likewise deficient. The administrative record establishes, in fact, that at the time the April 2021 New Mexico sale was cancelled, even BLM's leadership did not know why. *See id.* at 2419 (seeking information "on why and when" the New Mexico State Office cancelled the second quarter lease sale). Upon inquiry, it was discovered that the New Mexico State Office had cancelled the sale "when they saw all the March sales were postponed," *id.* at 2420, based on a "'perception' that all future sales would be postponed," *see id.* Rather than being a rational decision supported by substantial evidence related to the merits of the April 2021 sale, Nedd himself described the New Mexico State Office's "perception" as "based on misinformation." *Id.*

- 39 -

Support for the cancellation of lease sales in other states is little better. The only communication, in fact, that the State Offices for Nevada, Colorado, Montana/Dakotas, and Utah issued related to the cancellation of the first quarter 2021 lease sales were one-sentence notations on the State Offices' respective websites, noting that the first quarter lease sales had been "postponed." *See id.* at 1132 (Nev.); *id.* at 1173 (Colo.); *id.* at 1167 (Mont./Dakotas); *id.* at 1171 (Utah); *id.* at 1172 (Wyo.). None of the notations offered any explanation why the sale had been cancelled or identified any date on which the sale was to be rescheduled. None of the notations advised that lease sales in additional states, including North Dakota, New Mexico, and the Eastern States, had also been cancelled.[19]

To the extent Respondents may now rely on various memoranda recommending that certain sales be postponed, those arguments must also be rejected. Annatoyn's February 12, 2021 memorandum to Daniel-Davis recommends that the first quarter lease sales in Utah and Wyoming be cancelled because, according to Annatoyn, "BLM has not prepared Environmental Assessments for the proposed lease sales in these states." A.R. at 1170. But that assertion is demonstrably inaccurate. The administrative record establishes that not only had both the Utah and

---

[19] There is, in fact, no evidence in the administrative record that any notice of cancellation was ever posted on the websites of the New Mexico or Eastern States offices.

Wyoming State Offices prepared NEPA documents for the first quarter leases sales, but also that Daniel-Davis had knowledge that these documents existed and were fundamentally complete. *See id.* at 1149 (Utah); *id.* at 1156 (Wyo.).

But even were the memoranda not factually inaccurate, the pretextual and self-serving references to adverse judicial decisions, *see* discussion *supra* Part III.A.3, do not constitute justification for cancelling lease sales sufficient to withstand scrutiny under the APA. Neither Annatoyn's, Sheehan's, nor Leverette's memorandum provides any explanation why, if there were problems with the NEPA documents that had been prepared for the respective sales, those concerns could not be addressed through the on-going NEPA process. The agency's remedy was to identify and fix those problems before finalizing the document, not to silently abandon a statutorily required analysis. Nor do the memoranda contain any discussion of the various negative externalities associated with cancelling the lease sales. As an illustrative example, BLM recognizes the economic and social importance of oil and gas development to communities in many producing states. *See, e.g.*, A.R. at 631 (observing that revenue from oil and gas production funds law enforcement, infrastructure, first responder services, primary and secondary education, clinics, hospitals, and other civil services); *id.* at 1175 (emphasizing that oil and gas revenues account for one-third of New Mexico's operating budget); *id.* ("The oil and gas industry has been a substantial contributor to the social setting and

- 41 -

economic basis of Dewey County, Oklahoma."). Yet none of the memoranda in the administrative record recommending lease sales be cancelled includes *any* discussion of the impacts lost or delayed revenues might have on state and local governments.[20]

Nor do the memoranda include any discussion of the impact cancellation of the lease sales will have on Petitioners' members and other stakeholders who justifiably relied on BLM's existing resource management plans, leasing regulations, and the statutory mandate that lease sales be held quarterly. Having accounted for existing law and prior government practice in managing their operations, oil and gas operators developing federal lands are now at risk of having the economics of those operations undermined by elimination of the opportunity to regularly bid on nominated parcels on a predictable schedule.

