**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**

WESTERN ENERGY ALLIANCE and
PETROLEUM ASSOCIATION OF WYOMING,

        Petitioners,

    v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the
United States; DEB HAALAND, in her official capacity as
Secretary of the Interior; and THE UNITED STATES BUREAU
OF LAND MANAGEMENT,

        Respondents, and

CENTER FOR BIOLOGICAL DIVERSITY, *et al.* ("Conservation
Groups"), and ALTERRA MOUNTAIN COMPANY, *et al.*
("Business Coalition"),

        Intervenor-Respondents.

**No. 21-CV-13-SWS**
**(Lead Case)**

---

STATE OF WYOMING,

        Petitioner,

    v.

THE UNITED STATES DEPARTMENT OF INTERIOR;
DEBRA ANNE HAALAND, in her official capacity as
Secretary of the Interior; THE BUREAU OF LAND
MANAGEMENT; NADA CULVER, in her official capacity
as Acting Director of the Bureau of Land Management; and
KIM LIEBHAUSER, in her official capacity as the Acting
Director of the Wyoming State Bureau of Land Management,

        Respondents, and

CENTER FOR BIOLOGICAL DIVERSITY, *et al.* ("Conservation
Groups"), and ALTERRA MOUNTAIN COMPANY, *et al.*
("Business Coalition"),

        Intervenor-Respondents.

No. 21-CV-56-SWS
(Joined Case)

## ORDER UPHOLDING AGENCY ACTION ON JUDICIAL REVIEW

These joined cases come before the Court under the Administrative Procedure Act (APA) for judicial review of the Department of Interior's (DOI) failure to lease any federal lands for the purpose of oil and gas development during the first and second quarters of 2021. The administrative record has been submitted and supplemented (Docs. 62, 71[1]); the parties and amicus have fully briefed the issues and provided exhibits and supplementation (Docs. 73, 74, 84, 86, 87, 88, 98, 101, 103, 108, 110, 111); and the parties presented oral arguments on the matter (Doc. 109). Having considered the parties' arguments and reviewed the record, the Court finds the challenged agency actions must be upheld.[2]

---

[1]  All citations to filed documents are to Case No. 21-CV-13-SWS as the lead case unless otherwise noted.

[2]  Frustratingly, this case illustrates the continued ping ponging from one executive administration to the next, confirming the administrative state we find ourselves in today. Not counting guidance documents, federal administrative agencies adopt three to five thousand final rules a year while Congress enacts two to four hundred laws a year. *West Virginia v. Environmental Protection Agency*, 142 S. Ct. 2587, 2619 (June 20, 2022), citing with approval R. Cass, *Rulemaking Then and Now: From Management to Lawmaking*, 28 Geo. Mason L. Rev. 683, 694 (2021). The issues raised in this case, along with offshore leasing, were raised in *Louisiana et al v. Biden*, 543 F. Supp. 3d 388 (W.D. La. 2021), in which the district court granted a preliminary injunction against the Government defendants' implementation of a "pause" on new oil and gas leases on public lands or in offshore waters as directed under Executive Order 14008, signed by President Biden on January 27, 2021. That preliminary injunction was appealed to the Fifth Circuit, which vacated and remanded the preliminary injunction on August 17, 2022. *Louisiana v. Biden*, --- F.4th ---, 2022 WL 3405854 (5th Cir. Aug. 17, 2022). The following day, the Western District of Louisiana issued its opinion on the merits of the parties' claims (*Louisiana v. Biden*, --- F. Supp. 3d ---, 2022 WL 3570933 (W.D. La. August 18, 2022)), finding in favor of Plaintiff States and granting a permanent injunction on their APA and ultra vires claims as to any lease sales canceled or postponed prior to March 24, 2021, but denying Plaintiff States' citizen suit claim or any lease sales canceled or postponed after March 24, 2021, which post-dated the filing of the lawsuit. *Id.*

The initial decision in the *Louisiana* case was followed by a decision in the District of Columbia, *Friends of the Earth v. Haaland*, --- F. Supp. 3d ---, 2022 WL 2545526 (Jan. 27, 2022) (finding that Bureau of Ocean Energy Management's exclusion of foreign consumption in greenhouse gas emissions calculation for purposes of NEPA and preparation of environmental impact statement (EIS) for sale of oil and gas leases under OCSLA was arbitrary and capricious, requiring the vacatur of lease sale). The decision in *Friends of the Earth* was preceded by a decision, also out of the District of Columbia, *WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237, 247-48 (D.C. 2020) (finding that BLM's supplemental environmental assessment regarding oil and gas leases in Wyoming failed to take "hard look" at greenhouse-gas emissions from current lease sales and those future lease sales in Wyoming and neighboring states and region). The *Bernhardt* decision was preceded by the decision in *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.C. 2019) (BLM's NEPA analysis of Wyoming oil and gas leases failed to adequately consider the impacts of climate change before authorizing oil and gas leasing on federal lands). Subsequent to the change in

## INTRODUCTION

The Mineral Leasing Act of 1920 (MLA), 30 U.S.C. §§ 181 *et seq.*, grants authority to the Secretary of the Department of Interior (DOI) to lease parcels of federal land for the purpose of developing natural resources (e.g., oil, coal, natural gas, sodium, potassium, etc.). The DOI Secretary postponed most scheduled lease sales in the first quarter of 2021 and did not conduct any lease sales in the second quarter of 2021. Petitioners allege these actions were not in accordance with governing law, arbitrary or capricious, and an abuse of discretion.