"[A]gencies may not impose undue hardship by suddenly changing direction, to the detriment of those who have relied on past policy." *Grace Petroleum Corp. v. Fed. Energy Regul. Comm'n*, 815 F.2d 589, 591 n.4 (10th Cir. 1987). Because BLM has failed to identify substantial evidence to support cancellation of the first and second quarter lease sales, because the reasons for those cancellations are

---

[20] State and local governments have already lost – or at the very least, have had significantly delayed – their share of bonus revenue that lease sales generate even before a single hydrocarbon molecule is extracted.

inadequately explained, and because BLM "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, federal Respondents' cancellation of the lease sales is arbitrary and capricious and must be reversed.

### C.  THE CANCELLATIONS ARE PROCEDURALLY DEFECTIVE.

Through coordinated action involving the President, the Secretary, and BLM, federal Respondents have now cancelled the sales scheduled for the first and second quarters of 2021, missed the deadline to conduct lease sales in the third quarter of 2021, acknowledged that they do not intend to conduct lease sales in the fourth quarter of 2021, and abandoned the practice of conducting quarterly lease sales at least for some unspecified and indeterminable amount of time in the future. These "concerted actions to implement a specific policy or plan," executed in the form of "systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive," constitute the type of "major federal action" that should have required NEPA review. *See* 40 C.F.R. § 1508.1(q)(3)(iii). BLM failed to conduct that review.

Numerous aspects of BLM's decision making implicate NEPA requirements that were not met. Cancellation of lease sales has the effect of removing millions of acres that are open to oil and gas development under applicable resource management plans from the available inventory of oil and gas leasing. In other words, despite resource management plans indicating that these lands are open for

nomination and leasing, BLM is treating the lands as if they are not. The result is tantamount to an amendment to the controlling resource management plans. But "[a]mendments to [a resource management plan] . . . require environmental analysis under NEPA." *Nat. Res. Def. Council v. McCarthy*, 993 F.3d 1243, 1246 (10th Cir. 2021). BLM has not undertaken any process – through NEPA or otherwise – to re-classify lands included in the cancelled lease sales as closed to oil and gas development or otherwise amended the applicable resource management plans in any way.

The cancellation of lease sales is a meaningful adjustment to the status quo with environmental and socioeconomic impacts that required NEPA analysis. Cancelling lease sales does nothing to reduce demand for or consumption of oil and gas products. Yet BLM has not taken a hard look (or any look) at the environmental impact of shifting production from federal lands to non-federal domestic and foreign sources, where environmental standards may be less stringent and production less sustainable.[21] *See WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1226 (10th Cir. 2017) (observing that agencies must analyze, among other

---

[21] Respondents cannot credibly argue that the shift in production from federal land to non-federal lands was not reasonably foreseeable when, as referenced above, *see infra* n. 18, the Biden Administration has affirmatively requested that non-federal, foreign producers increase their crude oil production.

- 44 -

categories, "reasonably foreseeable indirect effects"). BLM has not examined the environmental justice impacts of shifting production from often rural and remote federal public lands to population-adjacent locations where minerals are privately owned.[22] *See Sierra Club v. Fed. Energy Regul. Comm'n*, 867 F.3d 1357, 1368 (D.C. Cir. 2017) (observing that NEPA requires an agency take a "hard look" at environmental justice issues). And as referenced above, *see* discussion *supra* Part III.B, BLM has not conducted any analysis of the socioeconomic and operational impacts of limiting federal leasing on state and local governments, Petitioners' members, or other private stakeholders.[23]

---

[22] While many of the shale plays in which federal lands dominate are in remote areas of the Mountain West region, there are numerous plays that lie adjacent to or directly on major metropolitan areas. *See* U.S. Energy Info. Admin., *Review of Emerging Resources: U.S. Shale Gas and Shale Oil Plays*, Fig. 1, at 6 (July 2011) (depicting major shale plays within the metropolitan areas of Pittsburgh, Dallas-Fort Worth, and Denver, among others), available at: https://www.eia.gov/analysis/studies/usshalegas/pdf/usshaleplays.pdf (last visited Aug. 30, 2021). An indefinite suspension of federal leasing has little or no effect on development in those areas.