## STANDARD OF REVIEW OF AGENCY ACTION

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999) (internal quotation marks omitted). The Administrative Procedure Act includes a limited waiver of sovereign immunity that allows for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The APA sets forth the full extent of a court's authority to review an agency's action and provides as follows:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (1)   compel agency action unlawfully withheld or unreasonably delayed; and
> (2)   hold unlawful and set aside agency action, findings, and conclusions found to be—
>   (A)   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>   (B)   contrary to constitutional right, power, privilege, or immunity;
>   (C)   in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

---

administrations in 2021 and over the objections of various intervenors, the Plaintiffs and Federal Government Defendants miraculously reached a settlement resolving the issues raised in *Haaland* and two other related lawsuits, resulting in the voluntary dismissal by Plaintiffs of those cases. *See WildEarth Guardians v. Haaland*, --- F. Supp. 3d ---, 2022 WL 1773474 (D.C. June 1, 2022).

(D)     without observance of procedure required by law;

(E)     unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F)     unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

Reviewing agency action for its compliance with law is mostly a straightforward application of the law to the facts. In contrast, much has been written of the arbitrary-or-capricious, abuse-of-discretion, and substantial-evidence standards, which largely overlap one another.

When reviewing agency action under the arbitrary-or-capricious standard, the Court focuses on the decision-making process, not on its wisdom or "correctness." *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1575 (10th Cir. 1994). Under this "narrow" standard of review, the U.S. Supreme Court has said that

> an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). "The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse,* 42 F.3d at 1574 (citing *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43). The Court does not substitute its judgment for the agency's and should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 513–14 (2009) (internal citations

omitted).   Indeed, the Court must "presume that an agency action is valid unless the party challenging the action proves otherwise." *Defs. of Wildlife v. Everson*, 984 F.3d 918, 934 (10th Cir. 2020)  (quoting *Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1264 (10th Cir. 2020)).; *see also Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 793 (10th Cir. 2010) ("In performing arbitrary and capricious review, we accord agency action a presumption of validity; the burden is on the petitioner to demonstrate the action is arbitrary and capricious."). Additionally, "[t]he arbitrary-or-capricious standard, *see* 5 U.S.C. § 706(2)(B), and the substantial-evidence standard, *see* 5 U.S.C. § 706(2)(E), amount to a single substantive standard of review." *N. New Mexico Stockman's Ass'n v. United States Fish & Wildlife Serv.*, 494 F. Supp. 3d 850, 973 (D.N.M. 2020) (citing *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys.*, 745 F.2d 677, 683-84 (D.C. Cir. 1984)), *aff'd*, 30 F.4th 1210 (10th Cir. 2022). Similarly, the Tenth Circuit has described an "abuse of discretion" as "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011) (quoting *Attorney Gen. of Okla. v. Tyson Foods, Inc.,* 565 F.3d 769, 776 (10th Cir. 2009)). It is with these standards in mind that the Court undertakes review of Petitioners' claims.

## BACKGROUND

The MLA sets the backdrop for the parties' dispute in this case, and it provides that certain federal lands "which are known or believed to contain oil or gas deposits may be leased by the Secretary." 30 U.S.C. § 226(a).  It also requires leases to be offered for competitive bidding and says: "Lease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary...." 30 U.S.C. § 226(b).

The Department of Interior (DOI), acting through its Bureau of Land Management (BLM)

agency, held two lease sales in early January 2021, one for federal lands in Alaska and the other

for federal lands in New Mexico. (A.R. 2428.[3]) Additional lease sales were tentatively scheduled

for March 2021 by the BLM State Offices in Colorado, the "Eastern States" (the 31 states

bordering and east of the Mississippi River served by a single state office), Montana/Dakotas (a

single state office serving the three states), Nevada, Utah, and Wyoming. (*Id.*)

On the day of President Joseph Biden's inauguration, January 20, 2021, the Acting DOI

Secretary issued an order effectively suspending the authority of DOI Bureaus or Offices (e.g.,

BLM) to issue any federal leases, which they had been delegated the authority to do in the past,

and requiring all such federal leases to be submitted to a member of DOI's leadership for

authorization. (A.R. 1129-30.)

On January 25, 2021, the BLM Nevada Office confirmed internally via email that it was

postponing its March 2021 lease sale and issued a public erratum to that effect a couple of days

later, but no reason was stated. (A.R. 1131-32.)

Then on January 27, 2021, President Biden issued Executive Order 14008, titled "Tackling

the Climate Crisis at Home and Abroad," which provides in relevant part:

> **Sec. 208.** *Oil and Natural Gas Developments on Public Lands and in Offshore Waters.* To the extent consistent with applicable law, the Secretary of the Interior shall pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and in offshore waters, including potential climate and other impacts associated with oil and gas activities on public lands or in offshore waters. The Secretary of the Interior shall complete that review in consultation with the Secretary of Agriculture, the Secretary of Commerce, through the National Oceanic and Atmospheric Administration, and the Secretary of Energy. In conducting this analysis, and to the extent consistent with applicable law, the Secretary of the Interior shall consider whether to adjust royalties associated with coal, oil, and gas resources extracted from public lands

---

[3] The administrative record is available at Docs. 62 and 71. It consists of 2,683 consecutively numbered pages bates-stamped BLM_I000001 through BLM_I002683. The Court has omitted "BLM_I" and all preceding zeros when pinciting to the administrative record.

and offshore waters, or take other appropriate action, to account for corresponding climate costs.

Exec. Order No. 14008, 86 Fed. Reg. 7619, 7624-25 (Feb. 1, 2021) (A.R. 1138-39).

In early February 2021, the Colorado, Montana/Dakotas, Utah, and Wyoming BLM offices submitted requests to the DOI Assistant Secretary for Land and Mineral Management for authorization to conduct its March lease sales. (A.R. 1148-62.) The record does not demonstrate whether those applications were ever expressly granted or denied, but as shown below, they were effectively denied by the postponement of all March 2021 lease sales.