[23] Most oil and gas wells drilled in the United States are hydraulically fractured shale wells. *See* U.S. Energy Info. Admin., *Initial prod. rates in tight oil formations continue to rise* (Feb. 11, 2016) (noting that production from tight oil formations accounted for more than half of total domestic production by 2015), available at: https://www.eia.gov/todayinenergy/detail.php?id=24932#tab_3 (last visited Aug. 30, 2021). The overwhelming majority of production from these wells typically occurs in the first eighteen to thirty-six months after a well is completed. *See id.* As a result, oil and gas operators must maintain a consistent drilling schedule and continually replenish their lease assets. Given that need, even a delay of six months between lease sales can impact operators' ability to maintain the economics of their

Perhaps most glaring, BLM has not conducted any examination of how cancelling lease sales will affect federal lands themselves. Revenues from oil and gas development on federal leases is the primary source of funding for conservation on federal lands. Under the Great American Outdoors Act, Pub. L. 116-152, 134 Stat. 682 (Aug. 4, 2020), fifty percent of all energy development revenue payable to the United States, up to $1.9 billion annually, are to be deposited into the National Parks and Public Legacy Restoration Fund. *See* 54 U.S.C. § 200402(b)(1). This money is to be used "for priority deferred maintenance projects in the [National Park] System, in the National Wildlife Refuge System, on public land administered by the [BLM], for the Bureau of Indian Education schools, and in the National Forest System." *Id.* § 200402(e)(1). Because this provision is effective only through the close of fiscal year 2025, *see id.* § 200402(b)(1), leasing policies that diminish the federal government's ability to maximize this revenue stream in the near term directly undermine the federal government's ability to protect, restore, and enhance these public assets. The administrative record reveals that BLM disregarded these impacts entirely.

---

development projects. Yet BLM failed to undertake any analysis to evaluate any of the foreseeable environmental, operational, or socioeconomic impacts likely to result if oil and gas fields are abandoned prematurely or operators of existing fields are economically undermined.

Like all federal agencies, BLM was required, "to the fullest extent possible," to comply with NEPA when taking "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). While BLM may attempt to characterize the cancellation of leases as an effort to "leave nature alone" by precluding commercial activity on federal lands, failing to conduct statutorily required lease sales "will certainly have a demonstrable impact on the physical environment – the world around us, so to speak – and is the very action upon which Congress intended NEPA to apply." *Idaho ex rel. Kempthorne v. U.S. Forest Serv.*, 142 F. Supp. 2d 1248, 1259 (D. Idaho 2001) (citing *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983)). Because BLM had a statutory obligation to complete NEPA analyses before cancelling lease sales and failed to meet that obligation, the cancellations are procedurally defective and must be reversed.

## IV. **CONCLUSION**.

Federal Respondents' cancellation of oil and gas lease sales violates the Secretary's statutory obligations and is irreconcilable with Congressional will. The Secretary has discretion to manage numerous aspects of oil and gas leasing on federal lands. But that discretion does not endow the Secretary with the power to disregard statutory mandates or excuse BLM from its obligations under administrative law to adequately explain and support with substantial evidence

- 47 -

agency action. Because BLM's cancellation of all oil and gas lease sales in 2021 is inconsistent with federal Respondents' obligations under substantive and administrative law, the Court should vacate those cancellations and enter an order requiring that: (i) BLM immediately reinstate the canceled oil and gas lease sales; (ii) all cancelled sales be held as expeditiously as logistical arrangements allow; and (iii) BLM adopt immediately revised lease sale schedules that comply with the terms of the Mineral Leasing Act and other applicable law.

Submitted respectfully this 30th day of August, 2021,

*/s/ Mark S. Barron*
L. Poe Leggette
Mark S. Barron
Alexander K. Obrecht
BAKER & HOSTETLER LLP.
1801 California Street, Suite 4400
Denver, Colorado 80202
Telephone: 303.861.0600
Facsimile: 303.861.7805
pleggette@bakerlaw.com
mbarron@bakerlaw.com
aobrecht@bakerlaw.com

*Attorneys for Western Energy Alliance & Petroleum Association of Wyoming*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 30, 2021, a copy of the foregoing
**PETITIONERS' OPENING MEMORANDUM ON THE MERITS** was
electronically filed with the Clerk of the Court using the CM/ECF system, which
will send notification of such filing to all counsel of record.


*/s/ Mark S. Barron*
Mark S. Barron

- 49 -