A few days later, BLM Utah switched gears and sought authority to postpone its March 2021 lease sale over concern the Environmental Assessment (EA) did not satisfy the then-recent federal court decision in *Rocky Mountain Wild v. Bernhardt*, 2:19-CV-00929 (2020 U.S. Dist. LEXIS 233142)[4], which had found a prior Utah EA inadequate. (A.R. 1163-64; *see also* A.R. 1914.) The BLM Deputy Director of Operations approved the postponement to give BLM Utah additional time to determine whether the recent court opinion required a new or amended EA. (A.R. 1164.) The next day, BLM Eastern States likewise sought authority to postpone its March 2021 lease sale over concern its EA needed additional air quality analysis in light of the then-recent federal court decision in *WildEarth Guardians v. Bernhardt*, 16-CV-01724 (D.D.C. Nov. 13, 2020), which determined the EAs for certain Wyoming lease sales violated the National Environmental Policy Act (NEPA) by lacking a sufficient analysis of greenhouse-gas emissions.[5] (*Id.* at 1165-66.) BLM's Deputy Director of Operations authorized this second requested

---

[4] *Rocky Mountain Wild v. Bernhardt*, No. 219CV00929DBBCMR, 2020 WL 7264914 (D. Utah Dec. 10, 2020), *appeal dismissed* (June 11, 2021), *appeal dismissed sub nom. Rocky Mountain Wild v. Haaland*, No. 21-4020, 2021 WL 6933075 (10th Cir. Nov. 22, 2021).
[5] *WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237 (D.D.C. 2020), *appeal dismissed sub nom. WildEarth Guardians v. Haaland*, No. 21-5006, 2021 WL 3176109 (D.C. Cir. Apr. 28, 2021).

postponement. (*Id.*)

On February 12, 2021, an Acting Deputy Solicitor for the DOI issued a memorandum recommending the March 2021 lease sales for Colorado, Montana/Dakotas, Utah, and Wyoming similarly be postponed over concern the EAs for the proposed lease sales did not satisfy NEPA because they lacked sufficient analysis of greenhouse-gas emissions. (A.R. 1169-70.) The memorandum explained this concern was driven by then-recent federal court decisions that had "remanded or vacated agency actions for want of proper analysis of greenhouse emissions." (*Id.* (citing *Columbia Riverkeeper v. United State Army Corps of Engrs.*, No. 19-6071, 2020 WL 6874871 (W.D. Wash. Nov. 23, 2020), and *WildEarth Guardians v. Bernhardt*, No. 16-1724, 2020 WL 6701317 (D.D.C. Nov. 13, 2020).) The memorandum asserted, "The parcels proposed for each of the above lease sale[s] are not now 'eligible' and 'available' because, at a minimum, BLM has not completed its NEPA analysis." (A.R. 1170.) The DOI Assistant Secretary for Land and Mineral Management concurred with the suggestion to postpone the March 2021 lease sales for Colorado, Montana/Dakotas, Utah, and Wyoming. (*Id.*) As of February 12, 2021, the BLM Wyoming website announced that "lease sales in Colorado, Montana, Utah, and Wyoming are postponed to confirm the adequacy of underlying environmental analysis." (*Id.* at 1172.)

Thus, save for the lease sales for Alaska and New Mexico held in January 2021, no lease sales on federal lands were conducted during the first quarter of 2021.

As for the second quarter lease sales, all were eventually postponed or canceled, but the DOI and BLM took a circuitous route to that end. BLM New Mexico had tentatively scheduled its next lease sale for the week of April 12, 2021. (A.R. 2428.) Based on the March 2021 postponements, BLM New Mexico announced in February 2021 that its April lease sale was also postponed. (*Id.* at 1183.) This turned out to be erroneous at the time, as the DOI Assistant

Secretary for Land and Mineral Management inquired into the postponement while noting there was "not a blanket policy even with direction in the EO [14008]." (*Id.* at 2427.) BLM leadership reported to the DOI Assistant Secretary for Land and Mineral Management:

> I'm sorry to say that there is/was much confusion in BLM-NM that led to them posting a postponement for the April sale when they saw all the March sales were postponed. Their "perception" that all future sales would be postponed was based on misinformation.

(*Id.* at 2424-25.) On or before February 24, 2021, BLM New Mexico sought authorization to hold its lease sale during the week of April 12, 2021.[6] (*Id.* at 1174-78, 2423, 2428-29.) In a notice dated March 1, 2021, BLM New Mexico announced it would conduct the lease sale on April 15, 2021, but the record is unclear whether this notice was ever published. (*Id.* at 2635-2672.) Instead, this lease sale was not to be because in the evening of March 1, 2021, the DOI Assistant Secretary for Land and Mineral Management sent the following email to BLM leadership asserting that second-quarter sales were being postponed pending further consideration of EO 14008:

> Department officials with delegated authority to approve fossil fuel authorizations, including onshore lease sales, are postponing further consideration of Quarter Two sales (including authorization of the sales) pending decisions on how the Department will implement the Executive Order on Tackling the Climate Crisis at Home and Abroad [EO 14008] with respect to onshore sales. The Department has not yet rendered any such decisions, but we hope to have further information in the coming weeks. In the meantime, please post the following update on the relevant website(s): "The oil and gas lease sale scheduled for April, 2021 has been postponed."

(*Id.* at 1180.)

New Mexico was the only lease sale scheduled for April 2021, but several other BLM State Offices (Colorado, Eastern States, Montana, Nevada, Utah, and Wyoming) had tentatively sought to hold their second-quarter lease sales in June 2021. (A.R. 2428.) No lease sales covering federal

---

[6] At the same time, several other BLM State Offices (Colorado, Eastern States, Montana, Nevada, Utah, and Wyoming) tentatively sought to hold their next lease sales in June 2021. (A.R. 2428.)

lands were held during the second quarter of 2021. The administrative record fails to reflect how or when the decision to postpone or cancel all second-quarter lease sales was made.

## DISCUSSION

The Court starts by examining what exactly is at issue in this judicial review action. Respondents and Intervenor-Respondents question Petitioners' standing to challenge some or all of the agency's actions. (Doc. 84 pp. 21-24; Doc. 86 pp. 32-34.[7])

### 1.    All Petitioners Lack Standing as to Second-Quarter Lease Sales

The procedural timing of Petitioners' complaints is important to understand the issue of Petitioners' standing to sue. Industry Petitioners in Case No. 21-CV-13-SWS filed their initial Petition for Review of Government Action (Doc. 1) on January 27, 2021, the day President Biden issued EO 14008. They filed an amended petition on February 23, 2021 (Doc. 4), and a second amended petition on March 17, 2021 (Doc. 8). Petitioner State of Wyoming in Case No. 21-CV-56-SWS filed its Petition for Review of Final Agency Action on March 24, 2021. (21CV56 Doc. 1.) As all of Petitioners' petitions and amendments were filed during the first quarter of 2021, the question is whether Petitioners have standing in this lawsuit to challenge any agency action regarding the postponement or cancelation of second-quarter lease sales.

"A federal court may hear cases only where the plaintiff has standing to sue." *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1164 (D.N.M. 2020). Standing comes in two flavors: constitutional standing and statutory standing (also referred to as "prudential standing"). *Id.* As the party attempting to invoke federal jurisdiction here, it is Petitioners' burden to establish standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). Additionally, "[s]tanding is determined as of the time the action is brought." *Nova Health Sys. v.*

---

[7] Pincites to the parties' briefs are to the page numbers assigned by the CM/ECF system at the top of each page.

*Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005); *see also Davis v. FEC*, 554 U.S. 724, 735 (2008) ("the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed").

The Court begins here by looking at prudential standing (also known as "statutory standing"). *See Colorado Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000) (noting "courts should avoid reaching constitutional issues when statutory determinations are decisive").

### 1.1    Statutory Standing under the Administrative Procedures Act

As noted earlier, the APA grants federal courts the authority to review "final agency action." 5 U.S.C. § 704.  Therefore, a petitioner must challenge a "final agency action" in order to have statutory (prudential) standing to seek judicial review under the APA.

The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]"  5 U.S.C. § 551(13); *see also* 5 U.S.C. § 701(b)(2).

> In *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), we distilled from our precedents two conditions that generally must be satisfied for agency action to be "final" under the APA.  "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.,* at 177–178, 117 S.Ct. 1154 (internal quotation marks and citation omitted).

*U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016).  Petitioners "have the burden of identifying specific federal conduct and explaining how it is 'final agency action' within the meaning of section 551(13)." *Colorado Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000).  Whether an agency's conduct constitutes "final agency action" under the APA is a question of law. *Id.*

The problem for Petitioners here is that at the time they filed their petitions for review, no final agency action exists in the administrative record concerning second-quarter lease sales. Petitioner Wyoming filed its petition for review most recently on March 24, 2021. (21CV56 Doc. 1.) As recounted earlier, the administrative record demonstrates that in the evening of March 1, 2021, the DOI Assistant Secretary for Land and Mineral Management sent an email to BLM leadership asserting that agency officials were

> postponing further consideration of Quarter Two sales (including authorization of the sales) pending decisions on how the Department will implement the Executive Order on Tackling the Climate Crisis at Home and Abroad [EO 14008] with respect to onshore sales. The Department has not yet rendered any such decisions, but we hope to have further information in the coming weeks. In the meantime, please post the following update on the relevant website(s): "The oil and gas lease sale scheduled for April, 2021 has been postponed."

(A.R. 1180.) This effectively postponed the BLM New Mexico lease sale scheduled for April 2021 and postponed "consideration" of the lease sales tentatively scheduled for June 2021. (*See* A.R. 2428.) It is significant, though, that this did not entirely postpone or cancel lease sales for Quarter Two. The DOI could have spent several weeks determining how it would "implement" EO 14008 and still hold lease sales during the second quarter of 2021. Federal regulation requires notice of a competitive lease sale to be posted at least 45 days before the auction date (30 U.S.C. § 226(f); 43 C.F.R. §3120.4-2), which means notice of a competitive lease sale needed to be posted during the first half of May 2021 in order to still be held before the end of the second quarter (end of June 2021). (*See* A.R. 2424 ("Therefore, it is highly likely that the sale date [for BLM New Mexico's second-quarter lease sale] would be moved and we have the flexibility to hold the sale NLT [not later than] the end of the Quarter (end of June).").) Thus, as of March 24, 2021, when Petitioner Wyoming filed the latter of the petitions for review, the administrative record does not demonstrate any consummation of the agency's decisionmaking process. The DOI's email on

March 1st to postpone April's lease sale along with consideration of the other auction requests while determining how to implement EO 14008 was interlocutory and non-final in nature. *(See id.* at 1180 ("The Department has not yet rendered any such decisions ...."*).)*

It is true the DOI and BLM went on to postpone or cancel all second-quarter sales after Petitioners filed their petitions for review in this case, but the Court does not consider that as part of the standing analysis because standing is determined at the time the action is instituted. *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) ("standing is determined at the time the action is brought ... and we generally look to when the complaint was first filed, not to subsequent events to determine if a plaintiff has standing"); *see also Louisiana v. Biden*, --- F. Supp. 3d ---, 2022 WL 3570933, at *9 (W.D. La. Aug. 18, 2022) (court lacked jurisdiction to review any agency action, including stop or pause of lease sales, occurring after suit was filed on March 24, 2021). There is nothing in the administrative record demonstrating the existence of a final agency action as to second-quarter lease sales at the time Petitioners brought their respective actions. Consequently, Petitioners do not have statutory (prudential) standing to challenge any agency action concerning second-quarter 2021 lease sales in this lawsuit.

### 1.2    Constitutional Standing under Article III

Even if Petitioners had statutory standing to challenge the postponement or cancelation of Quarter Two lease sales, the Court would find their Article III standing lacking.

Article III, Section 2 of the U.S. Constitution limits federal courts' jurisdiction to "Cases" and "Controversies." For a plaintiff to possess Article III standing, the law requires

> (1) that the plaintiff have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely,

as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 167 (1997).

Here, at the time Petitioners filed their petitions for review (no later than March 24, 2021), there was no concrete and particularized injury in fact concerning second-quarter lease sales. The administrative record shows no final decision had been made to postpone or cancel all second-quarter lease sales, and time remained for the DOI to determine how it would "implement" EO 14008 and still hold lease sales during the second quarter of 2021 with the required pre-sale notice. Thus, at the time Petitioners filed their petitions in this case, they had yet to suffer any concrete and particularized injury regarding Quarter Two lease sales; indeed, their alleged injury could only be conjectural and hypothetical because it had yet come to pass. Consequently, Petitioners do not have constitutional (Article III) standing to challenge any agency action concerning the postponement or cancelation of second-quarter 2021 lease sales in this lawsuit.

**2.      Industry Petitioners Lack Standing as to First-Quarter Lease Sales**

Along similar lines, Industry Petitioners (Western Energy Alliance and Petroleum Association of Wyoming) also lack prudential and constitutional standing to challenge any agency action concerning the postponement or cancelation of first-quarter lease sales. Industry Petitioners filed their petition for review on January 27, 2021, which is the point at which standing is determined. (Doc. 1.) They later filed amended petitions, but those are of no consequence to the standing analysis because the "standing of the original plaintiff is assessed at the time of the original complaint, even if the complaint is later amended." *S. Utah Wilderness All.*, 707 F.3d at 1153 (quoting *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.,* 402 F.3d 1198, 1202 n.3 (Fed. Cir. 2005)).

In their original petition, Industry Petitioners assert, "On January 27, 2021, the Secretary

of the Interior, acting at the President's direction, suspended indefinitely the federal oil and gas leasing program." (Doc. 1 p. 1.) The administrative record does not support this assertion. As of January 27, 2021, the only first-quarter auction postponed was in Nevada, but the decision to postpone Nevada's lease sale had been made several days earlier, not in response to EO 14008 or any program suspension by the DOI Secretary. (A.R. 1131.) As discussed earlier, all remaining first-quarter lease sales were postponed, but those postponements occurred days or weeks later. (*Id.* at 1163-72.) The administrative record does not demonstrate any final agency action as to first-quarter lease sales at the time Industry Petitioners filed their action. Consequently, Industry Petitioners do not have statutory (prudential) standing to challenge any agency action concerning first-quarter 2021 lease sales in this lawsuit.

Likewise, Industry Petitioners lack constitutional standing. Because the injury claimed in their original complaint (indefinite suspension of the federal oil and gas leasing program) did not exist at the time of the original complaint, they cannot show a concrete and particularized injury in fact concerning first-quarter lease sales. Moreover, as of January 27, 2021, lease sales were still tentatively set to occur in March 2021 for the BLM State Offices of Colorado, Eastern States, Montana/Dakotas, Utah, and Wyoming. (*See* A.R. 19-245 (Colorado EA and FONSI), 246-567 (Wyoming EA and FONSI), 568-670 (Montana/Dakotas EA), 806-983 (Utah EA and FONSI), 1025-1128 (Eastern States EA and FONSI).) Again, it is true that the DOI and BLM went on to postpone all first-quarter lease sales after Industry Petitioners filed their original petition for review in this case, but the Court does not consider that as part of the standing analysis because standing is determined as of the time the action is instituted. *S. Utah Wilderness All.*, 707 F.3d at 1153. Thus, at the time Industry Petitioners filed their original petition for review in this case (January 27, 2021), they had yet to suffer any concrete and particularized injury regarding the alleged

indefinite suspension of Quarter One lease sales; indeed, their alleged injury could only be conjectural and hypothetical because it had yet come to pass.  Consequently, Industry Petitioners do not have constitutional (Article III) standing to challenge any agency action concerning first-quarter 2021 lease sales in this lawsuit.

In sum, Petitioner Wyoming has standing to challenge the 2021 first-quarter lease sale postponements in this judicial review action, while Industry Petitioners lack standing to challenge either the first-quarter or second-quarter lease sale postponements or cancelations.  Thus, only the first-quarter lease sale postponements are at issue here.

### 3.    The First-Quarter Lease Sale Postponements Did Not Violate the Mineral Leasing Act (MLA).

Petitioner Wyoming contends the first-quarter lease sale postponements violated the MLA's requirement to hold quarterly lease sales.  (Doc. 74 pp. 39-44.)

"The MLA and accompanying regulations establish the procedures for development of oil and gas deposits on federal land." *W. Energy All. v. Salazar*, 709 F.3d 1040, 1042 (10th Cir. 2013). The MLA states in part:

> **(a)  Authority of Secretary**
> All lands subject to disposition under this chapter which are known or believed to contain oil or gas deposits may be leased by the Secretary.
>
> **(b)  Lands within known geologic structure of a producing oil or gas field; lands within special tar sand areas; competitive bidding; royalties**
> (1)(A)  All lands to be leased ... shall be leased as provided in this paragraph to the highest responsible qualified bidder by competitive bidding under general regulations in units of not more than 2,560 acres, except in Alaska, where units shall be not more than 5,760 acres.  Such units shall be as nearly compact as possible.  Lease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary.

30 U.S.C. § 226(a), (b).

First-quarter lease sales were held in 2021 for Alaska and New Mexico. (A.R. 2428.) The

remaining lease sales that had been tentatively scheduled for the first quarter were "postponed." (A.R. 1172.) The question concerns why those remaining first-quarter[8] lease sales were postponed. The administrative record does not support Petitioner State of Wyoming's assertion they were postponed or canceled because the DOI Secretary "adopted a final, binding decision to stop holding quarterly oil and gas lease sales in response to Executive Order 14008." (Doc. 74 p. 35.)

As recounted earlier, in February 2021, BLM Utah and BLM Eastern States requested and received permission from BLM leadership to postpone their March 2021 lease sales over concern the Environmental Assessments (EAs) for those lease sales, which had been completed earlier, would not satisfy the then-recent federal court decisions of *Rocky Mountain Wild v. Bernhardt* and *WildEarth Guardians v. Bernhardt*. (A.R. 1163-66.) Those requests for postponement were granted to allow those BLM State Offices additional time to determine whether new or amended EAs would be needed. Along similar lines, legal counsel for the DOI issued a memorandum in mid-February 2021 recommending the March 2021 lease sales for Colorado, Montana/Dakotas, Utah, and Wyoming be postponed over concern the EAs would not satisfy the then-recent federal court decisions of *Columbia Riverkeeper v. United State Army Corps of Engrs.* and *WildEarth Guardians v. Bernhardt* because the EAs did not adequately analyze greenhouse-gas emissions. (A.R. 1169-70.) The DOI Assistant Secretary for Land and Mineral Management concurred with the suggestion to postpone the March 2021 lease sales for Colorado, Montana/Dakotas, Utah, and Wyoming, which was quickly noticed on the relevant websites. (*Id.* at 1172.)

In short, the administrative record supports that postponing the first-quarter 2021 lease sales was done to ensure NEPA compliance with several then-recent federal court opinions that negated previously authorized oil and gas lease sales. The administrative record does not support

---

[8] Due to the lack of standing as noted above, this Court makes no determination as to the basis for not conducting second-quarter lease sales.

that first-quarter lease sales were postponed or canceled because the DOI Secretary decided to stop

holding all quarterly lease sales pursuant to EO 14008. Indeed, the administrative record supports

the opposite. (A.R. 2419 (as of February 24, 2021, "there's no blanket policy even with direction

in the EO").) And even if EO 14008 was a factor in the decision to postpone the first-quarter lease

sales, "a court may not reject an agency's stated reasons for acting simply because the agency

might also have had other unstated reasons." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573

(2019).

Even then, the question is whether the first-quarter postponements complied with the MLA.

After all, "[l]ease sales shall be held for each State where eligible lands are available at least

quarterly ...." 30 U.S.C. § 226(b). If eligible lands were available in those states where lease sales

were not held in the first quarter of 2021, then the DOI violated the MLA. "Eligible" and

"available" are not defined by Congress in the MLA, which necessarily delegates the matter to the

agency. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44

(1984).

> "'Eligible' lands comprise all lands 'subject to leasing, i.e, lands not excluded from
> leasing by a statutory or regulatory prohibition.' 'Available' lands are those 'open
> to leasing in the applicable [Resource Management Plan], ... when all statutory
> requirements and reviews have been met.'"

*W. Energy All. v. Zinke*, 877 F.3d 1157, 1162 (10th Cir. 2017) (quoting Amicus Br. at 6 n.2,

quoting in turn BLM Manual 3120.11). (*See also* A.R. 9 (BLM "has explained that 'available'

lands are those statutorily open to leasing under the MLA, that have met other statutory

requirements, and for which leasing is in the public interest" and "use 'eligible' for the lands not

closed [to leasing] by law"); A.R. 17 ("Eligible lands are available for leasing when all statutory

requirements and reviews, including compliance with the National Environmental Policy Act

(NEPA) of 1970 have been met.").)

Here, the postponed lease sales involved lands that were not "available" because the BLM Deputy Director of Operations or DOI Assistant Secretary for Land and Mineral Management determined the EAs, required by NEPA for lease sales, needed additional review and possible reworking due to recent caselaw. That is, the federal lands tentatively set for lease through competitive bidding in March 2021 had not satisfied all necessary statutory requirements. And nothing in the record, or the caselaw relied upon, suggests the BLM and DOI's decisions that the EAs needed additional consideration were unworthy of belief.

Petitioner Wyoming relies on language from 43 C.F.R. § 3120.1-1, which states in part: "All lands available for leasing shall be offered for competitive bidding under this subpart [Subpart 3120], including but not limited to: ... (e) Lands included in any expression of interest." The plain language of this regulation, though, establishes that it is not an attempt to define everything that constitutes "available" lands. Instead, it describes which available lands are to be offered for competitive bidding, as distinguished from those that may be offered for noncompetitive leasing. *Compare* 43 C.F.R. § 3120.1-1 *with* § 3110.1(b) ("Only lands that have been offered competitively ..., and for which no bid has been received, shall be available for noncompetitive lease."). Additionally, Petitioner Wyoming pointed to a statement by the DOI Secretary published in the Federal Register in 1988 that said, "The term 'available' means any lands subject to leasing under the Mineral Leasing Act." (Doc. 74 p. 42 (quoting 53 Fed. Reg. 22814, 22828 (June 17, 1988)).) Again, it is clear this was not an attempt to exhaustively define or redefine what constitutes "available" lands. It was a small, introductory portion of a response to several public comments submitted as part of the public comment period. This single sentence from a response to a public comment carries little, if any, value or applicability to this case, and it does not operate to render the contemplated first-quarter 2021 leases "available" under 30 U.S.C. § 226(b) because the fact

remains, like it or not, that recent caselaw created a cloud over the sufficiency of many of the existing EAs.

Accordingly, the administrative record does not reveal a violation of the MLA's requirement that a quarterly lease sale be held "where eligible lands are available."

4.    **The First-Quarter Lease Sale Postponements Were Not Arbitrary and Capricious or an Abuse of Discretion.**

Petitioner Wyoming also argues the failure to hold quarterly lease sales was arbitrary and capricious because it ignored the mandatory language of the MLA.  (Doc. 74 pp. 44-48.)

As already discussed, the MLA requires quarterly lease sales to be held in states "where eligible lands are available."  30 U.S.C. § 226(b).  The administrative record adequately supports the DOI's decision that the lands were not "available" because additional analysis was needed to ensure compliance with NEPA due to no less than three then-recent federal court decisions having found similar EAs inadequate.  Its decision does not run counter to the evidence before the DOI at the time.  The record demonstrates the DOI examined the relevant data and articulated a rational connection between the federal court decisions and the decision to postpone the remaining first-quarter 2021 lease sales in an attempt to ensure those EAs would satisfy the standards required by the new caselaw.  The DOI's path to and reason for its first-quarter postponements is discernable and supported by substantial evidence in the administrate record.

Moreover, the decision to postpone the remaining first-quarter lease sales was not an abuse of the DOI Secretary's discretion.  The DOI Secretary enjoys wide discretion when it comes to determining which federal lands will be offered for oil and gas development.  *See* 30 U.S.C. § 226(a) (lands with known or suspected oil or gas deposits "**may** be leased by the Secretary") (emphasis added).

Before the MLA was amended by the Federal Onshore Oil and Gas Leasing Reform

Act of 1987 ("Reform Act"), it was well established that the Secretary had extremely broad discretion and was not obligated to issue any lease on public lands. *See Udall v. Tallman,* 380 U.S. 1, 4, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) (even though the MLA "directed that if a lease were issued on such a tract, it had to be issued to the first qualified applicant, it left the Secretary discretion to refuse to issue any lease at all on a given tract"). We consistently affirmed the broad discretion afforded to the Secretary under the MLA. In *Justheim Petroleum Co. v. Dep't of the Interior,* 769 F.2d 668 (10th Cir. 1985), a case arising in the non-competitive bidding context, we held that "the Secretary is under no requirement to issue or reject lease applications within a certain time limit." *Id.* at 670. Similarly, in *McDonald v. Clark,* 771 F.2d 460 (10th Cir. 1985), we concluded that the Secretary had the discretion to withdraw a lease from the non-competitive leasing process even after he had determined the first qualified applicant. *Id.* at 463. We held that until the Secretary actually acts to issue the lease, the applicant has only a "hope or ... expectation of a lease" and not a vested right. *Id.*

The MLA, as amended by the Reform Act of 1987, continues to vest the Secretary with considerable discretion to determine which lands will be leased. Under 30 U.S.C. § 226(a), "[a]ll lands subject to disposition under this chapter which are known or believed to contain oil or gas deposits *may be leased* by the Secretary," (emphasis added) and the Secretary still retains the authority to determine which lands are "to be leased" under § 226(b)(1)(A).

*W. Energy All. v. Salazar,* 709 F.3d 1040, 1044 (10th Cir. 2013) (internal footnote omitted). "It is undisputed that, pursuant to this statute, prior to a lease sale the Secretary has discretion to decide which lands will be offered for lease." *Impact Energy Res., LLC v. Salazar,* No. 2:09-CV-435, 2010 WL 3489544, at *5 (D. Utah Sept. 1, 2010), *aff'd,* 693 F.3d 1239 (10th Cir. 2012). This discretion extends "to pre-sale decisions about whether or not to offer a parcel of land in a lease sale." *Id.*

Here, the DOI Secretary was within her discretion to determine, pre-sale, that the remaining first-quarter sales should be postponed to allow further consideration of the EAs in light of the federal court decisions finding similar EAs insufficient. The Court finds the DOI Secretary's conclusion that the federal parcels were not available at the time because it was unclear whether the statutorily-required NEPA analysis was sufficient was not whimsical, manifestly unreasonable, or unworthy of belief.

The administrative record does not establish the decision to postpone the remaining first-quarter 2021 lease sales was arbitrary, capricious, or an abuse of discretion.

**5.     The First-Quarter Lease Sale Postponements Did Not Violate the Federal Land Policy and Management Act (FLPMA).**

Petitioner Wyoming further contends the first-quarter lease sale postponements violated the Federal Land Policy and Management Act (FLPMA) because the DOI unlawfully withdrew federal land from sale and entry and unlawfully amended existing Resource Management Plans (RMPs).  (Doc. 74 pp. 49-57.)

> FLPMA governs the BLM's management of federal lands and
>
> directs the BLM to manage public lands "under principles of multiple use and sustained yield."  43 U.S.C. § 1732(a); *see also* 43 U.S.C. § 1701(a)(8) (listing purposes and values that should be considered in the management of public lands). "'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put...." *SUWA,* 542 U.S. at 58, 124 S.Ct. 2373 (citing 43 U.S.C. § 1702(c)).  These uses include, but are not limited to, "recreation range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values.'"  *Id.*

*Utah Shared Access All. v. Carpenter,* 463 F.3d 1125, 1128–29 (10th Cir. 2006).

FLPMA defines "withdrawal" to mean "withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program."  43 U.S.C. § 1702(j).  "A withdrawal makes land unavailable for certain kinds of private appropriation under the public land laws."  *S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 784 (10th Cir. 2005), *as amended on denial of reh'g* (Jan. 6, 2006).  Removing otherwise eligible and available federal land from oil and gas leasing can constitute a "withdrawal," and withdrawals must follow FLPMA's procedural requirements (including notice and an inventory of current natural resources uses and their values).

*Mountain States Legal Found. v. Andrus*, 499 F. Supp. 383, 391 (D. Wyo. 1980).

The first-quarter auction postponements here were not a violation of FLPMA because they were not done "for the purpose of limiting activities under [general land] laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program." 43 U.S.C. § 1702(j).  As shown and supported by the administrative record, the postponements were done to allow additional consideration of the EAs in light of the federal caselaw finding many similar EAs inadequate under NEPA.  Nothing in the record suggests the postponements permanently removed those federal lands from being considered for leasing; indeed, nothing in the record even suggests the postponements were intended for a significant period of time. *Cf. Andrus*, 499 F. Supp. at 386 ("oil and gas lease applications have been pending several years without action by the Secretary"); *Mountain States Legal Found. v. Hodel*, 668 F. Supp. 1466, 1469 (D. Wyo. 1987) ("At the time this action was filed on January 15, 1986, there were at least 72 lease offers, some as old as twelve years, pending for lands located in the Shoshone National Forest.").

Petitioner Wyoming also alleges "the Secretary's action violates dozens of governing RMPs across the United States that designate millions of federal acres as 'available' to oil and gas development" and *de facto* amended the RMPs without abiding by the required procedures. (Doc. 74 pp. 54-55.)  "Amending a resource management plan is a 'major federal action' whose potential environmental impacts must be assessed under NEPA." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 689 (10th Cir. 2009).  Again, the administrative record shows the first-quarter lease postponements at issue in this case were done to allow time for additional analysis in light of recent caselaw.  The record does not support Petitioners' claim that the first-quarter postponements were caused by or resulted in significant changes to land use plans. *See Or. Natural Res. Council Fund v. Forsgren*, 252 F. Supp. 2d 1088 (D. Or. 2003) (narrower

definition of lynx habitat resulting in reduction in such habitat was a "significant" change to land use plan that required public comment period and an Environmental Impact Statement).  The record evidence does not support Petitioner Wyoming's claim that the DOI Secretary "unilaterally determined millions of acres of federal land in Wyoming and across the United States are simply no longer 'available' for leasing." (Doc. 74 p. 55.)

Thus, Petitioner Wyoming has not shown the postponements of the first-quarter lease sales in 2021 violated FLMPA.

6.      **The First-Quarter Lease Sale Postponements Did Not Violate the National Environmental Policy Act (NEPA).**

Finally, Petitioner Wyoming argues the first-quarter postponements violate NEPA. (Doc. 74 pp. 58-69.) It contends, "In the name of further environmental review, the Secretary suspended oil and gas leasing nationwide without first considering the environmental impacts as required by NEPA." (*Id.* p. 58.) As the Court hopes is clear by now, the premise of this claim—that the DOI Secretary suspended oil and gas leasing nationwide—is simply not supported in this administrative record. (*See* A.R. 1180 (noting that as of March 1, 2021, "[t]he Department has not yet rendered any [] decisions" "on how the Department will implement" EO 14008).) The first-quarter 2021 lease sale postponements are at issue because that is all Petitioner Wyoming has standing to challenge in this judicial review action. Petitioner Wyoming's NEPA arguments fail because its premise, that a nationwide suspension of oil and gas leasing was put into effect, does not exist in this administrative record before this Court.

Considering only that which Petitioner Wyoming has standing to challenge in this case, the NEPA argument becomes: Whether the DOI Secretary's decision to postpone the remaining first-quarter lease sales to allow for additional NEPA analysis violated NEPA. Stated thusly, the fallacy becomes clear. Petitioner Wyoming's argument would require the DOI to undertake a separate

EA before it could postpone a lease sale to undertake additional analysis of a previous EA. While this additional delay would be undesirable, it is also the only remedy available if Petitioner Wyoming were to prevail on its NEPA claim. The appropriate remedy under this scenario would be to remand the matter to the DOI to conduct an additional EA, not to order a lease auction be held. Even if Petitioner Wyoming's NEPA claim was viable (it's not), the Court doubts it would be satisfied with this remedy.

Petitioner Wyoming's NEPA claim fails because its premise that the DOI Secretary implemented a nationwide policy suspending lease sales is not supported by the administrative record.

## CONCLUSION AND ORDER

Industry Petitioners filed their lawsuit seeking judicial review of the Department of Interior's actions on January 27, 2021. Their standing to challenge agency action is judged as of that date, but the actions Industry Petitioners complain of here, if they occurred at all, did not occur until after January 27, 2021. Industry Petitioners do not have standing to challenge later agency action because such later action is necessarily not "final agency action" at the time their standing is determined.

Petitioner State of Wyoming filed its petition for review on March 24, 2021. As of that date, the DOI had postponed all March 2021 lease sales, which Petitioner Wyoming has standing to challenge in this lawsuit. However, at that time, the DOI still had time to hold second-quarter lease sales. Thus, the second-quarter lease sale postponements or cancelations are necessarily not "final agency action" at the time Petitioner Wyoming's standing was determined, and therefore Petitioner Wyoming lacks standing to challenge anything beyond the first-quarter lease sale postponements in this lawsuit. *See Donelson v. United States Through Dep't of the Interior*, 730

F. App'x 597, 603 (10th Cir. 2018) (affirming trial court's dismissal for lack of jurisdiction based on the plaintiff's lack of standing).

In examining the first-quarter 2021 lease sale postponements, the administrative record before this Court shows the first-quarter 2021 lease sale postponements did not violate the Mineral Leasing Act, the Federal Land Policy and Management Act, or the National Environmental Policy Act, and the postponements were not arbitrary, capricious, or an abuse of discretion. Substantial evidence in record supports the DOI Secretary's decision to postpone the March 2021 lease sales over concerns that the associated Environmental Assessments did not satisfy recent federal court caselaw that had found similar EAs lacked sufficient NEPA analysis.

**IT IS THEREFORE ORDERED** that Petitioners lack standing to challenge the DOI's failure to conduct second-quarter 2021 oil and gas lease sales, and the DOI's decisions to postpone the March 2021 oil and gas lease sales are hereby **AFFIRMED**.

**DATED:** September _2ND_, 2022.

Scott W. Skavdahl
United States District Judge